**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 16-10345-HCM |
| KLD ENERGY TECHNOLOGIES, INC. | § | |
| | § | |
| DEBTOR. | § | CHAPTER 11 |
| | § | |
| EIN: 32033226500 | § | |
| | § | |
| 1611 HEADWAY CIRCLE | § | |
| AUSTIN, TEXAS 78754 | § | |
| | § | |
| | § | |

**DECLARATION OF MARK WABSCHALL IN SUPPORT OF THE
DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Mark Wabschall, hereby declare under penalty of perjury:

1. "I am the Chief Financial Officer of KLD Energy Technolgoies, Inc. (the "Debtor" or "KLD"). In this capacity, I am generally familiar with the Debtor's operations, businesses, financial affairs, and books and records.

2. "On March 25, 2016, KLD voluntarily commenced this case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is operating its business and managing its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or creditors committee has been appointed in the Chapter 11 Case.

3. "I submit this declaration (the "First Day Declaration") to provide an overview of the Debtor and the Chapter 11 Case and to supplement the Debtor's chapter 11 petition and "first day" motions and applications (each, a "First Day Motion," and collectively, the "First Day Motions"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtor's operations and finances,

AUS-6237840-1 527825/1

information learned from my review of relevant documents, information supplied to me by other members of the Debtor's management teams or the Debtor's advisors, and/or my opinion based upon my knowledge and experience and information I have reviewed concerning the Debtor's operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtor and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4. "The purpose of this First Day Declaration is to familiarize the Court with the Debtor and the relief it seeks in the First Day Motions. To that end, this First Day Declaration is organized as follows:

## II.
## THE DEBTOR'S BUSINESS, OPERATIONS, AND CAPITAL STRUCTURE

**A. Debtor's Businesses and Operations**

5. "The Debtor, a Texas corporation, formed in July 2008 by the conversion of KLD Energy Technologies LLC, a Texas limited liability company formed in July 2007. KLD is privately-owned Austin, Texas-based technology company with its headquarters and an engineering lab in Austin, Texas and Advanced Research facility near San Jose, California.

6. "KLD is focused on developing and commercializing innovative green technologies that have a positive global impact on people's lives and the environment. These disruptive technologies are based upon innovative sciences that represent a paradigm shift in design and enable the production of highly efficient, less polluting products. KLD's mission is to develop innovative, sustainable propulsion technologies for the electric vehicle markets using its oneDRIVE™ electric propulsion system. The KLD oneDRIVE™ propulsion and generation system is also applicable in a broad range of markets, including: elevators, air conditioners, pumps, generators and other applications. Focused on the research, development and

commercialization of advanced and sustainable technologies, KLD has received worldwide interest. The Company recently won an Edison Award for innovation and excellence for energy sustainability for transportation.

7. "Since inception in 2007, KLD has incurred over $30 million in research and development costs in commercializing its electric motor system technology with over 50 patent applications. Beginning in 2011, KLD commenced production of the initial version of its electric motor and controller to an electric scooter manufacturer in Malaysia. This customer has reported that over 3 million kilometers have been driven on scooters with KLD's electric motor and controller without any maintenance or performance issues.



B. **Capital Structure**

8. "KLD is a development-stage company that has primarily been incurring research and development and engineering costs in connection with the commercialization of its technologies. The company has raised more than $65 million in capital in the form of equity and debt since inception in 2008. Funding has predominantly been used for research and development, engineering design, prototyping, pilot-production, and manufacturing of KLD's oneDRIVE™ electric propulsion system.

9. "As of March 15, 2016, KLD has issued 28.1 million shares of capital stock comprised of 6.5 million shares of Common Stock and 21.6 shares of preferred stock. Of the

6.5 million common shares approximately 5.5 million are founders shares issued to founder and CEO and 1 million are issued to CSO and technology inventor Ray Caamano by way of warrant exercise in connection to the licensing of his electric motor technology. The 21.6 million preferred shares were issued in conjunction of raising approximately $40 million, including $5 million from the Emerging Technology Fund of the State of Texas and the remainder from primarily individual investors.

10. "The shareholders have authorized up to 13 million shares of Common Stock that have been reserved for stock options to be issued to employees and directors. As of March 15, 2016, stock options to purchase approximately 12.5 million shares of Common Stock have been issued. The stock options have an exercise price ranging from $0.40 to $0.65 per share.

11. "In connection with raising capital, the Company has issued warrants to purchase 65 million shares of the Company's Common Stock. Of the warrants issued, 23.3 million have exercise prices at $3.00 per share or above, 29.8 million have an exercise price equal to $2.25 per share, and 11.9 million have exercise prices ranging from $0.32 - $2.20 per share.

12. "The Company has 27.4 million of callable secured convertible notes and secured debt which can be converted or reinvested into Series C Preferred Stock at the $2.25 per share offering price.

### III.
### EVENTS LEADING TO BANKRUPTCY

13. "Since its inception, a number of factors have coalesced that significantly strained the Debtor's ability to fund its operations and service its outstanding indebtedness and, ultimately, led to the Debtors' filing of the Chapter 11 Case. The electric motor systems industry is subject to rapid technological change, requiring the Debtor to respond to changes in product function and quality and remain cost competitive. As a result the commercialization of

the Debtor's technology has been delayed. The delay in adoption of the Debtor's technology by customers and industry partners resulted in a lack of meaningful revenue and continued operating losses.

14. "The Debtor needed to raise additional debt and equity capital to fund its operations. At the Debtor's Annual Shareholder meeting in December 2014, the Debtor presented a financing plan, whereby the Debtor would obtain $25 million of long-term debt payable at the end of five years. The proceeds of this debt financing would be used to retire or convert all existing debt and raise additional working capital. In addition the shareholders authorized up to an additional $30 million of preferred stock to fund its growth plans.

15. "During the fourth quarter of 2014, the Debtor executed a $25 million Debt Financing Agreement with Stone Development, a private investment group. Originally the funding was scheduled for the first quarter of 2015; however, Stone Development incurred delays and rescheduled the funding until the third quarter of 2015. Despite providing a corporate guaranty of $8 million of the Debtor's bridge loans, Stone Development continues to encounter delays in funding its $25 million commitment.

16. "Because of the uncertainty of obtaining long-term debt financing to retire existing indebtedness, the Debtor was not able to raise any meaningful levels of equity in 2015. In January 2016, the Company reached out to our existing investors for additional funding and held a Special Shareholders' meeting in February 2016. The Company was unable to obtain sufficient commitments from its existing investors to avoid filing for bankruptcy protection. The Company intends to use the bankruptcy period to negotiate with the Prepetition Secured Parties to reach a consensual resolution and restructuring of the outstanding debt.

# IV.
# FIRST-DAY MOTIONS[1]

17. "The Debtor has filed a number of First Day Motions. I believe that, among other things, the relief requested in the First Day Motions is necessary to enable the Debtor to operate with minimal disruption during the pendency of this Chapter 11 Case, thereby preserving and maximizing the value of the Debtor's estate and assisting the Debtor in achieving a successful reorganization. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below. I have reviewed each of the First Day Motions, and the facts set forth therein are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

**A.  Emergency Motion for Order Authorizing the Debtors to Incur Postpetition Secured Super-priority Indebtedness; and Scheduling a Final Hearing Thereon ("DIP Financing Motion")**

18. "The Debtor seeks an interim order authorizing it to borrow up to $475,000 from the DIP Lender for the payment of expenses listed in Exhibit E of the DIP Financing Motion.

19. "All funds borrowed under the Interim Order will be secured by first-priority liens on all of the Debtor's assets, as well as super-priority claims with a priority over all administrative claims granted pursuant to Bankruptcy Code Sections 503(b) and 507(b), as contemplated by the Term Sheet and Term Sheet Amendment attached as Exhibits A and B to the DIP Financing Motion. The terms and conditions of the DIP loan agreement set forth in Exhibit C to the DIP Financing Motion will apply to the interim loan. The liens that would secure any DIP Loan borrowings undertaken by the Debtor would be senior to all liens other

---

[1] Capitalized terms used in this Part of this Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Motion. To the extent this Declaration is inconsistent with any provision of the First Day Motions, the applicable First Day Motion shall govern.

than the Carve-Out. Such liens would prime the existing liens of the Pre-Petition Secured Debt holders.

20. "On the Petition Date, the Debtor had approximately $8,345,597 of outstanding secured note obligations as set forth on the lien schedule attached as <u>Exhibit D</u>. The prepetition secured claims held against the Debtor are based on convertible debt instruments, as well as one of the Debtor's commercial real estate leases (collectively, the "<u>Pre-Petition Debt Documents</u>," and the debt set forth in such documents, the "<u>Pre-Petition Secured Debt</u>").

21. "The majority of the Pre-Petition Secured Debt is secured by liens against substantially all of the Debtor's personal property. However, some of the liens securing a portion of the Pre-Petition Secured Debt were filed within ninety (90) days of the petition date and are subject to avoidance under Bankruptcy Code § 547.

22. "The Debtor seeks financing under the DIP Loan in order to both satisfy its working capital needs and fund the cost of administering its Bankruptcy Case. All such cash usage will be made pursuant to the Budget, subject to permitted variances of 10% per line item and in the aggregate.

23. "The Debtor intends, to the extent possible, to sustain their business operations through DIP Loan proceeds. The Debtor believes that sufficient asset value exists in the Debtor to adequately protect the holders of Pre-Petition Secured Debt, even with the addition of the $2,500,000 DIP Loan. Under a variety of valuation methods (Grow And Hold, 2020 Sale Exit, Revenue Growth, Capitalization Multiple), the Debtor believes the company is currently worth approximately $20,000,000. Although prior valuations have set the value of the Debtor at approximately $80,000,000 in mid-2015, this valuation is based upon the Debtor's current status of being in a Chapter 11 bankruptcy case, with little revenue or cash reserves. The prior

valuation was based upon the Debtor's technology as utilized by the Debtor's strategic partners, thereby generating revenue from engineering fees and royalties sufficient to justify the valuation.

24. "Under the DIP Lender's current proposal, the $2,500,000 DIP Loan would be converted to equity in the Reorganized Debtor, with the DIP Lender gifting 80% of the equity pursuant to a confirmed plan of reorganization (as outlined in the Term Sheet) and retaining 20% of the senior equity in the Reorganized Debtor. Based on this proposed equity allocation, which is a result of negotiations with individuals and entities possessing significant knowledge of the Debtor's business and potential, the Debtor's valuation as a going concern is more conservatively estimated at approximately $12,500,000. Given that the Pre-Petition Secured Debt amounts to approximately $8,345,597, sufficient value exists to maintain the secured status of all lienholders, including the holders of Pre-Petition Secured Debt after the imposition of the additional $2,500,000 from the DIP Loan. Although the priming of the secured positions of the Pre-Petition Secured Debt will have a negative impact on their existing positions, such positions will remain fully secured.

25. "Additionally, given that the DIP Loan requirements as set forth in the Term Sheet include the proposal and confirmation of a plan of reorganization that pays all allowed Pre-Petition Secured Debt in full with interest, the holders of such debtor are further adequately protected that such debt will be repaid. Under the DIP Lender's requirements, the holders of Pre-Petition Secured Debt will effectively be placed back in their prepetition secured positions post-confirmation by the conversion of the DIP Lender's secured claim into equity and the DIP Lender's requirement that the Pre-Petition Secured Debt be paid in full. Consequently, the

proposed DIP Loan only temporarily alters the secured positions of the holders of the Pre-Petition Secured Debt and restores their repayment expectations at confirmation.

26. "The Debtor, in the exercise of its reasonable business judgment, have concluded that it will be unable to obtain additional post-petition financing from any source other than the DIP Lender. Here, substantially all of the Debtor's assets are encumbered by the Pre-Petition Secured Debt. In light of the present state of the Debtor's business affairs, significant prepetition encumbrances, and uncertainty relating to the events forcing the Debtor to seek bankruptcy protection, the Debtor is confident that it will be unable to locate a lender that will be able to both: (i) provide financing on the terms offered by the DIP Lender; and (ii) adequately protect the liens securing the Pre-Petition Secured Debt by requiring the proposal of a plan of reorganization that pays such debt in full. In short, the DIP Lender are the only source of capital able to provide the Debtor with the terms and conditions required to ensure that they will have sufficient capital available to preserve and maintain the value of their estates.

27. "The Debtor and DIP Lender have negotiated the terms of the proposed DIP Loan at arm's length, and in good faith. Both the Debtor and DIP Lender were represented by separate counsel during the course of the DIP Loan negotiations. Those negotiations yielded a DIP Loan proposal on favorable terms, where in all likelihood, no alternative postpetition financing proposal, much less a financing proposal on terms as favorable as the ones proposed here, would be available.

28. "In the event that the Debtor is denied access to the DIP Loan financing, the Debtor would have insufficient liquidity to continue its operations, forcing it to suspend business operations, including all ongoing research and development. Such a suspension of

AUS-6237840-1 527825/1

operations would cause the Debtor to suffer irreparable harm, which will reduce the value of the recovery realized by the Debtor's creditors and stakeholders.

B. **Motion for Entry of an Order Authorizing the Rejection of an Unexpired Commercial Real Property Lease (1611 Headway Circle, Austin, Texas 78754) Effective April 3, 2016 ("Motion to Reject")**

29. "Debtor entered into a commercial real property lease for the tenancy located at 1611 Headway Circle, Austin, Texas 78754 ("the Lease") on or about March 30, 2012, with WCBC Investors II, L.P. (the "Landlord") for office space in a building located at 1611 Headway Circle, Austin, Texas 78754 (the "Premises"). Debtor will cease operations at the Premises, vacate the Premises, and surrender possession and keys to the Landlord on or before April 3, 2016. Absent rejection of the Lease, pursuant to the Lease, Debtor would continue to be obligated to pay rent for the remainder of the term of the Lease, through March 30, 2018. The Lease provides for gradually increasing monthly base rental payments, and the estimated cost of the payments for the remaining term of the Lease, after April 30, 2016, is approximately $550,800.00. Consequently, the Debtor believes that, in its best business judgment, the Lease should be rejected.

30. "After careful review and due deliberation, Debtor has determined in its business judgment that the Lease is unnecessary to the continued operation of Debtor's business, will have no value to the estate after April 3, 2016, and should be rejected. Moreover, the Lease contains terms that are burdensome on Debtor and have no residual value to Debtor. Additionally, Debtor does not believe it is in the estate's best interest for Debtor to spend time, focus, and money on attempting to market the Lease in an attempt to sublease it, even if permitted by the Landlord.

**C. Emergency Motion to Assume Licensing Agreements ("Motion to Assume")**

31. "On or about January 27, 2009, Debtor entered into the License Agreement, as amended, with Green Ray LLC ("Green Ray") under which Green Ray licensed rights to Debtor to exploit certain intellectual property ("Green Ray Agreement"). A true and correct copy of the Green Ray Agreement, and the relevant amendments thereto, is attached as Exhibit A to the Motion to Assume.

32. "Pursuant to the Green Ray Agreement, as amended, Debtor was responsible for making certain royalty payments in exchange for exclusivity of certain licensed motor technologies. Debtor subsequently failed to make the required minimum royalty payments under the Green Ray Agreement. Despite Debtor's default, Green Ray agreed to an amendment whereby Green Ray would not sell or license the intellectual property to any third parties prior to December 31, 2016. The Debtor is obligated to pay royalties equal to 3% of revenue with minimum monthly royalty payments of $16,667. Prior to the December 31, 2016 deadline, the Green Ray Agreement provides Debtor the right to purchase the licensed intellectual property rights from Green Ray for a one-time fee of $185,000.

33. On or about August 10, 2012, Debtor entered into a development agreement and contingent license agreement, as amended, with Island Park Laboratories, Inc. ("Island Park") under which Island Park licensed Debtor certain rights to exploit certain intellectual property ("Island Park Agreement" together with Green Ray Agreement, the "Agreements"). A true and correct copy of the Island Park Agreement, and amendments thereto, is attached as Exhibit B to the Motion to Assume.

34. "Pursuant to the Island Park Agreement, as amended, Debtor was granted an exclusive license to certain battery and motor technologies so long as Debtor made certain per

unit and quarterly royalty payments to Island Park. In the fourth quarter of 2015, Debtor failed to make sufficient royalty payments to Island Park under the Island Park Agreement.

35. "Despite Debtor's failure to make sufficient royalty payments, Island Park entered into an amendment with Debtor whereby Island Park would refrain from exercising its contingent right to offer the licensed technology to third parties through December 31, 2016 in exchange for monthly payments of $16,667 and quarterly payments equal to 3% of revenues.[2] On or before December 31, 2016, the amendment provides Debtor the right to buy out Island Park's contingent rights for a one-time fee of $150,000.

36. "The Agreements are valuable assets to the Debtor's bankruptcy estate as the licensed technology is the primary source of future revenues and critical to the continued operations of the Debtor. Therefore, Debtor's interest in the Agreements is expected to generate considerable revenue for the Debtor's estate. Moreover, the assumption of the Agreements is imperative to the Debtor's viability as a reorganized business. The assumption of the Agreements will benefit Debtor, its estate, and its creditors and is in the best interest of Debtor's bankruptcy estate.

**D. Emergency Motion for Authority to Pay Certain Pre-Petition Employee Obligations ("Wage Motion")**

37. "As of the Petition Date, Debtor employed 17 employees – 13 staff ("Staff") and four executives ("Executives") (Staff and Executives collectively, the "Employees"). The Employees receive compensation in the form of, among other things, wages, salaries, reimbursement of expenses, including vacation, severance, and sick leave pay earned by the

---

[2] The term "revenue," as used in paragraph 9, shall have the meaning of royalty revenues, non-recurring engineering fees, grant revenue, and any product sales revenue received by Debtor, less payments made pursuant to section 8f(vi) of the Island Park Agreement.

Employees (collectively, "Employee Obligations"). The Employee Obligations include, but are not limited to, claims for the following:

(a) <u>Wages and Salaries</u>.

38. "Debtor pays its salaried employees through a third-party service provider, ADP, LLC ("ADP"), on a semi-monthly basis ("Wages and Salaries"). Debtor remits the amount of its payroll to ADP prior to the end of the period in which payroll is due, and ADP issues the payroll checks and makes the direct deposits on the 15th and the end of each month from accounts maintained by ADP. The most recent pre-petition payroll date for the Debtor's Employees was March 15, 2016, at which time no Employees were paid for the period ending March 15, 2016. As of the Petition Date, all Employees are owed their full Wages and Salaries for the period ending March 15, 2016. The Executives have not been paid their full Wages and Salaries since October of 2015. Debtor intends to pay all current Employees their full Wages and Salaries going forward, which amounts to $81,111 per month. This Motion seeks authority for Debtor to pay the pre-petition Wages and Salaries owed to the Staff who were actively employed on the Petition Date and who are currently employed by Debtor, none of which exceeds $12,475 per individual. The Debtor also seeks authority to pay the Executives the statutory priority wage amount of $12,475 for pre-petition Wages and Salaries. *See* 11 U.S.C. § 507(a)(4). As of March 31, 2016, the Debtor owes, and seeks to pay, $102,104 in wages as set forth in the chart below:

| Unpaid Wages March 15-31, 2016 | Pre-Petition Unpaid Wages | | Ongoing Semi-Monthly Payroll |
|---|---|---|---|
| **Active Employees** | **Unpaid Wages** | **Priority Claims** | **Payroll March 31, 2016** |
| Caamano, Ray | 61,980 | 12,475 | 7,292 |
| Lee, Michael | 84,376 | 12,475 | 9,375 |
| Okonsky, Christian | 79,167 | 12,475 | 8,334 |

13
AUS-6237840-1 527825/1

| | | | |
|---|---:|---:|---:|
| Wabschall, Mark | 65,626 | 12,475 | 7,292 |
| Baker, David | 3,500 | 3,500 | 3,500 |
| Bell, Dan | 4,167 | 4,167 | 4,167 |
| Collier, David | 3,750 | 3,750 | 3,750 |
| Helfand, Jason | 4,375 | 4,375 | 4,375 |
| Li, Weitao | 6,771 | 6,771 | 3,386 |
| List, Jaye | 3,375 | 3,375 | 3,375 |
| Avlas, Nicolas | 5,834 | 5,834 | 5,834 |
| Brindle, Jerry | 1,979 | 1,979 | 1,979 |
| Gallagher, David | 2,625 | 2,625 | 2,625 |
| Miller, Chrissy | 2,600 | 2,600 | 2,600 |
| Moya, Hector | 6,019 | 6,019 | 6,019 |
| Orteza, Mark | 2,625 | 2,625 | 2,625 |
| Wan, Alfred | 4,584 | 4,584 | 4,584 |
| **TOTAL** | **343,354** | **102,104** | **81,111** |

(b)     <u>Reimbursable Business Expenses</u>.

39.     "In the ordinary course of its business, Debtor routinely reimburses certain Employees for certain expenses incurred in the course and scope of their employment which expenses include, travel, auto expenses, meals, supplies and miscellaneous business expenses (the "Business Expenses"). The Debtor currently owes approximately $12,000 for business expenses that were incurred pre-petition. All such expenses were incurred on behalf of the Debtor and in the furtherance of Debtor's business, and the Employees understood at the time they incurred such Business Expenses that they would be timely reimbursed for such Business Expenses. Debtor seeks approval only to pay the customary Business Expenses owed to current Employees. In addition, the Debtor seeks approval to pay the reimbursable business expenses owed to former employee Brian Donohoe in the amount of $10,792.12.

(c)     <u>Employee Deductions</u>.

40.     "In addition to compensation, Debtor deducts from its Employees' paychecks some or all of the following items ("Employee Deductions") for payroll taxes, the employees'

portion of FICA taxes, and legally ordered deductions, such as garnishments, child support and tax levies. Debtor regularly deducts the Employee Deductions from the Employees' paychecks and forwards it to the appropriate third party recipients. These Employee Deductions are not property of the bankruptcy estate; they are funds held in trust. Payment of the Employee Deductions. Therefore, will not prejudice any creditor or interested party.

41. "With respect to each of the Employee Obligations, Debtor believes that a failure to honor these claims will severely threaten current Employee morale and loyalty at a time when the Employees' continued dedication and support is critical to Debtor's reorganization efforts. Debtor believes that any uncertainty or anxiety aroused with regard to these matters will be detrimental to the Debtor's ability to maximize the value of the bankruptcy estate and Debtor's ability to retain its Employees. The avoidance of such threats to the welfare of the Employees, and therefore to the efforts of Debtor to maximize the value of the bankruptcy estate, can and should be avoided by granting Debtor authority requested herein. The granting of such relief is in the best interests of Debtor, its Employees, the bankruptcy estate and all interested parties.

42. "Most of Debtor's Employees rely exclusively on receiving its full compensation as and when due to continue to pay its daily living expenses. These Employees will face exposure to potentially significant financial hardship if Debtor is not permitted to pay the Employee Obligations. It is essential, therefore, that the payroll cycle not be interrupted.

43. "With respect to those Employee Deductions that Debtor makes at the direction of courts or other governmental authorities (i.e. garnishments), Debtor's failure to continue making such payments may not only subject Employees to hardship and potential legal action, but may also subject Debtor to legal actions for such non-compliance.

**E.     Application to Employ Husch Blackwell LLP as Bankruptcy Counsel ("Application to Employ")**

44.     "The Debtor desires to employ Lynn Hamilton Butler and the law firm Husch Blackwell LLP ("Husch Blackwell") to serve as its bankruptcy counsel in this case. Husch Blackwell has been selected by the Debtor because the firm has significant experience in bankruptcy matters and is well qualified to represent the Debtor. The Debtor and the Firm have designated Lynn Hamilton Butler of the Firm to serve as attorney in charge with respect to Debtor's representation, with other attorneys and staff to perform services as needed.

45.     "Husch Blackwell received a retainer of $45,000 for services to be performed in connection with this case, of which $30,000 was loaned to the Debtor by the proposed debtor-in-possession lender (Adams DIP Finance Group, Inc.) but was paid directly to the Firm. Of that retainer, $42,730 was offset by the Firm immediately before filing of the Case.

46.     "Pursuant to an agreement reached with the proposed debtor-in-possession lender, upon interim approval of the Debtor's proposed financing motion, the Firm will receive an additional $50,000 into its trust account as a post-petition retainer to be held by the Firm as an evergreen retainer to be drawn upon only after appropriate orders are entered by the Court. The Firm's retainer funds will be subject to certain carve-out provisions proposed in the Debtor's financing motion, which provisions will exclude the retainer funds from the collateral proposed to the debtor-in-possession lender. The debtor-in-possession lender will continue to fund the Firm's retainer funds on a weekly basis in an amount equal to the unpaid fees and expenses accrued in the prior week. However, no attorney fees and/or expenses will be paid from the retainer funds until such payment is approved by the bankruptcy court.

F.  **Emergency Motion for Entry of an Order Limiting Notice and Establishing Notice Procedures ("Motion to Limit Notice")**

47. "The Debtor proposes the following notice procedures (the "Notice Procedures")

for use in the Bankruptcy Case:

(a)  The Debtor will establish a master service list (the "Master Service List"), listing the parties upon which all pleadings will be served, which will include: (i) the Debtor and bankruptcy counsel for the Debtor; (ii) the Debtor's 20 largest unsecured creditors on a consolidated basis, until such time as the official committee of unsecured creditors, if any, is appointed, as those lists may subsequently be amended; (iii) all secured creditors, and their counsel of record, including: (a) Art Duncan; (b) Office of the Governor; (c) HK-KLD C-Investment Partners; (d) WCBE Investors II, LP; (e) CIT Finance LLC; (f) Jared Slosberg; (g) Silverman Family Trust/Eric Silverman; (h) Michael L. Davis; (i) Dell Financial Services LLC; (j) ETC Custodian FBO Jared Slosberg IRA; (k) Michael Macari; (l) Indravijay Gohil; (m) Manish Nandani; (n) Arvind Mewani; (o) Anthony Masaryk; (p) Roy Ribelin; (q) Wallikip, LP (Paul Nader); (r) Austin Kidney Associates 401(k) PS Plan; (s) Gerald S. Lidnenmuth TTEE, Lendenmuth & Associates; (t) Paul Agarwall; (u) Matthew Stephen Nader; (v) Wallis Anne Nader; (w) Imran Akbar; (x) Bryce C. Alsup Trust UTD 1/19/2005; (y) Craig L. Clark; (z) Group MW Employer Profit Sharing 401K Plan; (aa) John Constantine; (bb) Mark Adams; (cc) Martha Lynn Magnum; (dd) Moreno Energy Inc. (Fox Benton); (ee) Stephen W. Reesing; (ff) Taylor Dunham, L.L.P.; (gg) William J. Maddux; (hh) Verity National Group, Inc.; (ii) Laurie H. Burke Revocable Trust; (jj) Laurie H. Burke; (kk) John William McPhaul; (ll) People Fund; (iv) counsel for any official committee or committees appointed pursuant to the Bankruptcy Rules or the Bankruptcy Code; (v) the Office of the United States Trustee for the Western District of Texas (the "U.S. Trustee"); (vi) the Internal Revenue Service; (vii) the United States Department of Justice; (viii) the Texas Comptroller of Public Accounts; (ix) the Texas Workforce Commission; (x) the Texas State Attorney General; (xi) the U.S. Securities and Exchange Commission; (xii) parties who have filed a UCC-1 financing statement against the Debtor; (xiii) Debtor's shareholders; and (xiv) all other persons that have formally appeared and requested notice or copies of pleadings filed in the Bankruptcy Case under Bankruptcy Rule 2002 (as provided below) and have served that request on Debtor's counsel. Debtor further proposes that (except as provided below) notice of any relief sought or other pleadings in the Bankruptcy Case will only be served on: (x) the parties then listed in the Master Service List; (y) any parties that have, pursuant to Bankruptcy Rule 2002, formally appeared and requested service in the manner provided below following the most recent version of the Master Service List filed with the Court; and (z) any party whose interests are directly affected by a specific pleading.

(b)  Notice will be limited to the entities on the Master Service List for all matters covered by Bankruptcy Rule 2002 and the Local Rules, with the express exception of: (i) notice of the first meeting of creditors pursuant to section 341 of the Bankruptcy Code; (ii) the time fixed for filing proofs of claim, if any, pursuant to Bankruptcy Rule 3003(c); (iii) the time fixed for filing objections to, and the hearing on consideration of, approval

17
AUS-6237840-1 527825/1

of a disclosure statement and confirmation of a plan of reorganization; (iv) notice of and transmittal of ballots for accepting or rejecting a plan of reorganization; and (v) notices of confirmation and effectiveness of a plan of reorganization. Notice of the foregoing matters will be provided to all parties in interest in accordance with Bankruptcy Rule 2002 or any order of the Court, unless otherwise prescribed by the Bankruptcy Code.

(c)     Any party in interest who wishes to receive notice of pleadings filed in the Bankruptcy Case shall be required to file and serve upon Debtor's counsel a written notice of appearance and request for notice and service of papers (each, a "2002 Notice"), which shall include such party's (i) name; (ii) address; (iii) name of client, if applicable; (iv) telephone number; (v) facsimile number; and (vi) only one email address. Parties may opt out of service via U.S. mail.

(d)     If a 2002 Notice fails to include an email address, the party filing the 2002 Notice will not be served email with copies of pleadings and documents filed in this case.

(e)     All pleadings and documents filed with the Court in the Bankruptcy Case, including the initiation of adversary proceedings,[3] will be served by facsimile, regular mail, or email on the Master Service List, with the exception of Debtor's shareholders, which shall be deemed to constitute proper service for all purposes on all parties who are sent such service. Debtor will serve all pleadings and documents filed with the Court in the Bankruptcy Case, including the initiation of adversary proceedings, on Debtor's shareholders and convertible noteholders via email through Debtor's email distribution system. At all times, Debtor is in the practice of maintaining and keeping current its email distribution list for all shareholders and convertible noteholders. All pleadings and documents served via email shall be in portable document format ("PDF"), if available, and the subject line of the email shall indicate the Debtor's case name and the name of the party filing and serving such pleadings and/or documents (e.g., *In re KLD Energy Technologies, Inc.*, Case No. 16-10345-hcm—Service by Debtor). If, however, the PDF is too large to be emailed effectively, Debtor will either send an email containing a link to the pleading in a secure virtual workspace or email the party directing them to the pleading on the noticing agent's website. Furthermore, parties shall include the title(s) of the pleadings(s) and/or document(s) being served in the text of the email.

(f)     Debtor will file the initial Master Service List within three days after entry of this Order. A revised list shall be filed 10 days after the initial Master Service List is filed, if new parties need to be added. The Debtor shall update the Master Service List, and shall file a copy of the updated Master Service List (i) at least every seven days during the first 30 days of the case, if new parties need to be added; (ii) at lease every 15 days during the next 60 days of the case, if new parties need to be added; and (iii) at least every 30 days thereafter throughout the case, if new parties need to be added.

(g)     Debtor will also submit to the Court upon the completion of noticing any

---

[3] Subsequent pleadings filed in an adversary proceeding shall be served only on the U.S. Trustee, any statutory committee appointed in the Bankruptcy Case, and the parties directly affected by such adversary proceeding.

18
AUS-6237840-1 527825/1

particular matter either an affidavit of service or certification of service annexing the list of parties who received notice of such matter.

48. "The Debtor believes that the Notice Procedures are both sufficient and proper in the Bankruptcy Case. The Notice Procedures will provide any party in interest that may be affected by the relief sought by a particular filing or pleading with notice thereof. Also, interested parties who have expressed an interest in receiving notice will also be provided for under the Notice Procedures. The Notice Procedures will not adversely affect the relevant parties in interest.

49. "Furthermore, the Notice Procedures will preserve the assets of the Debtor's estate that would otherwise be consumed by unnecessary expenses in providing notice to all parties in interest. The relief sought in the Motion is the type envisioned by section 105(a) and Bankruptcy Rule 2002.

## **CONCLUSION**

50. "To minimize any loss of value to their businesses, the Debtor's immediate objective is to engage in business as usual following the commencement of this Chapter 11 Cases with as little interruption to the Debtor's operations as possible. If the Court grants the relief requested in the First Day Motions, the prospect of achieving these objectives–to the maximum benefit of the Debtor's estates, creditors and parties in interest–will be substantially enhanced. I respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 30, 2016

                                                */s/ Mark Wabschall*
                                                Mark Wabschall
                                                Chief Financial Officer of KLD Energy Technologies Inc.

AUS-6237840-1 527825/1