## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 16-10345-HCM |
| | § | |
| **KLD ENERGY TECHNOLOGIES, INC.,** | § | (Chapter 11) |
| | § | |
| | § | Related to Docket No. 320 |
| Debtor. | § | |

## ORDER (I) AUTHORIZING (A) THE SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND (B) THE DEBTOR'S ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (II) GRANTING RELATED RELIEF

Upon the *Debtor's Expedited Motion for Order (A) Approving Sale of Assets of Debtor, (B) Approving Assumption and Assignment of Executory Contracts, and (C) Granting Other Related Relief* [Docket No. 320] (the "***Motion***")[1] of the above-captioned debtor and debtor in possession (the "***Debtor***")[2] for entry of an order (this "***Order***"), among other things, (a)

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Purchase Agreement (as defined below), as applicable; *provided* that in the event of any conflict with respect to the meaning of a capitalized term between the Motion and the Purchase Agreement, the meaning ascribed to such term in the Purchase Agreement shall control.

authorizing the sale (the "*Sale*") of the Purchased Assets to MyWay Group, Co., Ltd. (or any permitted assignee pursuant to the terms of the Purchase Agreement, the "*Buyer*") pursuant to the *Asset Purchase Agreement* between the Debtor and the Buyer dated as of November 16, 2016 (together with all other documents contemplated thereby, as such agreement may be amended, restated or supplemented, the "*Purchase Agreement*"), a copy of which is attached hereto as **Exhibit 1**, free and clear of all Liens, Claims, and Interests (each as defined below); (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases to the Buyer; and (c) granting related relief, all as more fully set forth in the Motion; and the Court having entered the *Order (A) Approving Bidding Procedures, (B) Approving Bid Protections, (C) Scheduling Bid Deadlines and an Auction, and (D) Approving the Form and Manner of Notice Thereof* [Docket No. 166], as modified on August 23, 2016 by the *Order Granting Debtor's Emergency Motion to Extend Important Dates and Deadlines Set Out in Order (A) Approving Bid Procedures, (B) Approving Bid Protections, (C) Scheduling Bid Deadlines and an Auction, and (D) Approving the Form and Manner of Notice Thereof* [Docket No. 210], and as further modified on November 16, 2016 by the *Order Granting Debtor's Expedited Motion for Extension of the Remaining Deadlines Established by the Procedures Order* [Docket No. 291] (collectively, the "*Bidding Procedures Order*"); and the Court having announced on the record at the hearing on November 29, 2016 and ruled pursuant to the *Order Denying Expedited Motion for Extension of the Remaining Deadlines Established by the Procedures Order* [Docket No. 318] (the "*Successful Bidder Order*") that no Qualified Bids (as defined in the Bidding Procedures Order) were submitted and the November 30, 2016 auction (the "*Auction*") for the Purchased Assets would not be held; and the Debtor having filed the

---

[2]  All references to the "Debtor" shall include the Debtor and its estate.

2

*Notice of Successful Bidder* [Docket No. 319] (the "***Notice of Successful Bidder***") identifying the Buyer as the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures Order; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor and its estate, its creditors, and all other parties in interest; and the Court having reviewed the Motion and having heard the statements and evidence in support of the relief requested therein at a hearing before the Court that commenced on December 2, 2016 (the "***Sale Hearing***"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY FOUND AND DETERMINED THAT:**

## Findings of Fact and Conclusions of Law

A.      The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

## Jurisdiction and Venue

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Purchased Assets pursuant to 28 U.S.C. § 1334(e), as such Purchased Assets are property of the Debtor's estate, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein.  This matter is a core

3

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

### Statutory Predicates

C.      The statutory and other legal bases for the relief requested in the Motion are sections 105(a), 363, and 365 of Title 11 of the United States Code (the "***Bankruptcy Code***") and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014.    The consummation of the transactions contemplated by the Purchase Agreement and this Order (the "***Transactions***") is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules for the Western District of Texas and the Debtor, the Buyer, and their respective affiliates have complied with all of the applicable requirements of such sections and rules in respect of the Transactions.

### Notice

D.      As evidenced by the certificates of service filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the executory contracts and unexpired leases, including the *Amended and Restated License Agreement* dated January 4, 2010 between Green Ray Technologies, LLC, as licensor ("***Green Ray***") and the Debtor, as exclusive licensee (as amended from time to time and last amended on February 26, 2016) (the "***Green Ray License Agreement***"), specified as of the date hereof pursuant to the Purchase Agreement (the "***Assigned Contracts***" and the "***Assumed Leases***,"[3] respectively), the Cure Costs (as defined below), the Sale Hearing, and all deadlines related

---

[3]     All references to "Purchased Assets" shall include the Assigned Contracts and Assumed Leases, and all references to "Assigned Contracts" shall include, without limitation, the Green Ray License Agreement.

4

thereto, has been provided, as relevant, in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and in compliance with the Bidding Procedures Order, to all parties in interest.

E.      The Debtor served on the applicable counterparties to the Assigned Contracts and the Assumed Leases the *Notice to Contract Parties to Potentially Assume Executory Contracts and Unexpired Leases* [Docket No. 297] (the "**Notice of Assumption and Assignment**") in accordance with the Bidding Procedures Order, identifying, among other things, the Cure Costs. The service of the Notice of Assumption and Assignment was sufficient under the circumstances and in full compliance with the Bidding Procedures Order, and no further notice need be provided in respect of the Debtor's assumption and assignment to the Buyer of the Assigned Contracts and the Assumed Leases or the Cure Costs.  All counterparties to the Assigned Contracts and the Assumed Leases have had an adequate opportunity to object to the assumption and assignment of the Assigned Contracts and the Assumed Leases and the Cure Costs.

F.      The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the Assigned Contracts and the Assumed Leases, the Cure Costs, the Sale Hearing, and all deadlines related thereto is or shall be required.

### Marketing and Sale Process

G.      The Sale of the Purchased Assets to the Buyer pursuant to the Bidding Procedures was duly authorized pursuant to sections 363(b)(1) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 6004(f).  As demonstrated by (a) testimony and other evidence proffered or adduced at the Sale Hearing and (b) the representations of counsel made on the record at the Sale

5

AUS-6322329-3

Hearing, the Debtor and its professionals, agents, and other representatives have marketed the Purchased Assets and conducted all aspects of the sale process in good faith and in compliance with the Bidding Procedures and the Bidding Procedures Order. The marketing process undertaken by the Debtor and its professionals, agents, and other representatives with respect to the Purchased Assets has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders. The Bidding Procedures and all subsequent modifications and deadline extensions were duly noticed, were substantively and procedurally fair to all parties, including all potential bidders, and were conducted in a diligent, non-collusive, fair, and good-faith manner.

H. The Bid Deadline passed at 2:00 p.m. (Central Time) on November 28, 2016 in accordance with the Bidding Procedures and Bidding Procedures Order. On November 29, 2016, the Court having ruled in the Successful Bidder Order that no Qualified Bids were received (other than the Buyer's bid) and an Auction would not be held. Pursuant to the terms of the Bidding Procedures, the Transactions contemplated by the Purchase Agreement and the purchase price for the Purchased Assets ($12.5 million cash plus payment of Cure Costs up to $500,000) constituted the highest and best bid for the Purchased Assets and, therefore, were designated by the Court pursuant to the Successful Bidder Order as the Successful Bid. On November 30, 2016, the Debtor filed the Notice of Successful Bidder identifying the Buyer as the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures Order. As established by the record of the Sale Hearing, the Debtor, the Buyer, and their respective affiliates have complied with the Bidding Procedures and the Bidding Procedures Order in all material respects. The Bidding Procedures afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the

6

Purchased Assets, and the Purchase Agreement constitutes the best and highest offer for the Purchased Assets.

<u>**Corporate Authority**</u>

I.       The Purchased Assets constitute property of the Debtor's estate and title thereto is vested in the Debtor's estate within the meaning of section 541 of the Bankruptcy Code.  The Debtor      (a) has full corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and the Sale to the Buyer has been duly and validly authorized by all necessary corporate action, (b) has all of the corporate power and authority necessary to consummate the Sale and the Transactions contemplated by the Purchase Agreement, (c) has taken all corporate action necessary to authorize and approve the Purchase Agreement and the consummation by the Debtor of the Sale and the Transactions contemplated thereby, and (d) requires no consents or approvals, other than those expressly provided for in the Purchase Agreement, to consummate the Transactions.

<u>**Highest and Best Offer; Business Judgment**</u>

J.       The Debtor has demonstrated a sufficient basis to enter into the Purchase Agreement, sell the Purchased Assets on the terms outlined therein, and assume and assign the Assigned Contracts and the Assumed Leases to the Buyer under sections 363 and 365 of the Bankruptcy Code.  All such actions are appropriate exercises of the Debtor's business judgment and in the best interests of the Debtor, its creditors, its estate, and other parties in interest. Approval of the Sale pursuant to the Purchase Agreement at this time is in the best interests of the Debtor, its creditors, its estate, and all other parties in interest.

K.       Pursuant to Section 2.3(b) of the Purchase Agreement, on November 29, 2016 the Buyer provided written notice to the Debtor of its election to increase the Cash Consideration to

7

$12.5 million in exchange for a decrease in the Equity Consideration to zero.  The offer of the Buyer for $12.5 million cash, upon the terms and conditions set forth in the Purchase Agreement, including the total consideration to be realized by the Debtor thereunder, (a) is the highest and best offer received by the Debtor after extensive marketing, including through the Bidding Procedures, (b) is in the best interests of the Debtor, its creditors, its estate, and other parties in interest and (c) constitutes full and adequate consideration, is fair and reasonable and constitutes reasonably equivalent value, fair consideration, and fair value for the Purchased Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the laws of the United States and any state, territory, possession, including the District of Columbia.  Taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Purchased Assets for greater economic value to the Debtor or its estate.

L.      There has been no showing that the Debtor or Buyer (a) entered into the Purchase Agreement or seeks to consummate the Transactions for the purposes of hindering, delaying, or defrauding the Debtor's present or future creditors or (b) is entering into the Purchase Agreement or proposing to consummate the Transactions fraudulently, for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States or any state, territory, possession thereof, including the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

M.      The sale of the Purchased Assets outside of a chapter 11 plan pursuant to the Purchase Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a chapter 11 plan of the Debtor.  The sale of the Purchased Assets does not constitute a sub rosa chapter 11 plan.

8

**Opportunity to Object**

N.    A reasonable opportunity to object or be heard with respect to the Motion, the Bidding Procedures, the Auction, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the Assigned Contracts and the Assumed Leases, the Cure Costs, the Sale Hearing, and all deadlines related thereto has been afforded to all interested persons and entities.

**Good Faith Purchaser; Arm's Length Sale**

O.    The Purchase Agreement was negotiated, proposed, and entered into by the Debtor and the Buyer without collusion, in good faith, and at arm's length.  Neither the Debtor or the Buyer, nor any parent or affiliate of the Debtor or the Buyer, has engaged in any conduct that would cause or permit the Purchase Agreement or the Sale to be avoided under section 363(n) of the Bankruptcy Code.

P.    The Buyer is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

Q.    Neither the Buyer nor any of its affiliates, members, officers, directors, shareholders, or any of their respective successors or assigns is an "insider" or "affiliate" of any of the Debtor, as those terms are defined in sections 101(31) and 101(2) of the Bankruptcy Code, and the Buyer's professionals, agents, and other representatives have complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Purchase Agreement.  The Purchase Agreement complies with the Bidding Procedures Order and all other applicable orders of this Court.

## **Free and Clear Transfer Required by Buyer**

R.      The Buyer would not have entered into the Purchase Agreement and would not have consummated the Sale, thus adversely affecting the Debtor, its estate, and its creditors, if each of the Sale and the assumption and assignment of the Assigned Contracts and the Assumed Leases to the Buyer were not free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of the Assumed Liabilities) or if the Buyer would, or in the future could, be liable for any of the Excluded Liabilities.  For the avoidance of doubt, neither the Buyer nor any of its affiliates shall have any responsibility whatsoever with respect to the Excluded Liabilities, which shall remain the responsibility of the Debtor before, on, and after the Closing.

S.      As of the Closing, pursuant and subject to the terms of the Purchase Agreement and this Order, the transfer of the Purchased Assets (and the Assumed Liabilities) and the Sale will effect a legal, valid, enforceable, and effective transfer of the Purchased Assets (and the Assumed Liabilities) and will vest the Buyer with all of the Debtor's rights, title, and interests in the Purchased Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of the Assumed Liabilities).

## **Satisfaction of Section 363(f)**

T.      The Debtor may sell the Purchased Assets free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever, including any rights or claims based on any putative successor or transferee liability, as set forth herein, because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  All parties in interest, including, without limitation, any holders of Liens, Claims, or Interests, and any counterparties to the Assigned Contracts and Assumed Leases who did not

10

object, or who withdrew their objection, to the Sale, the Motion, the assumption and assignment of the applicable Assigned Contract or Assigned Lease or the associated Cure Cost are deemed to have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Liens, Claims, or Interests and counterparties to Assigned Contracts and Assumed Leases that did not object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

## Assigned Contracts and Assumed Leases

U.     The Debtor has demonstrated (a) that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts and the Assumed Leases to the Buyer in each case in connection with the consummation of the Sale and (b) that the assumption and assignment of the Assigned Contracts and the Assumed Leases to the Buyer is in the best interests of the Debtor, its estate, its creditors, and other parties in interest.  The Assigned Contracts and the Assumed Leases being assigned to the Buyer are an integral part of the Purchased Assets being purchased by the Buyer and, accordingly, such assumption, assignment, and cure of any defaults under the Assigned Contracts and the Assumed Leases are reasonable and enhance the value of the Debtor's estate.  Any counterparty to an Assigned Contract or Assigned Lease that has not actually filed with the Court an objection to such assumption and assignment in accordance with the terms of the Motion is deemed to have consented to such assumption and assignment.

## Cure Costs and Adequate Assurance

V.     The Debtor and the Buyer, as applicable, have, including by way of entering into the Purchase Agreement, and agreeing to the provisions relating to the Assigned Contracts and Assumed Leases therein, (a) cured, or provided adequate assurance of cure, of any default

existing prior to the date of this Order under any of the Assigned Contracts and Assumed Leases within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (b) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date of this Order under any of the Assigned Contracts and the Assumed Leases within the meaning of section 365(b)(1)(B) of the Bankruptcy Code and the Buyer has, based upon the record of these proceedings, including the evidence proffered by the Debtor at the Sale Hearing, provided adequate assurance of its future performance of and under the Assigned Contracts and the Assumed Leases pursuant to sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. The Buyer's agreement under the Purchase Agreement to perform the obligations under the Assigned Contracts and the Assumed Leases after the Closing shall constitute adequate assurance of future performance under the Assigned Contracts and the Assumed Leases being assigned to the Buyer within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. The Cure Costs are hereby found to be the sole amounts necessary to cure any and all defaults under the Assigned Contracts and the Assumed Leases under section 365(b) of the Bankruptcy Code.

### Time Is of the Essence; Waiver of Stay

W.      Time is of the essence in consummating the Sale. In order to maximize the value of the Purchased Assets, it is essential that the sale and assignment of the Purchased Assets occur within the time constraints set forth in the Purchase Agreement. Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

### The Motion is Granted

1.      The relief requested by the Motion is granted as set forth herein.

12

**All Objections Overruled**

2.     All objections to the entry of this Order or to the relief granted herein, whether filed, stated on the record before this Court, or otherwise, which have not been withdrawn, waived, or settled, and all reservations of rights included therein, are denied and overruled on the merits.  All objections to the entry of this Order or to the relief granted herein that were not timely filed are hereby forever barred.

3.     Notice of the Motion, the Bidding Procedures, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the Assigned Contracts and the Assumed Leases, the Cure Costs, the Sale Hearing, and all deadlines related thereto was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

**Approval of the Purchase Agreement**

4.     The Purchase Agreement, including all of the terms and conditions thereof, is hereby approved.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtor is authorized and directed to take any and all actions necessary to fulfill its obligations under, and comply with the terms of, the Purchase Agreement and to consummate the Sale pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Order, without further leave of the Court.  The Debtor is further authorized and directed to pay, without further order of this Court, whether before, at, or after the Closing, any expenses or costs that are required to be paid in order to consummate the Transactions contemplated by the Purchase Agreement or perform their obligations under the Purchase Agreement.

5.     The Debtor is authorized and directed, in accordance with the Purchase Agreement, to execute, deliver, consummate, perform under, and implement the Purchase

Agreement, together with all additional instruments, documents, and other agreements that may be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer or reducing to possession the Purchased Assets, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement.

6.      Buyer properly elected to increase the Cash Consideration to $12.5 million in exchange for a decrease in the Equity Consideration to zero pursuant to Section 2.3(b) of the Purchase Agreement.

7.      Buyer has no obligation to proceed with the Closing unless and until all conditions precedent to its obligations to do so, as set forth in the Purchase Agreement, have been met, satisfied, or waived in accordance with the terms of the Purchase Agreement.

## Binding Effect of Order

8.      This Order and the Purchase Agreement shall be binding upon all creditors of, and equity holders in, the Debtor and any and all other parties in interest, including, without limitation, any and all holders of Liens, Claims, and Interests (including holders of any rights or claims based on any putative successor or transferee liability) of any kind or nature whatsoever, all counterparties to the Assigned Contracts and the Assumed Leases, the Buyer, the Debtor and its affiliates and subsidiaries, and any trustee or successor trustee appointed in this chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code.  Nothing contained in any chapter 11 (or other) plan confirmed in this chapter 11 case or the confirmation order confirming any such plan shall conflict with or derogate from the provisions of the Purchase Agreement or this Order.  To the extent of any such conflict or derogation, the terms of this Order shall govern.

14

AUS-6322329-3

**Amendments to the Purchase Agreement**

9.       The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, supplemented, or restated by the parties thereto in a writing signed by such parties and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, supplement, or restatement does not have a material adverse effect on the Debtor's estate.  The Purchase Agreement and the Debtor's obligations therein shall not be altered, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in this chapter 11 case without the prior written consent of the Buyer.

**Transfer of the Purchased Assets Free and Clear**

10.       The Buyer shall assume and be liable for only those liabilities expressly assumed pursuant to the Purchase Agreement.  Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement or this Order, pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing, the Purchased Assets shall be transferred to the Buyer free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of the Assumed Liabilities).  For purposes of this Order, "Liens," "Claims," and "Interests" shall mean:

      a.       any and all Encumbrances, charges, liens (statutory or otherwise), claims, mortgages, leases, subleases, hypothecations, deeds of trust, pledges, security interests, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), rights of consent, rights of offset, setoff, and recoupment, successor liability, easements, servitudes, restrictive covenants, interests, or rights under any operating agreement, encroachments, encumbrances, restrictions on transferability of any type, any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtor's or the Buyer's interest in the Purchased Assets, any similar rights, and third party interests or any

15

other restrictions or limitations of any kind with respect to the Purchased Assets (collectively, "***Liens***");

b.    any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, (1) any and all claims or causes of action based on or arising under any labor, employment, intellectual property, or pension laws, labor, license, intellectual property, or employment agreements, including any employee claims related to worker's compensation, occupational disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (A) ERISA (as defined below), (B) the Fair Labor Standards Act, (C) Title VII of the Civil Rights Act of 1964, (D) the Federal Rehabilitation Act of 1973, (E) the National Labor Relations Act, (F) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (G) the Americans with Disabilities Act of 1990, (H) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code and of any similar state law (collectively, "***COBRA***"), (I) state discrimination laws, (J) state unemployment compensation laws or any other similar state laws, (K) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors, or (L) the WARN Act (29 U.S.C. §§ 2101 *et seq*.), (2) any rights under any pension or multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974 (as amended, "***ERISA***"), health or welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtor or any multiemployer plan to which the Debtor has at any time contributed to or had any liability or potential liability, (3) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, (4) any rights related to intercompany loans and receivables between the Debtor and any non-Debtor subsidiary or affiliate, (5) any Excluded Liabilities, (6) any and all claims or causes of action based upon or relating to any unexpired and executory contract or unexpired lease to which the Debtor is a party that is not an Assigned Contract or an Assigned Lease that will be assumed and assigned pursuant to this Order and the Purchase Agreement, (7) any and all claims or causes of action based upon or relating to any bulk sales or similar law, (8) any and all claims or causes of action based upon or relating to any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing, including, without limitation, any ad valorem taxes assessed by any applicable taxing authority, and (9) any and all other claims, causes of action, proceedings,

16

warranties, guaranties, rights of recovery, setoff, recoupment, rights, remedies, obligations, liabilities, counterclaims, cross-claims, third party claims, demands, restrictions, responsibilities, or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against the Debtor or any of its affiliates, subsidiaries, directors, officers, agents, successors, or assigns in connection with or relating to the Debtor, its operations, its business, its liabilities, the Debtor's marketing and bidding process with respect to the Purchased Assets, the Assigned Contracts, the Assumed Leases, the Green Ray License Agreement, or the Transactions contemplated by the Purchase Agreement  (collectively, "***Claims***"); and

c.     any and all equity or other interests of any kind or nature whatsoever in or with respect to (1) the Debtor or its affiliates, subsidiaries, successors or assigns, (2) the Purchased Assets, or (3) the Assigned Contracts (collectively, "***Interests***");

whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity, or otherwise, and whether occurring or arising before, on, or after the Petition Date, or occurring or arising prior to the Closing.  On the Closing, the Buyer shall take title to and possession of the Purchased Assets subject only to the Assumed Liabilities.

### Vesting of Purchased Assets in the Buyer

11.     The transfer of the Purchased Assets to the Buyer pursuant to the Purchase Agreement shall constitute a legal, valid, and effective transfer of the Purchased Assets on the Closing, and shall vest the Buyer with all of the Debtor's rights, title, and interests in the Purchased Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of the Assumed Liabilities).

17

12.     At Closing, the Debtor is directed to pay the allowed secured claims of Slosberg, Masaryk , the Nader Group, and Adams DIP Finance Group, LLC , (collectively "the Secured Lenders") (as allowed in the Amended Order Granting Joint Motion to Approve Compromise of Controversies, Including Claims of the Estate [Docket No. 272]), together with all allowed post-petition accrued but unpaid interest, principal and reasonable attorneys' fees and expenses.

13.     After Closing and subject in all respects to any financing documents or shareholders agreements, the Buyer is hereby authorized in connection with the consummation of the Sale to allocate the Purchased Assets, including the Assigned Contracts and Assumed Leases, among its affiliates, agents, designees, assigns, or successors, in a manner as it in its sole discretion deems appropriate, and to assign, lease, sublease, license, sublicense, transfer, or otherwise dispose of any of the Purchased Assets, including the Assigned Contracts and Assumed Leases, to its affiliates, designees, assignees, or successors with all of the rights and protections accorded to the Buyer under this Order and the Purchase Agreement with respect thereto, and the Debtor shall cooperate with and take all actions reasonably requested by the Buyer to effectuate any of the foregoing. .

**Police and Regulatory Power of Governmental Units**

14.     Nothing in this Order or the Purchase Agreement releases, nullifies, precludes, or enjoins the enforcement of any police power by, or any regulatory liability to, any governmental unit under any applicable Environmental Laws on the part of any entity as the owner or operator of property after the Closing.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the Purchased Assets or the operation thereof on account of the filing or pendency of this chapter 11 case or, to the extent provided by section 525 of the Bankruptcy

18

Code, the consummation of the Transactions contemplated by the Purchase Agreement, including, without limitation, the Sale and the Debtor's assumption and assignment of the Assigned Contracts and Assumed Leases to the Buyer.

### The Green Ray License Agreement

15.     Green Ray is hereby deemed to consent to the Sale and waive its ability, if any, to exercise any termination rights under the Green Ray License Agreement arising prior to Closing. The Green Ray License Agreement, including any purchase option referenced therein (the "*Option*"), shall remain in full force and effect, and Buyer may exercise the Option on or before December 31, 2016 in accordance with the terms of the Green Ray License Agreement.  For the avoidance of doubt, any attempt by Green Ray to terminate the Green Ray License Agreement based upon alleged defaults occurring, arising, or accruing prior to the assignment of the Green Ray License Agreement to the Buyer at Closing shall be void and of no force and effect.

### Assumption and Assignment of Assigned Contracts and Assumed Leases

16.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtor's assumption and assignment to the Buyer of the Assigned Contracts and the Assumed Leases is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

17.     The Debtor is hereby authorized, in accordance with the Purchase Agreement, and in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (a) assume and assign to the Buyer the Assigned Contracts and the Assumed Leases, effective upon and subject to the occurrence of the Closing, free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of the Assumed Liabilities), which Assigned Contracts and Assumed Leases, by operation of this Order, shall be deemed assumed and assigned to the Buyer

AUS-6322329-3

effective as of the Closing, and (b) execute and deliver to the Buyer such documents or other instruments as the Buyer may deem necessary to assign and transfer the Assigned Contracts and the Assumed Leases to the Buyer.

18.     Except as otherwise expressly provided in this Order:

a.      The Debtor is authorized to and shall assume all of the Assigned Contracts and the Assumed Leases in accordance with section 365 of the Bankruptcy Code.

b.      The Debtor is authorized to and shall assign each Assigned Contract and Assigned Lease to the Buyer in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assigned Contract or Assigned Lease that prohibit or condition the assignment of such Assigned Contract or Assigned Lease on the consent of the counterparty thereto or allow the counterparty to such Assigned Contract or Assigned Lease to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract or Assigned Lease, shall constitute unenforceable anti-assignment provisions which are expressly preempted under section 365 of the Bankruptcy Code and void and of no force and effect.

c.      All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment of the Assigned Contracts and Assumed Leases by the Debtor to the Buyer have been satisfied.

d.      Upon the Closing, the Assigned Contracts and Assumed Leases shall be transferred and assigned to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract or Assigned Lease (including those of the type described in sections 365(b)(2), 365(e)(1) and 365(f) of the Bankruptcy Code) that prohibits, restricts, limits, or conditions such assignment or transfer.

e.      After the Debtor's transfer and assignment of the Assigned Contracts and the Assumed Leases to the Buyer, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of each Assigned Contract and Assigned Lease free and clear of Liens, Claims, and Interests with the sole exception of the Assumed Liabilities.

f.      Any portion of any Assigned Lease which purports to permit a landlord thereunder to cancel the remaining term of such Assigned Lease if the

20

Debtor discontinues its use or operation of the leased premises is void and of no force and effect, and shall not be enforceable against the Buyer, or its assignees and sublessees; and the landlords under any such Assigned Lease shall not have the right to cancel or otherwise modify the Assigned Lease or increase the rent, assert any claim, or impose any penalty by reason of such discontinuation, the Debtor's cessation of operations, the assignment of such Assigned Lease to the Buyer, or the interruption of business activities at any of the leased premises.

g.    The failure of the Debtor to enforce, at any time prior to the Closing Date, one or more terms or conditions of any Assumed Contract or Assumed Lease shall not be a waiver of such terms or conditions, or of the Buyer's rights to enforce every term and condition of the Assumed Contract and Assumed Leases.

h.    There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Buyer as a result of the assumption, assignment, and sale of the Assumed Contract and Assumed Leases.

19.    All defaults and all other obligations of the Debtor under the Assigned Contracts and the Assumed Leases occurring, arising, or accruing prior to the assignment thereof to the Buyer at Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) are deemed to have been cured or satisfied by the payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract and Assigned Lease in the amounts set forth in the Notice of Assumption and Assignment or any supplemental Notice of Assumption and Assignment (or any other cure cost reached by agreement after an objection to the proposed cure cost by a counterparty to an Assigned Contract or Assigned Lease), which was served in compliance with the Bidding Procedures Order, and is set forth on the schedule attached hereto as **Exhibit 2** (the "*Cure Costs*"), and which Cure Costs were satisfied, or shall be satisfied as soon as practicable, by the Debtor or by the Buyer, as the case may be, as provided in the Purchase Agreement.  For all Assigned Contracts and Assumed Leases for which a Notice of Assumption and Assignment was served, the Debtor and the Buyer, as applicable, are each

authorized and directed to pay their respective portion of all Cure Costs required to be paid by such parties in accordance with the Purchase Agreement upon the Closing.

20.    If the P3 Consulting Agreements are not assumed and assigned to MyWay pursuant to this Order, nothing in this Order affects the Proof of Claim filed by P3 in the Debtor's bankruptcy estate, and P3 is entitled to treatment of its Proof of Claim as an allowed unsecured claim.

21.    Pursuant to section 365(k) of the Bankruptcy Code, the Debtor and its estate shall be relieved from any liability for any breach for any Assigned Contract or Assigned Lease that occurs after the effectiveness of such assumption and assignment to the Buyer.

### No Successorship or Transferee Liability

22.    Neither the Buyer nor any of its affiliates are or shall be deemed, as a result of the consummation of the Transactions contemplated herein, to: (a) be legal successors to the Debtor or its estate by reason of any theory of law or equity, (b) have, *de facto* or otherwise, merged with or into the Debtor, or (c) be an alter ego or a mere continuation or substantial continuation or successor of the Debtor in any respect.  Neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of the Debtor or its estate, except as otherwise expressly provided in the Purchase Agreement or this Order.

### Modification of the Automatic Stay

23.    The automatic stay provisions of section 362 of the Bankruptcy Code are lifted and modified to the extent necessary to implement the terms and conditions of the Purchase Agreement and the provisions of this Order.

**Release of Liens by Creditors; Collection of Purchased Assets**

24.     Except as expressly provided to the contrary in this Order or in the Purchase Agreement, the holder of any valid Lien, Claim, or Interest in the Debtor or the Purchased Assets shall, as of the Closing, be deemed to have waived and released such Lien, Claim, or Interest, without regard to whether such holder has executed or filed any applicable release. Notwithstanding the foregoing, any such holder of such a Lien, Claim, or Interest is authorized and directed to execute and deliver any waivers, releases, or other related documentation reasonably requested by the Debtor or the Buyer to evidence the release of their Liens, Claims, or Interests in the Purchased Assets.  Any person or entity that has filed any financing statements, mortgages, mechanic's liens, *lis pendens*, or any other documents or agreements evidencing a Lien on the Debtor or any of the Purchased Assets conveyed pursuant to the Purchase Agreement and this Order is directed to deliver to the Debtor and the Buyer prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens which the person or entity has with respect to the Debtor, the Purchased Assets, or otherwise.

25.     In the event that such termination statements, instruments of satisfaction, or releases of all Liens are not filed in accordance with the foregoing paragraph, (a) the Debtor is hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Purchased Assets in the event not filed by such person or entity, and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, and Interests of any kind or nature whatsoever existing as to the Purchased Assets.

23

26.     As of the Closing, the Buyer and its successors and assigns shall be designated and appointed as the Debtor's true and lawful attorney with full power of substitution in the Debtor's name and stead on behalf of and for the benefit of the Buyer and its successors and assigns for the following sole and limited purposes: (a) to have the power to demand and receive any and all of the Purchased Assets and to give receipts and releases for and in respect of the Purchased Assets, or any part thereof, and (b) from time to time to institute and prosecute against third parties for the benefit of the Buyer, its successors and assigns, proceedings at law, in equity, or otherwise, which the Buyer and its successors and assigns may deem proper for the collection or reduction to possession of any of the Purchased Assets.

## Effect of Recordation of Order

27.     This Order, once filed, registered, or otherwise recorded, (a) shall be effective as a conclusive determination that, upon the Closing, all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of the Assumed Liabilities) existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all persons and entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, local officials, notaries, protonotaries, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Purchased Assets.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all

24

documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Purchase Agreement, including, without limitation, recordation of this Order.

## Administrative Priority Status

28.     Any amounts that become payable by the Debtor to the Buyer pursuant to the Purchase Agreement and any related agreements executed in connection therewith shall (a) be entitled to administrative expense claim status under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code; (b) not be subordinate to any other administrative expense claim against the Debtor other than allowed claims entitled to priority under section 507(b) of the Bankruptcy Code, (c) not be altered, amended, discharged, or affected by any chapter 11 plan proposed or confirmed in this chapter 11 case without the prior written consent of the Buyer, and (d) be paid by the Debtor in the time and manner provided for in the Purchase Agreement without further order of this Court.

## Prohibition of Actions Against the Buyer

29.     Except for the Assumed Liabilities or as expressly permitted or otherwise specifically provided for in the Purchase Agreement or this Order, the Buyer and its affiliates shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Purchased Assets or otherwise.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the Purchase Agreement, the Buyer and its affiliates shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, including, without limitation, any claims arising in connection with the Green Ray License Agreement, and the Buyer and its affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory of antitrust,

25

warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtor's business prior to the Closing or any claims under the WARN Act or any claims related to wages, benefits, severance, or vacation pay owed to employees or former employees of the Debtor.

30. Effective upon the Closing, with the sole exception of any enforcement of rights related to the Assumed Liabilities, all persons and entities, including Green Ray, shall be, and hereby are, forever barred and estopped from (a) taking any action that would adversely affect or interfere with the ability of the Debtor to transfer the Purchased Assets to the Buyer in accordance with the terms of this Order and the Purchase Agreement and (b) asserting, prosecuting, or otherwise pursuing, whether in law or in equity, in any judicial, administrative, arbitral or other proceeding, any Liens, Claims or Interests of any kind or nature whatsoever against the Buyer and its successors, designees, assigns, or property, or the Purchased Assets conveyed under this Order in accordance with the Purchase Agreement.

## No Interference

31. Following the Closing, no holder of a Lien, Claim, or Interest in or against the Debtor or the Purchased Assets shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to such Lien, Claim, or Interest or any actions that the Debtor may take in this chapter 11 case or any successor cases.

26

### Retention of Jurisdiction

32.     This Court retains jurisdiction to, among other things, interpret, enforce, and implement the terms and provisions of the this Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, without limitation, retaining jurisdiction to: (a) compel delivery of the Purchased Assets or performance of other obligations owed to the Buyer; (b) compel performance of obligations owed to the Debtor; (c) resolve any disputes arising under or related to the Purchase Agreement, except as otherwise provided therein; (d) interpret, implement, and enforce the provisions of this Order; and (e) protect the Buyer and its affiliates against (i) any Liens, Claims, and Interests in or against the Debtor or the Purchased Assets of any kind or nature whatsoever and (ii) any creditors or other parties in interest regarding the turnover of the Purchased Assets that may be in their possession.

### No Stay of Order

33.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtor and the Buyer are free to close the Sale under the Purchase Agreement at any time pursuant to the terms thereof.

### Good Faith Purchaser

34.     The Sale contemplated by the Purchase Agreement is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and Buyer has acted without collusion, undertaking the Sale and Transactions contemplated by the Purchase Agreement.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Buyer (including the

27

assumption and assignment by the Debtor of any of the Assigned Contracts and the Assumed Leases), unless such authorization is duly stayed pending such appeal.  The Buyer is a buyer in good faith of the Purchased Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

35.     There has been no showing that the Debtor or Buyer engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

## Inconsistencies with Prior Orders, Pleadings or Agreements

36.     To the extent of any conflict between the Purchase Agreement and this Order, the terms of this Order shall govern.  To the extent this Order is inconsistent or conflicts with any prior order or pleading in this chapter 11 case, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.

## Failure to Specify Provisions

37.     The failure to specifically reference any particular provisions of the Purchase Agreement or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement and other related documents be authorized and approved in their entirety.

AUS-6322329-3

# **Exhibit 1**

**Purchase Agreement**

## **Exhibit 2**

**Cure Costs**

**PURCHASE AND SALE AGREEMENT**

**by and between**

**KLD Energy Technologies, Inc.,**

**in its capacity as Debtor and Debtor-in-Possession**

**as Seller**

**and**

**MyWay Group Co., Ltd.**

**as Buyer**

**November 16, 2016**

US 4712730

**EXHIBIT 1**
**Page 1 of 90**

## Purchase and Sale Agreement

This Purchase and Sale Agreement (this "Agreement") is dated and effective on November 16, 2016 (the "Execution Date") by and between KLD Energy Technologies, Inc., a Texas corporation ("Seller"), in its capacity as debtor and debtor-in-possession in the Bankruptcy Case (as defined herein), and MyWay Group Co., Ltd. ("MyWay" and together with New KLD (as defined herein), its designee, "Buyer").

## Preliminary Statements

A.     Seller is a Texas corporation with its principal place of business located in Austin, Texas. Debtor is a privately-owned technology company focused on developing innovative, sustainable propulsion technologies for the electric vehicle markets (the "Business"). The KLD propulsion and generation system is applicable in a broad range of markets, including elevators, air conditioners, pumps, generators and many other applications.

B.     Seller commenced a case, bearing Case No. 16-10345 (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on March 25, 2016 by filing a voluntary petition with the United States Bankruptcy Court for the Western District of Texas (the "Bankruptcy Court").

C.     Seller was authorized to sell substantially all the assets associated with the operation of the Business pursuant to the Bankruptcy Courts' *Order (A) Approving Bidding Procedures, (B) Approving Bid Protections, (C) Scheduling Bid Deadlines and an Auction, and (D) Approving the Form and Manner of Notice Thereof* [Docket No. 166] dated July 13, 2016, as modified by the Bankruptcy Court's *Order Granting Debtor's Emergency Motion to Extend Important Dates and Deadlines Set Out in Order (A) Approving Bidding Procedures, (B) Approving Bid Protections, (C) Scheduling Bid Deadlines and an Auction, and (D) Approving the Form and Manner of Notice Thereof* [Docket No. 210] dated August 24, 2016 (together, the "Bidding Procedures Order").

D.     Seller wishes to sell to Buyer and Buyer wishes to purchase from Seller the Purchased Assets (as defined in Section 2.1) and Buyer wishes for Seller to assume and assign to Buyer certain of Seller's executory Contracts (as defined herein) and unexpired Leases (as defined herein) as listed on Schedule 2.1(c) hereto (collectively, the "Assigned Contracts") pursuant to Sections 363 and 365 of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

E.     The transactions contemplated by this Agreement will be subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Approval Order (as defined in Section 6.11(a)) to be entered by the Bankruptcy Court in the Bankruptcy Case and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

## Agreement

In consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of

**EXHIBIT 1**
**Page 2 of 90**

which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

   1.1 <u>Defined Terms</u>.  As used herein, the terms below shall have the following respective meanings:

   "<u>Acquired Intellectual Property</u>" shall mean all Intellectual Property owned by Seller.

   "<u>Affiliate</u>" shall mean all parties falling within the definition of affiliate under either (i) Rule 12b-2 of the General Rules and Regulations of the Securities Exchange Act of 1934, as amended, or (ii) Section 101(2) of the Bankruptcy Code.

   "<u>Alternative Transaction</u>" shall mean any sale transaction under Section 363 of the Bankruptcy Code or any consummation of any plan under the Bankruptcy Code of any or up to all of the assets subject to the Bankruptcy Case.

   "<u>Avoidance Actions</u>" shall mean any and all claims for relief of Seller under chapter 5 of the Bankruptcy Code.

   "<u>Benefit Plan</u>" shall mean an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), and any employment, termination, severance, retention, change in control, deferred compensation, bonus or other incentive compensation, equity compensation, retirement, welfare benefit, Tax gross up, vacation or other paid time off, educational assistance, or flexible benefit (including expense reimbursement account) plan, program, agreement or arrangement or other material employee benefit plan, program, agreement or arrangement, in each case as to which Seller has any obligation or liability, contingent or otherwise with respect to the Employees.

   "<u>Break-Up Fee</u>" shall mean a dollar amount equal to $375,000.00, which shall constitute an administrative expense claim under Section 503(b)(1) and Section 507(a)(2) of the Bankruptcy Code and shall be paid as set forth in <u>Section 8.2</u>.

   "<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

   "<u>Contract</u>" shall mean any agreement, contract, obligation, promise, or undertaking, other than a Lease, that is legally binding.

   "<u>Data Room</u>" shall mean the electronic data room prepared and populated by Seller.

   "<u>Employee</u>" shall mean each individual who is employed by Seller in connection with the Business.

**EXHIBIT 1**
**Page 3 of 90**

"Environmental Liabilities" shall mean any debts, adverse claims, liabilities, commitments, responsibilities, damages, expenses and obligations which may arise from or relate to any violation of or non-compliance with Environmental Laws.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Expense Reimbursement" shall mean a dollar amount equal to $75,000.00, which shall constitute an administrative expense claim under Section 503(b)(1) and Section 507(a)(2) of the Bankruptcy Code and shall be paid as set forth in Section 8.2.

"GAAP" shall mean United States generally accepted accounting principles as in effect from time to time.

"Governmental Entity" shall mean any (a) federal, state, local, municipal, foreign or other government; (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Income Tax" shall mean any federal, state, local or foreign tax measured by or imposed on, in whole or in part, the net income of Seller that was or is attributable to Seller's ownership of an interest in or operation of the Purchased Assets or the Business.

"Intellectual Property" shall mean all: (a) trade names, trademarks, service marks, trade dress, logos, slogans, Internet domain names and other similar designations of source or origin, together with the goodwill symbolized by, and any registrations, applications, renewals and extensions for, any of the foregoing; (b) patents and patent applications (including continuation, continuation-in-part, divisional and provisional applications) and any renewals extensions and substitutes of any of the foregoing; (c) copyrights and any copyright registrations or applications; (d) trade secrets and confidential know-how, information, processes, methods, formulae, technology, inventions, improvements, works of authorship, compositions, algorithms, databases, customer lists and supplier lists; (e) software; and (f) other similar intellectual property.

"Knowledge" shall mean with respect to Seller, the actual knowledge (after reasonable inquiry) of any director or officer of Seller.

"Law" shall mean any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, principle of common law, judgment enacted, promulgated, issued, enforced or entered by any Governmental Entity, or other requirement or rule of law.

"Lease" shall mean any lease with respect to Leased Real Property.

"Leased Real Property" shall mean any parcel of real property leased, subleased, or occupied by Seller in the operation of the Business.

**EXHIBIT 1**
**Page 4 of 90**

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, damages, expenses, Environmental Liabilities, and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust or other encumbrance.

"Material Adverse Effect" shall mean any development which could be reasonably expected to delay or prevent the consummation of the transactions contemplated hereby or which could be reasonably expected to materially and adversely affect the value of the Purchased Assets (as defined herein), taken as a whole.

"New KLD" shall mean a Subsidiary organized and wholly-owned by Buyer prior to Closing.

"New KLD Equity Interests" shall mean common equity interests in New KLD constituting 25% of the outstanding equity interests in New KLD immediately after the issuance pursuant to this Agreement, subject to reduction in accordance with Section 2.3.

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation or award of the Bankruptcy Court or any Governmental Entity or private arbitration tribunal.

"Organizational Documents" shall mean (a) the articles or certificate of incorporation and the bylaws of a corporation, (b) the partnership agreement and any statement or certificate of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the limited liability company agreement and articles or certificate of formation of a limited liability company, (e) any other charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (f) any amendment to any of the foregoing.

"Ownership Interest" shall mean, with respect to any Person, (a) capital stock, membership interests, partnership interests, other equity interests, rights to profits or revenue and any other similar interest of such Person, (b) any security or other interest convertible into or exchangeable or exercisable for any of the foregoing and (c) any right (contingent or otherwise) to acquire any of the foregoing.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"Proceeding" shall mean any action, arbitration, audit, hearing, investigation, prosecution, contest, examination, litigation, proceeding or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity or arbitrator.

**EXHIBIT 1**
**Page 5 of 90**

"Purchase Price" shall mean the consideration to be paid or issued, as applicable, by Buyer to Seller pursuant to Section 2.3 in exchange for the Purchased Assets.

"Registered Intellectual Property" shall mean all material issued patents, pending patent applications, trademark or service mark registrations, applications for trademark or service mark registrations, copyright registrations, applications for copyright registration and Internet domain name registrations owned, filed or applied for by Seller.

"Representative" shall mean, with respect to any Person, such Person's officers, directors, employees, agents and representatives (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

"Sale Motion" shall mean the motion or motions of Seller seeking approval of the sale to the Buyer and entry of the Approval Order.

"Stockholders' Agreement" shall mean a Stockholders' Agreement or similar agreement (depending on the type of entity) governing the rights of equity holders of New KLD, by and between Buyer, New KLD and Seller, in a form reasonably acceptable to Buyer and Seller.

"Subsidiary" shall mean any Person in which any ownership interest is owned, directly or indirectly, by another Person.

"Tax" or "Taxes" shall mean (a) all taxes, assessments, fees, unclaimed property and escheat obligations, and other charges of any kind whatsoever imposed by any Governmental Entity, including any federal, state, local and/or foreign income tax, surtax, remittance tax, presumptive tax, net worth tax, special contribution tax, production tax, value added tax, withholding tax, gross receipts tax, windfall profits tax, profits tax, ad valorem tax, personal property tax, real property tax, sales tax, goods and services tax, service tax, transfer tax, use tax, excise tax, premium tax, stamp tax, motor vehicle tax, entertainment tax, insurance tax, capital stock tax, franchise tax, occupation tax, payroll tax, employment tax, unemployment tax, disability tax, alternative or add-on minimum tax and estimated tax, (b) any interest, fine, penalty or additions to tax imposed by a Governmental Entity in connection with any item described in clause (a), and (c) any liability in respect of any item described in clauses (a) or (b) above, that arises by reason of a contract, assumption, transferee or successor liability, operation of Law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"Taxing Authority" shall mean the Internal Revenue Service and any other Governmental Entity responsible for the administration of any Tax.

"Tax Code" shall mean the Internal Revenue Code of 1986, as amended.

"Tax Return" shall mean any return, report, filing, declaration or information return or statement relating to Taxes, including any return of an affiliated, combined or unitary group, and any and all work papers relating to any Tax Return (including any elections, declarations, schedules or attachments thereto, and any amendment thereof).

**EXHIBIT 1**

**Page 6 of 90**

"Treasury Regulations" shall mean the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provision of the Tax Code.  All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute, temporary or final Treasury Regulations.

1.2  Other Defined Terms.  The following additional terms shall have the meanings defined for such terms in the Sections set forth below:

| Term | Section |
| --- | --- |
| 365 Contract | 6.9 |
| 365 Schedule | 6.9 |
| Agreement | Preamble |
| Annual Balance Sheet | 4.13 |
| Approval Order | 6.11(a) |
| Assigned Contracts | Recitals |
| Assumed Leases | 2.1(a)(iv) |
| Assumed Liabilities | 2.7 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bidding Procedures | 6.11(a) |
| Bid Selection Deadline | 6.7(b) |
| Bill of Sale | 3.1(a)(i) |
| Business | Recitals |
| Buyer | Preamble |
| Buyer Cure Amount Cap | 6.10(a) |
| Buyer Reduction Determination | 2.3(b) |
| Cash Consideration | 2.3(a) |
| Closing | 3.1 |
| Closing Date | 3.1 |
| Company Records | 2.2(h) |
| Competing Transaction | 6.7(a) |
| Cure Amounts | 2.7(b) |
| Deposit | 2.4 |
| Employment Agreements | 6.12 |
| Environmental Laws | 5.13 |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.8 |
| Execution Date | Preamble |
| Green Ray Amendment | 6.1(a) |
| Green Ray License Agreement | 6.1(a) |
| Increased Cash Amount | 2.3(b) |
| Inspection Period | 8.1(g) |
| Purchased Assets | 2.1 |
| Retained Employees | 6.12 |
| Seller | Recitals |

**EXHIBIT 1**
**Page 7 of 90**

Seller Cash Increase Notice            2.3(a)
Seller Cash Increase Notice Deadline      2.3(a)

# ARTICLE II
## AGREEMENT TO PURCHASE AND SELL AND CONSIDERATION

2.1    <u>Sale and Purchase</u>.   Subject to <u>Section 2.2</u>, <u>Section 2.3</u>, the other provisions of this Agreement and the Approval Order, at Closing, and upon the terms and conditions set forth herein, Seller agrees to sell, convey, assign, transfer, and deliver to Buyer, and Buyer agrees to purchase, acquire, and accept all right, title and interest of Seller in and to and in each case free and clear of all Liens, claims, encumbrances and interests pursuant to Sections 363 and 365 of the Bankruptcy Code the following assets, but excluding the Excluded Assets, as such assets are specified below (the "<u>Purchased Assets</u>"):

(a)    All assets and properties associated with Seller (except those specified under Excluded Assets) including, without limitation:

(i)    the assets and properties set forth on <u>Schedule 2.1(a)</u>;

(ii)    all accounts receivable, as specified on <u>Schedule 2.1(b)</u>;

(iii)    the Assigned Contracts listed or described on <u>Schedule 2.1(c)</u>, which schedule must be prepared and delivered by Buyer to Seller before the later of 11:59 pm Austin, Texas time on November 28, 2016, and the 7th Business Day after the Seller delivers a certification to Buyer that <u>Schedule 4.6</u> contains a complete list of all Contracts, Leases, agreements or other instruments or documents related to the Purchased Assets that are known to the Seller and copies of all such items;

(iv)    all rights and incidents of interest of Seller to all real property leases used in the operation of the Business, including without limitation such of the foregoing that are listed or described on <u>Schedule 2.1(d)</u> (to the extent not excluded under <u>Section 2.2</u>, the "<u>Assumed Leases</u>"); and

(v)    any of Seller's rights, claims and causes of action under the Bankruptcy Code and any Avoidance Actions, in each case, solely to the extent related to any of the Purchased Assets or the Assigned Contracts.

2.2    <u>Excluded Assets</u>. Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer expressly understands and agrees that the following assets and properties of Seller (the "<u>Excluded Assets</u>") shall be excluded from the Purchased Assets:

(a)    all cash and cash equivalents on hand and in banks, bank accounts, lockboxes, investments, and marketable securities;

(b)    all insurance policies and rights under such policies, including all insurance recoveries, prepaid premiums, and unearned premiums thereunder and cancellation

**EXHIBIT 1**
**Page 8 of 90**

value thereof and rights to assert claims, actions, rights, or causes of actions with respect to any such insurance recoveries;

(c)     all rights of Seller under this Agreement or any other agreement executed in connection with the transactions contemplated by this Agreement;

(d)     the Tax and Tax related records such as invoices with respect to Income Taxes of Seller or the Excluded Assets;

(e)     the rights and claims to Tax refunds related to the Business or the Purchased Assets, relating to taxable periods ending on or prior to the Closing Date, regardless of whether the refunds or credits are realized following the Closing Date;

(f)     except to the extent they involve, have any connection with, or relate to the Purchased Assets or the Assigned Contracts, any of Seller's rights, claims and causes of action under the Bankruptcy Code and any Avoidance Actions, but excluding those rights, claims and causes of action described in Section 2.1(a)(v);

(g)     all assets (including books and records) related to any pension, profit sharing, stock bonus, stock option, thrift or other retirement plan, medical, hospitalization, dental, life, disability, vacation or other insurance or benefit plan, employee stock ownership plan, deferred compensation, stock ownership, stock purchase, bonus, benefit or other incentive plan, severance plan or other similar plan covering or applicable to Seller or its employees, whether or not sponsored by Seller and including plans sponsored by Seller's Affiliates;

(h)     all company seals, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence, or capitalization of Seller, all financial, tax and accounting books and records of Seller, all books and records of Seller relating to any Excluded Assets, and any other books, records or materials relating to Seller generally and not involving or related to the Purchased Assets or the operations of the Business (other than the Assigned Contracts, if applicable) (the "Company Records");

(i)     all of Seller's claims and causes of action under Chapter 5 of the Bankruptcy Code including, without limitation, under Sections 502, 510, 541, 542, 544, 545, 547-551, 553, and 558 of the Bankruptcy Code, and any other avoidance action under the Bankruptcy Code and all proceeds therefrom that do not relate to the Purchased Assets;

(j)     all rights, claims and causes of action of Seller that are related solely to the Excluded Assets or the Excluded Liabilities and do not relate to the Purchased Assets;

(k)     any Contract that is not an Assigned Contract listed or described on Schedule 2.1(c), including, but limited to, the Development Agreement and Contingent License, dated as of August 10, 2012, by and between Seller and Island Park Laboratories, Inc., and any amendments thereto;

(l)     all deposits submitted by any third party under the terms of the Bidding Procedures;

**EXHIBIT 1**
**Page 9 of 90**

(m)     any and all privileges of Seller with any of its professionals including attorneys, accountants, and other advisors, whether related to attorney-client privilege, attorney work product, or otherwise; and

(n)     any other asset of Seller listed or described on Schedule 2.2(n), which schedule must be prepared and delivered by Buyer to Seller before the later of 11:59 pm Austin, Texas time on November 28, 2016, and the 7th Business Day after the Seller delivers final versions of all disclosure schedules called for Seller to deliver by this Agreement.

2.3     Purchase Price.

(a)     In consideration for purchasing the Purchased Assets and subject to the terms and conditions of this Agreement, Buyer will assume the Assumed Liabilities as provided in Section 2.7 and at the Closing, will (i) pay to Seller an amount in cash equal to $9,000,000.00 (as adjusted herein, the "Cash Consideration") and (ii) issue to Seller the New KLD Equity Interests (the "Equity Consideration"); provided, however, that Seller may, in its sole discretion, elect to increase the Cash Consideration to $12,500,000 in exchange for a decrease in the Equity Consideration to zero by providing written notice (the "Seller Cash Increase Notice") to Buyer of such election within 5 Business Days of the Execution Date (the "Seller Cash Increase Notice Deadline").

(b)     Notwithstanding anything in Section 2.3(a) to the contrary, if Seller does not deliver the Seller Cash Increase Notice by the Seller Cash Increase Notice Deadline, the parties acknowledge and agree that in the event (i) Buyer in good faith determines (the "Buyer Reduction Determination") that issuing the Equity Consideration will be reasonably likely to result in adverse legal, tax, regulatory or other similar effects or inefficiencies to Buyer or (ii) the Bankruptcy Court determines that Buyer cannot issue the Equity Consideration to Seller pursuant to a sale of the Purchased Assets under Sections 363 and 365 of the Bankruptcy Code and the applicable Bankruptcy Rules (as contemplated herein), Buyer may, in its sole discretion, (A) increase the Cash Consideration to be paid to Seller by an amount up to $3,500,000.00 (the amount of such increase, the "Increased Cash Amount") and (B) decrease the Equity Consideration to be issued to Seller by an amount equal to (x) the aggregate amount of New KLD Equity Interests that would otherwise be issued under this Agreement to Seller multiplied by (y) a fraction, the numerator of which is the Increased Cash Amount and the denominator of which is $3,500,000.00; provided, that Buyer will provide written notice to Seller of the Buyer Reduction Determination no later than 5 Business Days before the Closing, or such later date as mutually agreed by Buyer and Seller.

2.4     Deposit.  Buyer has given a deposit in the amount of $100,000.00 (the "Deposit") to Seller in accordance with the Bidding Procedures.  If the transaction contemplated by this Agreement is consummated in accordance with this Agreement, then the Deposit will be applied against the Cash Consideration to be paid at Closing. The balance of the Cash Consideration after application of the Deposit will be paid to Seller at the Closing. Return or forfeiture of the Deposit shall be in accordance with the Bidding Procedures attached hereto and made a part hereof as Exhibit A or the applicable provisions of this Agreement.

EXHIBIT 1
Page 10 of 90

2.5     Allocation of Purchase Price for Tax Purposes.  Seller and Buyer agree that the allocation of the Purchase Price, the Assumed Liabilities and any other items constituting consideration for applicable Income Tax purposes among the Purchased Assets shall be as set forth on Exhibit C attached hereto, which was prepared by Buyer in accordance with Section 1060 of the Tax Code.  If there is any adjustment to the Purchase Price or the Assumed Liabilities, Seller and Buyer agree to make appropriate adjustments to the allocation set forth in Exhibit C attached hereto.  Seller and Buyer shall be bound by such allocation (and if necessary, any revised allocation), and shall file, or cause to be filed, all applicable federal, state, local and foreign income, franchise and excise Tax Returns, including Internal Revenue Service Form 8594, in a manner that is substantially consistent with such allocation.  If the allocation set forth on Exhibit C is disputed by any Taxing Authority, the party hereto receiving notice of such dispute shall promptly notify the other party hereto concerning the existence of such dispute and the parties shall consult with each other with respect to all issues related to the allocation in connection with such dispute.

2.6     Withholding.  Buyer shall be entitled to deduct and withhold from any amounts payable to Seller such amounts as Buyer determines in good faith are required to be deducted or withheld therefrom or in connection therewith under the Tax Code or any provision of state, local or foreign Tax Law or under any other Law.  To the extent such amounts are so deducted or withheld and paid over to the relevant Governmental Entity, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid.

2.7     Liabilities to be Assumed by Buyer.  Upon the transfer of the Purchased Assets on the Closing Date, Buyer shall assume, pay and/or perform when due and discharge the following Liabilities (collectively, the "Assumed Liabilities"):

(a)     Any and all Liabilities associated with, or in any way relating to, the Purchased Assets that arise after the Closing;

(b)     All Liabilities of Seller arising as cure amounts under the Assigned Contracts, including all Liabilities with respect to Cure Amounts identified on Schedule 2.1(c) (the "Cure Amounts"), subject to and only up to the amount of the Buyer Cure Amount Cap set forth in Section 6.10(a); and,

(c)     all Taxes related to the operation of the Business by Buyer attributable to taxable periods, or portions thereof, beginning after the Closing Date, including Liabilities for Taxes attributable to the ownership of the Purchased Assets after the Closing Date;

2.8     Excluded Liabilities.  Except for the Assumed Liabilities as specifically set forth in Section 2.7, Buyer shall not assume, and shall be deemed not to have assumed, any Liabilities (all liabilities other than the Assumed Liabilities, collectively, the "Excluded Liabilities").

EXHIBIT 1
Page 11 of 90

## ARTICLE III
## CLOSING

3.1 <u>Closing; Transfer of Possession; Certain Deliveries</u>. Unless this Agreement is terminated and the transaction contemplated herein is abandoned pursuant to <u>Article VIII</u> hereof, the closing of the transaction contemplated herein (the "<u>Closing</u>") will take place on December 22, 2016 or on such other date as the parties hereto shall mutually agree, such date to be as soon as practicable following entry of the Approval Order. The Closing shall be held at the offices of Vinson & Elkins L.L.P. at 2001 Ross Avenue, Suite 3700, Dallas, Texas 75201-2975, at _____ a.m., Dallas, Texas time, unless the parties hereto otherwise agree. The actual time and date of the Closing are herein called the "<u>Closing Date</u>."

(a) At the Closing, Seller shall deliver to Buyer:

(i) A duly executed Bill of Sale in a form reasonably acceptable to Buyer and Seller (the "<u>Bill of Sale</u>");

(ii) Documentation reasonably required by Buyer's counsel showing that Seller has the authority to enter into this Agreement, to execute the Closing documents contemplated herein and to convey title to the Purchased Assets;

(iii) A copy of the Approval Order;

(iv) A duly executed Stockholders' Agreement;

(v) The officer's certificates required to be delivered pursuant to <u>Section 7.2(c)</u> hereof;

(vi) A certificate of non-foreign status of Seller meeting the requirements of Treasury Regulation Section 1.1445-2(b)(2); and

(vii) All other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be reasonably necessary to convey the Purchased Assets to Buyer or Buyer's designee.

(b) At the Closing, Buyer shall deliver to Seller:

(i) The Cash Consideration, including the authorization of any release of the Deposit to Seller, to be paid by wire transfer to an account or accounts designated by Seller;

(ii) Certificate(s) or otherwise appropriate evidence representing the New KLD Equity Interests, duly executed by New KLD;

(iii) A duly executed Bill of Sale;

(iv) A duly executed Stockholders' Agreement;

**EXHIBIT 1**
**Page 12 of 90**

(v)     If applicable, payment of all undisputed Cure Amounts under the Assigned Contracts in accordance with <u>Section 6.10</u> by wire transfer of immediately available funds or evidence reasonably acceptable to Seller of Buyer's payment of all Cure Amounts under the Assigned Contracts as ordered by the Bankruptcy Court;

(vi)    Documentation such as a company resolution or written consent, reasonably required by Seller's counsel showing that Buyer has the authority to enter into this Agreement, to execute the Closing documents contemplated herein and to accept title to the Purchased Assets and assume the Assumed Liabilities; and

(vii)   The officer's certificate required to be delivered pursuant to <u>Section 7.3(c)</u> hereof.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants as follows:

4.1     <u>Existence; Good Standing and Power</u>.  Seller is a Texas corporation validly existing and in good standing under the laws of Texas. Subject to entry of the Approval Order, Seller has all requisite power and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by Seller and to perform its obligations hereunder and thereunder.  Seller is duly qualified to do business as a foreign entity and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification, except such jurisdictions where the failure to so qualify, individually or in the aggregate, has not had, and would not reasonably be expected to have a Material Adverse Effect on Seller.  Seller has delivered to Buyer complete and correct copies of its organizational documents, including any amendment thereto.

4.2     <u>Authority</u>.  The execution, delivery and performance of this Agreement and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all necessary company action on the part of Seller.

4.3     <u>Execution and Binding Effect</u>.  This Agreement has been duly and validly executed and delivered by Seller, and, following entry of the Approval Order, this Agreement and the transaction contemplated hereby constitute (assuming in each case the due and valid authorization, execution and delivery thereof by the other parties hereto), a valid and legally binding obligation of Seller enforceable against Seller in accordance with its respective terms.

4.4     <u>No Violation</u>.  The execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby, do not and will not conflict with or result in, with or without the giving of notice or lapse of time or both, any violation of or constitute a breach or default, or give rise to any right of acceleration, payment, amendment, cancellation or termination, under (a) the certificate of formation, limited liability company operating agreement of Seller or any resolution or written consent adopted by the board of managers or the members of Seller and not rescinded, (b) subject to entry of the Approval Order, any agreement or other instrument to which Seller is a party or by which Seller or any of the Purchased Assets is bound,

**EXHIBIT 1**
**Page 13 of 90**

(c) subject to entry of the Approval Order, any Order of any Governmental Entity to which Seller is bound or subject, (d) subject to entry of the Approval Order, any Law applicable to Seller or any of its respective properties or assets, or (e) except as provided for herein, result in the imposition or creation of any Lien upon or with respect to any of the Purchased Assets.

4.5     Brokers and Finders.  Seller has not employed any broker or finder or incurred any liability for any brokerage fees, commissions, finders, or similar fees in connection with the transactions contemplated by this Agreement.

4.6     Assigned Contracts.  Subject to entry of the Approval Order and payment of all undisputed Cure Amounts, to Seller's Knowledge, there are no Contracts, agreements, Leases, or other instruments or documents that affect the Purchased Assets to which Seller is a party, or that are otherwise binding on Seller and pertain to the Purchased Assets, other than the Contracts, agreements, Leases or other instruments or documents described on Schedule 4.6. Seller has made available to Buyer accurate and complete copies of all such items listed on Schedule 4.6 as of the Execution Date.  With respect to the Assigned Contracts, other than as a result of the Bankruptcy Case and other than as set forth on Schedule 4.6: (a) Seller is not in breach or default, and there has occurred no event, fact, or circumstance that, with the lapse of time, or the giving of notice, or both, would constitute such a breach or default by Seller, with respect to the terms of any such Assigned Contract, that in each case, would have a Material Adverse Effect; (b) to Seller's Knowledge, no other Person is in breach or default with respect to the terms of any such Assigned Contract that would have a Material Adverse Effect; (c) neither Seller nor, to Seller's Knowledge, any other party to any such Assigned Contract has given or threatened to give notice of any action to terminate, cancel, rescind, repudiate, or procure a judicial reformation of any such Contract or any provision thereof; and (d) to Seller's Knowledge, each Assigned Contract is enforceable against each party to such Assigned Contract, and is in full force and effect, and will continue to be so enforceable and in full force and effect on identical terms following the consummation of the transactions contemplated by this Agreement.

4.7     Litigation.  As of the Execution Date:

(a)     other than the Bankruptcy Case, there are no material Proceedings pending or, to the Knowledge of Seller, threatened, against Seller or relating to the Business or any of the Purchased Assets; and

(b)     Seller has not received written notice of, and to the Knowledge of Seller, there are no, Orders against Seller that restricts the operation of the Business in any material respect.

4.8     Intellectual Property.

(a)     Seller (i) exclusively owns, free and clear of all Liens all Acquired Intellectual Property and (ii) has a valid right to use (in the manner used as of the Execution Date), free and clear of all Liens, the other material Intellectual Property that is used or held for use in or necessary for the conduct of the Business as it is being conducted as of the Execution Date; provided however, for the avoidance of doubt, the foregoing clauses (i) and (ii), shall not

EXHIBIT 1
Page 14 of 90

be deemed to constitute a representation with respect to infringement or other violation of any Intellectual Property of third parties, which is addressed in <u>Section 4.8(c)</u>.  The Acquired Intellectual Property is subsisting, in full force and effect, and has not been cancelled, expired or abandoned.

(b)     As of the Execution Date, Schedule 4.8(b) contains a complete and correct list (in all material respects) of the Registered Intellectual Property.  The Registered Intellectual Property is valid and enforceable.

(c)     Except as would not, individually or in the aggregate, be material to the Business, taken as a whole, (i) the conduct of the Business does not infringe or otherwise violate any Intellectual Property of any Person and (ii) as of the Execution Date, no Person has provided written notice to any Seller that the conduct of the Business infringes or otherwise violates any Intellectual Property of any Person.

(d)     Except as would not, individually or in the aggregate, be material to the Business, taken as a whole, to the Knowledge of Seller, no Person is infringing or otherwise violating any of the Acquired Intellectual Property.

(e)     Schedule 4.8(e) is a correct and complete list (in all material respects) of all material Contracts pursuant to which Seller has granted to any Person any license, covenant not to sue or right in, under or with respect to any Acquired Intellectual Property.

4.9     <u>Assumed Leases</u>.

(a)     On the Closing Date, Seller will sell, transfer and assign to Buyer a valid leasehold interest with respect to each of the Assumed Leases which is a lease (as opposed to a sublease), and a valid subleasehold interest with respect to each of the Assumed Leases which is a sublease, in each case free and clear of all Liens.  Schedule 4.9(a) identifies the instruments through which Seller derives their leasehold and subleasehold interests in the Assumed Leases (including all amendments thereto).

(b)     Set forth on Schedule 4.9(b) is a complete and correct list of all real property leases and all real property leased by Seller**,** setting forth the address, landlord and tenant for each real property lease.

(c)     Complete and correct copies of the Assumed Leases and the real property leases of Seller have been delivered to, or made available for inspection in the Data Room by, Buyer and, except to the extent such modifications are disclosed by the copies delivered to, or made available for inspection in the Data Room by, Buyer or otherwise disclosed to Buyer in writing, none of the Assumed Leases or any real property leases of Seller has been modified in any material respect.

(d)     Seller has valid and enforceable leasehold interests under each of the applicable Assumed Leases and real property leases.  Each of the Assumed Leases and the real property leases is in full force and effect, and Seller has not received or given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by Seller

**EXHIBIT 1**
**Page 15 of 90**

under any such leases and, to the Knowledge of Seller, no other party thereto is in default thereof.

      4.10   <u>Real Property</u>.

      (a)   Neither Seller nor any of its Subsidiaries owns any real property.

      (b)   The Leased Real Property: (i) constitutes all interests in real property currently used in the Business and which are necessary for the continued operation of the Business by Buyer as the Business is conducted immediately prior to the Execution Date by Seller; and (ii) is not, to the Knowledge of Seller, the subject of any condemnation or eminent domain proceedings.

      4.11   <u>Personal Property</u>.  Except as set forth on <u>Schedule 4.11</u>, Seller owns good and valid title or valid and enforceable leasehold interest, as the case may be, free and clear of all Liens, to or in all of the material tangible personal property and assets used in the Business.  All such items of tangible personal property and assets are, in all material respects, in good operating condition and repair (ordinary wear and tear excepted).

      4.12   <u>Labor Matters</u>.

      (a)   There are no collective bargaining agreements or similar agreements in effect that cover any Employees with respect to their employment with Seller.

      (b)   There is no organized labor strike, slowdown, lockout, or stoppage pending or, to the Knowledge of Seller, threatened against Seller.  Since January 1, 2013, Seller has not received written notice of any material unfair labor practice as defined in the National Labor Relations Act.  To the Knowledge of Seller, Seller has good labor relations.

      4.13   <u>Absence of Undisclosed Liabilities</u>.  Except as set forth on <u>Schedule 4.13</u>, Seller and Seller's Subsidiaries do not have any liabilities or obligations of any nature, that are required under GAAP to be reflected on or reserved for in a balance sheet, whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and whether arising out of transactions entered into or any condition or state of facts existing on or prior to the Execution Date, other than (i) liabilities and obligations set forth on Seller's audited balance sheet, as of December 31, 2015 (the "<u>Annual Balance Sheet</u>"), (ii) liabilities and obligations which have arisen after the date of the Annual Balance Sheet in the ordinary course of business consistent with past practice or (iii) liabilities or obligations that would not materially impair the financial condition or operations of Seller.

      4.14   <u>Subsidiaries</u>.  Except as set forth on <u>Schedule 4.14</u>, Seller does not have any Subsidiaries and does not own any Ownership Interests in any other Person.  Seller does not have any outstanding obligations to provide funds to or make any investment (in either case, in the form of a loan, capital contribution, purchase of an Ownership Interest or otherwise) in, any other Person.

      4.15   <u>Employee Benefit Matters</u>.

**EXHIBIT 1**
**Page 16 of 90**

(a)      Schedule 4.15(a) lists, as of the Execution Date, a true and complete list of each material Benefit Plan sponsored by Seller or any of its Subsidiaries.  Seller has provided Buyer with a complete and correct copy of each material Benefit Plan and, to the extent applicable, each of the following documents relating thereto: (i) most recent summary plan description and any summaries of material modifications relating thereto, (ii) most recent Form 5500, (iii) most recent Taxing Authority determination or opinion letter, (iv) most recent trust report, (v) most recent actuarial valuation and (vi) most recent insurance policy, administrative service contract or other contracts relating thereto.

(b)      Each Benefit Plan has been operated and administered, in all material respects, in accordance with its terms and applicable Law, including, but not limited to, ERISA and the Tax Code.

(c)      Each Benefit Plan which is intended to qualify under Section 401(a) of the Tax Code does so qualify, and to the Knowledge of Seller, nothing has occurred which would reasonably be expected to affect such qualified status.

(d)      Seller has provided to Buyer a true and complete list of all Employees and each Employee's employer, position, annual salary or wage rate, target annual bonus or other cash incentive compensation opportunity, prior year's annual bonus, hire date, principal work location, accrued and unused vacation days, accrued and unused paid time off, accrued and unused sick leave or other leave, and status (exempt or non-exempt, active or inactive), and such list shall be updated no more than seven (7) days prior to the Closing Date.

4.16   Taxes.

(a)      (i) All material Tax Returns required to be filed by or on behalf of each of Seller and any Affiliate thereof or otherwise related to the Purchased Assets or the Business have been duly and timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed, and all such Tax Returns are true, complete and correct in all material respects; and (ii) all owed by Seller or any Affiliate thereof or otherwise related to the Purchased Assets or the Business have been fully and timely paid.

(b)      Seller and its Subsidiaries have complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes imposed on or with respect to Seller, the Purchased Assets or the Business and have duly and timely withheld and paid over to the appropriate Taxing Authority all amounts required to be so withheld and paid under all applicable Laws.

(c)      Seller does not have in force any waiver of any statute of limitations in respect of Taxes or any extension of time with respect to a Tax assessment or deficiency and no extension of time within which to file any Tax Return with respect to the Purchased Assets or the Business is currently in effect.

(d)      There are no Liens on any of the Purchased Assets currently existing, pending or, to the Knowledge of Seller, threatened with respect to any Purchased Assets related to any unpaid Taxes and there are no pending or active audits or legal proceedings involving Tax

**EXHIBIT 1**
**Page 17 of 90**

matters or, to Knowledge of Seller, threatened audits or proposed deficiencies or other claims for unpaid Taxes of Seller.

(e)    All of the Purchased Assets have been properly listed and described on the property tax rolls for all periods prior to and including the Closing Date and no portion of the Purchased Assets constitutes omitted property for property tax purposes.

(f)    Seller is not a foreign Person within the meaning of Section 1445 of the Tax Code.

(g)    Buyer will not be held liable for any unpaid Taxes that are or have become due on or prior to the Closing Date as a successor or transferee, by statute, contract or otherwise, as a result of the transfer of the Purchased Assets pursuant to this Agreement.

(h)    None of the Purchased Assets is held by or is subject to any contractual arrangement between Seller, on the one hand, and any other person, on the other hand, whether owning undivided interests therein or otherwise, that is classified as a partnership for federal tax purposes and no transfer of any part of the Purchased Assets pursuant to this Agreement will be treated as a transfer of an interest or interests in any partnership for federal Income Tax purposes.

4.17    Limitations on Seller's Representations and Warranties.    Except for the representations and warranties contained in this Agreement, Seller makes no other express or implied representation or warranty, including, without limitation, representations or warranties as to the condition of the Purchased Assets, their contents, the income derived or potentially to be derived from the Purchased Assets, or the expenses incurred or potentially to be incurred in connection with the Purchased Assets. Seller is not, and will not be, liable or bound in any manner by express or implied warranties, guarantees, statements, promises, representations or information pertaining to the Purchased Assets or the Business, made or furnished by any broker, agent, employee, servant or other person representing or purporting to represent Seller, unless and to the extent the same is expressly set forth in this Agreement.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1    Existence, Good Standing and Power.    Buyer is a company validly existing and in good standing under the laws of the Cayman Islands. Buyer has all requisite power and authority to conduct its business as presently conducted, to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and to perform its obligations hereunder and thereunder.  Buyer is duly qualified to do business as a foreign entity and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification, except such jurisdictions where the failure to so qualify, individually or in the aggregate, has not had, and would not reasonably be expected to have a Material Adverse Effect on Buyer.

**EXHIBIT 1**
**Page 18 of 90**

5.2     Authority.  The execution, delivery and performance of this Agreement and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Buyer.

5.3     Execution and Binding Effect. This Agreement has been duly and validly executed and delivered by Buyer and, following entry of the Approval Order, this Agreement and the transaction contemplated hereby constitutes (assuming, in each case, the due and valid authorization, execution and delivery thereof by the other parties hereto) a valid and legally binding obligation of Buyer, enforceable against it in accordance with its terms.

5.4     No Violation.  The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby, do not and will not conflict with or result in, with or without the giving of notice or lapse of time or both, any violation of or constitute a breach or default, or give rise to any right of acceleration, payment, amendment, cancellation or termination, under (a) the organizational documents of Buyer or any resolution or written consent adopted by managers of Buyer and not rescinded, (b) any agreement or other instrument to which Buyer is a party or by which Buyer or any of its respective properties or assets is bound, (c) any Order of any Governmental Entity to which Buyer is bound or subject or (d) any Law applicable to Buyer or any of its respective properties or assets.

5.5     Third Party Approvals.  The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons which have not been obtained by Buyer, other than the approval of the Bankruptcy Court pursuant to the Approval Order.

5.6     Capitalization.  The New KLD Equity Interests will constitute 25% of the outstanding equity interests in New KLD immediately after the issuance pursuant to this Agreement, subject to reduction in accordance with Section 2.3.  All of the issued and outstanding Units of New KLD will be, and upon their issuance in accordance with this Agreement, all of the issued and outstanding Units shall be, duly authorized, validly issued, fully paid and nonassessable, and have been offered, sold and issued by Buyer in compliance with applicable securities and corporate Laws and Buyer's Organizational Documents and in compliance with any preemptive rights, rights of first refusal or similar rights.  Buyer represents that Buyer's Organizational Documents will not prevent Seller from distributing the New KLD Equity Interests to Seller's creditors and/or equityholders as part of a liquidation plan or plan of reorganization subject to compliance with applicable laws and any transferee executing the Stockholder Agreement.

5.7     Brokers and Finders.  Buyer has not employed any broker or finder or incurred any liability for any brokerage fees, commissions, finders, or similar fees in connection with the transactions contemplated by this Agreement.

5.8     No Continuation of Business.  Buyer's business is neither a continuation of, nor is it related to, the business of Seller, and Buyer covenants and agrees that it will not, in any way, represent that its business is a continuation of or related to the business of Seller.

EXHIBIT 1
Page 19 of 90

     5.9     <u>Financing</u>.  Buyer acknowledges and agrees that the purchase of the Purchased Assets is not subject to any financing contingency whatsoever and that on the Closing Date, Buyer will have sufficient funds on hand or committed lines of credit to consummate the transactions contemplated by this Agreement.

     5.10     <u>Financial Ability</u>.  At all times between the date of this Agreement and the Closing Date, Buyer has, and will have, the financial ability, including sufficient available funds or immediate access to sufficient funds, to consummate the transactions contemplated by this Agreement and, as necessary, establish its ability to provide "adequate assurance," as such term is used in Section 365 of the Bankruptcy Code, and Buyer will provide to Seller such information as Seller reasonably believes necessary to establish such "adequate assurance" and cooperate with Seller as reasonably necessary to obtain entry of the Approval Order.

     5.11     <u>Solvency</u>.  As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by this Agreement, Buyer reasonably believes it will not (a) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its probable Liability on its debts as they become absolute and matured), (b) have unreasonably small capital with which to engage in its business, or (c) have incurred or planned to incur debts beyond its ability to repay such debts as they become absolute and matured.

     5.12     <u>Condition of Property and Waivers</u>.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT FOR AS PROVIDED FOR IN THIS AGREEMENT, INCLUDING SELLER'S REPRESENTATIONS AND WARRANTIES CONTAINED IN <u>ARTICLE IV</u>, THE SALE OF THE PURCHASED ASSETS IS MADE AND ACCEPTED ON AN "AS IS" AND "WHERE IS" BASIS WITH ALL FAULTS OR DEFECTS, WHETHER LATENT OR APPARENT, KNOWN OR UNKNOWN AND WITH NO LEGAL WARRANTIES WHATSOEVER ALL OF WHICH ARE EXPRESSLY WAIVED. BUYER, FOR ITSELF AND ON BEHALF OF ITS ASSIGNS AND TRANSFEREES, ACCEPTS THE PURCHASED ASSETS IN THE CONDITION AS EXISTING AT THE TIME OF SALE. EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES CONTAINED IN <u>ARTICLE IV</u> OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING TITLE OR OWNERSHIP TO THE PURCHASED ASSETS, THE ABSENCE OF LIENS OR ENCUMBRANCES, THE CONDITION OF THE PURCHASED ASSETS, OR ANY PARTS THEREOF, INCLUDING, WITHOUT IMITATION, THE FITNESS OF THE PURCHASED ASSETS FOR ANY PURPOSE OR INTENDED USE, THE PRESENCE OR ABSENCE OF APPARENT OR HIDDEN DEFECTS, THE PRESENCE OR ABSENCE OF ENVIRONMENTAL CONTAMINATION, OR THE COMPLIANCE OF THE PURCHASED ASSETS WITH ANY APPLICABLE LAWS, RULES OR REGULATIONS, ALL OF WHICH WARRANTIES ARE HEREBY EXPRESSLY WAIVED BY BUYER. BUYER FULLY AND COMPLETELY WAIVES ANY AND ALL RIGHTS FOR THE RETURN OF ALL OR ANY PART OF THE PURCHASE PRICE BY THE REASON OF ANY SUCH DEFECTS. BUYER ACKNOWLEDGES AND DECLARES THAT NEITHER SELLER NOR ANY PARTY, WHOMSOEVER, ACTING OR PURPORTING TO ACT IN ANY CAPACITY WHATSOEVER ON BEHALF OF SELLER, HAS MADE ANY DIRECT, INDIRECT,

**EXHIBIT 1**
**Page 20 of 90**

EXPLICIT OR IMPLICIT STATEMENT, REPRESENTATION OR DECLARATION, WHETHER BY WRITTEN OR ORAL STATEMENT OR OTHERWISE, AND UPON WHICH BUYER HAS RELIED, CONCERNING TITLE TO THE PURCHASED ASSETS, THE ABSENCE OF ANY LIENS OR ENCUMBRANCES, THE EXISTENCE OR NON-EXISTENCE OF ANY QUALITY, CHARACTERISTIC OR CONDITION OF THE PURCHASED ASSETS, EXCEPT AS CONTAINED IN THIS AGREEMENT. BUYER EXPRESSLY WAIVES ALL LEGAL WARRANTIES.

5.13    Additional Environmental Waivers.    BUYER, FOR ITSELF AND ITS ASSIGNS AND TRANSFEREES HEREBY ACCEPTS THE PURCHASED ASSETS IN THE EXISTING ENVIRONMENTAL CONDITION AND WAIVES, DISCHARGES, AND RELEASES SELLER, ITS AFFILIATES, ASSIGNS, AGENTS, REPRESENTATIVES, SHAREHOLDERS, OFFICERS, EMPLOYEES, DIRECTORS AND INSURERS FROM ANY AND ALL CLAIMS AND/OR CAUSES OF ACTION WHICH BUYER OR ITS ASSIGNS OR TRANSFEREES MAY HAVE OR HEREAFTER BE OTHERWISE ENTITLED TO, WHETHER AFFECTING PERSON AND/OR PROPERTY, FOR ANY ENVIRONMENTAL LIABILITIES ARISING FROM THE PURCHASED ASSETS, INCLUDING ANY CLAIMS, DEMANDS, CAUSES OF ACTIONS (BOTH PUBLIC AND PRIVATE), JUDGMENTS, ATTORNEYS' FEES, COSTS, EXPENSES, PENALTIES AND FINES, IMPOSED OR ASSESSED UNDER ANY AND ALL FEDERAL, STATE OR LOCAL ENVIRONMENTAL LAW, RULE, REGULATION, RULING OR ORDINANCE (COLLECTIVELY, "ENVIRONMENTAL LAWS").

5.14    Acknowledgment.    EXCEPT AS PROVIDED IN THIS AGREEMENT, BUYER HEREBY ACKNOWLEDGES AND AGREES THAT SELLER IS HEREBY TRANSFERRING ITS RIGHT, TITLE AND INTEREST IN AND TO THE PURCHASED ASSETS "AS IS," "WHERE IS" AND "WITH ALL FAULTS" AND WITHOUT ANY WARRANTY OR RECOURSE WHATSOEVER, NOT EVEN AS TO THE RETURN OF ALL OR ANY PART OF THE PURCHASE PRICE, AND WITH THE SOLE PERIL AND RISK OF EVICTION BEING ASSUMED BY BUYER, BUT WITH FULL SUBSTITUTION AND SUBROGATION IN AND TO ALL OF THE RIGHTS AND ACTIONS OF WARRANTY WHICH SELLER HAS OR MAY HAVE AGAINST ALL PRECEDING OWNERS OR VENDORS.

5.15    Bill of Sale.    The waivers of warranty shall be effective as of and contained in the Bill of Sale.

## ARTICLE VI
## COVENANTS OF THE PARTIES

6.1    Conduct of the Business Pending the Closing.    Except as otherwise expressly contemplated by this Agreement (including the prosecution of the Bankruptcy Case) or with the prior written consent of Buyer, between the Execution Date and the Closing (or earlier termination of this Agreement) Seller shall use best reasonable efforts to:

(a)    if requested by Buyer in Buyer's sole discretion, adopt and execute an amendment (the "Green Ray Amendment") to the Amended and Restated License Agreement,

**EXHIBIT 1**
**Page 21 of 90**

dated January 4, 2010 (as amended from time to time and last amended on February 26, 2016, the "Green Ray License Agreement"), by and between Green Ray Technologies, LLC and Seller, extending the deadline for Seller to exercise its option to purchase the Licensed IP Rights (as defined therein) from December 31, 2016 to March 31, 2017;

(b)     conduct the Business only in a manner consistent with the manner, if any, in which it is being conducted on the Execution Date, and shall not materially reduce the level of the Business's operations, if any, from the level of operations on the Execution Date;

(c)     maintain (i) all of the assets and properties of Seller constituting Purchased Assets in their current condition, ordinary wear and tear excepted, and (ii) insurance upon all of such assets and properties of Seller in such amounts and of such kinds comparable to that in effect on the Execution Date;

(d)     comply in all material respects with applicable Laws, including, without limitation, Environmental Laws; and

(e)     not take any action which would adversely affect the ability of the Parties to consummate the transactions contemplated by this Agreement.

6.2     Preservation of Purchased Assets.  From and after the date hereof and until the Closing Date, except as may be expressly contemplated or permitted by this Agreement, Seller will use commercially reasonable efforts in the context of the Bankruptcy Case to maintain the condition of the Purchased Assets. Seller agrees that it: (i) will maintain all existing security measures that currently protect such Purchased Assets; and (ii) will continue to take such actions and maintain all conditions as are required to ensure that the Purchased Assets remain in the conditions existing on the date hereof on the Closing Date, subject to normal wear and tear.

6.3     Access.   Buyer acknowledges and agrees that the purchase of the Purchased Assets is not subject to any additional due diligence and that Buyer has conducted all tests and investigations and other due diligence that is deems necessary and appropriate to purchase the Purchased Assets. Buyer has not permitted any lien to be filed against the Purchased Assets arising out of Buyer's investigation, inspections or tests. Buyer shall indemnify, defend and hold Seller harmless from and against any and all claims, charges, actions, costs, suits, damages, injuries, liens, or other liabilities which arise, either directly or indirectly, from Buyer's or its contractors, agents or representatives inspection of the Purchased Assets. The provisions of this Section 6.3 setting forth Buyer's obligations, including the indemnification, defense and hold harmless provisions herein, shall survive the Closing or any termination of this Agreement. In connection with all such investigation, inspections or testing, Buyer represents that it has not caused or permitted any alteration or damage to any portion of the Purchased Assets and has promptly restored the Purchased Assets to the condition prior, if any alteration or damage results.

6.4     Reasonable Efforts.  Upon the terms and subject to the conditions herein provided, each of the parties hereto shall use its respective reasonable, good faith efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable under applicable Laws

EXHIBIT 1
Page 22 of 90

and regulations to satisfy the conditions set forth in this Agreement and to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the parties hereto shall furnish to each other such necessary information and reasonable assistance, as each may request in connection with Seller's preparation and filing of applications and motion papers, including the Sale Motion needed to obtain Bankruptcy Court approval of the transactions contemplated by this Agreement and shall execute any additional instruments necessary to consummate the transactions contemplated hereby, whether before or after the Closing.

6.5     Notification of Certain Matters.  Seller shall give prompt notice to Buyer, and Buyer shall give prompt notice to Seller, of (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby or the entry of the Approval Order; and (iii) any material damage to the Purchased Assets that occurs or that Seller becomes aware of after the execution of this Agreement.

6.6     Further Assurances.  On and after the Closing Date, the parties shall take all appropriate action and shall execute all documents, instruments or conveyances of any kind that may be reasonably necessary or advisable to carry out any of the provisions hereof.

6.7     Competing Transaction.

(a)     From the date hereof (and any prior time) and until the Bid Deadline of November 28, 2016, Seller is permitted to cause its Representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and Representatives) in connection with any sale or other disposition of the Purchased Assets (a "Competing Transaction"). In addition, Seller may have the responsibility and obligation under the Bankruptcy Code or other applicable law to respond to any inquiries or offers to purchase the Purchased Assets and perform any and all other acts related thereto, including, without limitation, supplying information relating to the Business and Purchased Assets to prospective buyers.

(b)     From the Bid Deadline of November 28, 2016 until the Closing Date, Seller shall not enter into any agreement, discussion, or negotiation with (and shall terminate any existing discussions or negotiations with), or provide information to, or solicit, encourage, entertain or consider any inquiries or proposals from, any person (other than a Qualified Bidder) with respect to a similar transaction or another transaction inconsistent with this Agreement. During such period, Seller shall not, without the prior consent of Buyer, directly or indirectly solicit, initiate, or participate in any discussions or negotiations with, or encourage or respond to any inquiries or proposals by, any person or group other than Buyer or other Qualified Bidder concerning the acquisition of the Purchased Assets, except as specifically required by the Bidding Procedures or other order of the Bankruptcy Court.

6.8     Waiver of Bulk Sales Laws.  To the greatest extent permitted by applicable Law, Buyer and Seller hereby waive compliance by Buyer and Seller with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions

EXHIBIT 1
Page 23 of 90

contemplated by this Agreement. The Approval Order shall exempt Buyer and Seller from compliance with any such Laws.

6.9     Disclosure Schedule Updates.  Seller agrees, on a weekly basis, and at any time as may be requested by Buyer, to update, amend, and supplement the disclosure schedules listing all of Seller's assets and liabilities, including all of Seller's executory contracts and unexpired leases (each a "365 Contract" and collectively, the "365 Contracts") and the estimated Cure Amounts thereunder (such list may from time to time be amended or supplemented with written notice to Buyer, the "365 Schedule").

6.10    Cure Amounts.

(a)     At the Closing, Buyer shall pay all undisputed Cure Amounts up to $500,000 in the aggregate (the "Buyer Cure Amount Cap") with respect to the Assigned Contracts in the amount listed on the 365 Schedule and Seller shall provide adequate assurance of future performance of all of the Assigned Contracts so all Assigned 365 Contracts can be assumed by Seller and assigned, transferred, and conveyed to Buyer at the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.  Seller shall pay all aggregate Cure Amounts in excess of the Buyer Cure Amount Cap.  Except for the amounts listed on the 365 Schedule with respect to the Assigned Contracts, neither Buyer nor any of its subsidiaries or affiliates shall have any liability or obligation to any person for any default under or Cure Amounts related to any 365 Contract of Seller existing at or prior to Closing.  In the event that any executory contract or unexpired lease is added to the 365 Schedule in accordance with Section 6.9 above and Buyer elects to list such 365 Contract as an Assigned Contract, Buyer, in its sole discretion, will pay the undisputed Cure Amounts associated with such additional Assigned Contract; provided, that Buyer shall only pay Cure Amounts up to the Buyer Cure Amount Cap and Seller shall pay any Cure Amounts in excess of the Buyer Cure Amount Cap.  In addition, in the event Buyer determines that any executory contract or unexpired lease exists that is not listed on the 365 Schedule on or prior to Closing, (a) Buyer shall have the right to designate any such executory contract or unexpired lease as an Assigned Contract, (b) Seller shall assume and assign such additional Assigned Contract to Buyer within twenty-one (21) calendar days thereafter by order of the Bankruptcy Court in form and substance acceptable to Buyer in its sole discretion, and (c) Buyer, in its sole discretion, will pay the undisputed Cure Amounts associated with such additional Assigned Contract at such time; provided, that Buyer shall only pay Cure Amounts up to the Buyer Cure Amount Cap and Seller shall pay any Cure Amounts in excess of the Buyer Cure Amount Cap.

(b)     In the event that any Cure Amount associated with any Assigned Contract is found to be greater than the estimated Cure Amount in the 365 Schedule, then the amount of the Purchase Price allocated to cure defaults under the Assigned Contracts shall be increased by an equivalent amount of such increase.

6.11    Bidding Procedures.

(a)     In accordance with the procedures set forth in the Bidding Procedures Order (the "Bidding Procedures"), Seller will, at its sole cost and expense, file a motion in form and substance acceptable to Buyer in its sole discretion (the "Sale Motion") to obtain approval of

EXHIBIT 1
Page 24 of 90

the sale of the Purchased Assets and assumption and assignment of the Assigned Contracts to Buyer pursuant to an order in form and substance acceptable to Buyer (the "Approval Order"). Seller will use its commercially reasonable efforts to obtain the entry of the Sale Order in accordance with the deadline set forth in the Bidding Procedures Order.

(b)  Seller agrees to provide Buyer and its counsel with copies of all material motions, applications, supporting papers, notices and bids or proposals prepared or received by Seller (including forms of orders and notices to interested parties) relating in any way to the Bidding Procedures, the assumption and assignment of Assigned Contracts, or otherwise relating to the transactions contemplated by this Agreement prior to the filing of such documents and shall provide Buyer with a reasonable opportunity to review and provide comments to same, and to prepare, file, and pursue such pleadings in the Bankruptcy Court (in consultation with Buyer) that are necessary or useful to effectuate this Agreement.

(c)  If entry of the Sale Order, any orders relating to the assumption and assignment of the Assigned Contracts, or any other orders of the Bankruptcy Court relating to the transaction contemplated by this Agreement shall be appealed or otherwise challenged by any party (including by petition for *certiorari* or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, or reargument), Seller agrees, at Seller's sole cost and expense, to diligently oppose such appeal, challenge, petition, or motion and use all efforts to obtain an expedited resolution thereof.

6.12  Employment Agreements.  Buyer shall use commercially reasonable efforts to negotiate new employment agreements to be effective as of Closing (the "Employment Agreements") with Ray Caamano, Hector Moya and Nicolas Avlas (such persons, the "Retained Employees"), and, only if negotiated and entered into, each such Employment Agreement will provide that Buyer will pay to the applicable Retained Employee all ordinary course, unpaid and undisputed amounts owed to such Retained Employee under such Retained Employee's prior employment agreement with Seller.

6.13  Monthly Financial Statements.  Seller agrees to provide Buyer with monthly financial statements no later than 10 Business Days following the conclusion of each month, and such monthly financial statements shall include (a) an unaudited balance sheet as of the end of such month, (b) unaudited statements of income and cash flows for such month and (c) a line-by-line summary of operating expenses (including payroll expenses) for such month.

**ARTICLE VII**
**CONDITIONS TO OBLIGATIONS OF THE PARTIES**

7.1  Conditions Precedent to Obligations of Buyer and Seller.  The respective obligations of Buyer, on the one hand, and Seller, on the other hand, to close the transactions contemplated under this Agreement shall be subject to the satisfaction (or waiver by the other party) at or prior to the Closing Date of the following conditions:

(a)  No Injunction.  No preliminary or permanent injunction or other order issued by, and no Proceeding or Order by or before any Governmental Entity or by any Governmental Entity nor any Law or Order promulgated or enacted by any Governmental Entity

**EXHIBIT 1**
**Page 25 of 90**

shall be in effect or pending which materially delays, restrains, enjoins or otherwise prohibits or seeks to restrain, enjoin or otherwise prohibit the transaction contemplated hereby.

(b)  <u>Bankruptcy Court Authorization</u>.  The Bankruptcy Court shall have entered the Approval Order.

(c)  <u>Consents and Approvals</u>.  All consents, waivers, authorizations and approvals of third Persons as are necessary in connection with the transactions contemplated by this Agreement shall have been obtained, except for such consents, waivers, authorizations and approvals which would not have a Material Adverse Effect and such consents and approvals which are not required due to the entry by the Bankruptcy Court of the Approval Order.

7.2  <u>Conditions Precedent to Obligations of Buyer</u>.  The obligation of Buyer to close the transactions contemplated under this Agreement is subject to the reasonable satisfaction (or waiver by Buyer) at or prior to the Closing Date of each of the following additional conditions:

(a)  <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of Seller contained herein shall be true and correct in all material respects (without giving effect to any materiality or material adverse effect qualifications contained therein) on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such date.

(b)  <u>Performance of Agreements</u>.  Seller shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them prior to or at the Closing Date.

(c)  <u>Officer's Certificate</u>.  Buyer shall have received a certificate, dated as of the Closing Date, of an officer of Seller to the effect that the conditions specified in <u>Sections 7.2(a)</u> and <u>(b)</u> above have been fulfilled.

(d)  <u>Green Ray Amendment</u>.  If requested by Buyer in its sole discretion, Buyer shall have received a duly executed copy of the Green Ray Amendment.

(e)  <u>Employment Agreements</u>.  Buyer and each applicable Retained Employee shall have executed the Employment Agreements.

7.3  <u>Conditions Precedent to the Obligations of Seller</u>.  The obligation of Seller to close the transactions contemplated under this Agreement is subject to the satisfaction (or waiver by Seller) at or prior to the Closing Date of each of the following additional conditions:

(a)  <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of Buyer contained herein shall be true and correct in all material respects (without giving effect to any materiality or material adverse effect qualifications contained therein) on the date hereof and on and as of the Closing Date, with the same force and effect as though such

**EXHIBIT 1**
**Page 26 of 90**

representations and warranties had been made on and as of the Closing Date, except to the extent that any such representations or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such date.

(b)     Performance of Agreements.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or at the Closing Date.

(c)     Officer's Certificate.  Seller shall have received a certificate, dated as of the Closing Date, from an officer of Buyer to the effect that the conditions specified in Sections 7.3(a) and 7.3(b) above have been fulfilled.

## ARTICLE VIII
## TERMINATION

8.1     Termination of Agreement.  This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)     By mutual written consent of Buyer and Seller;

(b)     By either Buyer or Seller if the Closing shall not have occurred on or before (i) December 30, 2016, in the event Seller has not obtained the Green Ray Amendment prior to such date or (ii) January 31, 2016, in the event Seller has obtained the Green Ray Amendment prior to December 31, 2016;

(c)     By either Buyer or Seller, if the Bankruptcy Court has not entered the Approval Order by December 3, 2016 (or if the Approval Order is modified in a manner adverse to Buyer without Buyer's consent) or due to the existence of an unresolved objection to the Sale Motion, unless extended by mutual written consent of Buyer and Seller;

(d)     By either Buyer or Seller, provided such party is not in breach of this Agreement, if there shall be any Law or regulation that makes the consummation of the transactions contemplated hereby illegal or otherwise prohibited or if consummation of the transactions contemplated hereby would violate any non-appealable final order, decree or judgment of any court or governmental body having competent jurisdiction;

(e)     By either Buyer or Seller if Seller consummates a Competing Transaction, on the Business Day following the date of consummation of any Competing Transaction (unless Seller or Buyer shall previously have given notice of termination pursuant to this Section 8.1); or

(f)     By Seller, on the one hand, or Buyer, on the other, if Buyer or Seller, as the case may be, breaches any of its representations and warranties or fails to perform or comply with any of its covenants and agreements under this Agreement such that the conditions to Closing set forth in Article VII are not satisfied, unless such breach shall be cured within ten (10) Business Days after such other party shall have received written notice of such breach in accordance with the terms hereof;

**EXHIBIT 1**
**Page 27 of 90**

(g)    By Buyer if an amendment or supplement to a disclosure schedule with respect to matters arising after the Execution Date discloses facts that would reasonably be expected to result in losses exceeding $250,000;

(h)    By Buyer after December 31, 2016, if the Bankruptcy Court determines that a Chapter 11 plan of reorganization is required and Seller is unable to obtain the Green Ray Amendment;

(i)    By Buyer if, between the date of execution of this Agreement and the Closing Date, a material portion of the Purchased Assets are destroyed or damaged such that a Material Adverse Effect would result. Seller agrees that it shall provide prompt written notice in the event that any portion of the Purchased Assets are destroyed or damaged, Buyer and Seller also may agree to consummate the transaction contemplated hereby with respect to non-damaged Purchased Assets, upon the parties' agreement to a concomitant reduction in the Purchase Price.

8.2    Effect of Termination.

(a)    In the event of termination of this Agreement by either party hereto, except as otherwise provided in this Section 8.2, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party; provided, however, that nothing herein shall relieve any party from liability for fraud or the knowing and intentional breach of this Agreement prior to such termination or abandonment of the transactions contemplated by this Agreement.  The provisions of this Section 8.2 and Article XIII shall expressly survive the expiration or termination of this Agreement.

(b)    Notwithstanding Section 8.2(a) or Section 11.1, if this Agreement is terminated other than by Seller pursuant to Section 8.1(f), then Seller shall pay to Buyer the Break-Up Fee and Expense Reimbursement in full and complete satisfaction of all of Seller's obligations hereunder.  The payment of the Break-Up Fee and Expense Reimbursement shall be granted administrative expense status in the Bankruptcy Case and shall be paid in cash at Closing from, including without limitation, any sale proceeds from any Alternative Transaction, regardless of any claims or interests asserted in such proceeds.  Notwithstanding anything to the contrary in this Agreement, Buyer's right to receive payment of the Break-Up Fee and Expense Reimbursement from Seller as herein provided shall be the sole and exclusive remedy available to Buyer against Seller or any of its former, current or future equityholders, directors, officers, Affiliates or agents with respect to this Agreement and the transactions contemplated hereby in the event that this Agreement is terminated other than by Seller pursuant to Section 8.1(f), and upon payment of the Break-Up Fee and Expense Reimbursement in the circumstances described herein, neither Seller or any of its former, current or future equityholders, directors, officers, Affiliates or agents shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.

**ARTICLE IX**
**POSSESSION**

9.1    Possession.  Possession of the Purchased Assets will be delivered to Buyer at the Closing.

**EXHIBIT 1**
**Page 28 of 90**

## ARTICLE X
## RISK OF LOSS

10.1    Risk of Loss.    Until the Closing, risk of loss to the Purchased Assets, ordinary wear and tear excepted, shall be upon Seller. Immediately after the Closing, risk of loss to the Purchased Assets shall be solely upon Buyer.

## ARTICLE XI
## MISCELLANEOUS

11.1    Expenses.    Except as set forth in this Agreement, including Section 8.2(b), and whether or not the transactions contemplated hereby are consummated, each party shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the transactions contemplated hereby.

11.2    Assignment.    Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Seller; provided, however, that Buyer may assign its rights and obligations hereunder, in whole or in part, to a nominee of Buyer, provided that no such assignment will relieve Buyer of its liabilities and obligations hereunder if such assignee does not perform such obligations and provided further, that this Agreement may be assigned to one or more trustees appointed by the Bankruptcy Court to succeed to the rights of Seller.

11.3    Parties in Interest.    This Agreement is binding upon and inures solely to the benefit of Seller and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of Seller or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of Seller or Buyer, nor any director, officer, employee, representative, agent or other controlling person of each of the parties hereto and their respective Affiliates will have any liability or obligation arising under this Agreement or the transactions contemplated thereby.

11.4    Notices.    Any and all notices or deliveries required to be given to another party to this Agreement shall be in writing and shall be delivered (i) in person, (ii) by a nationally recognized overnight carrier that guarantees next day delivery and provides a receipt, (iii) United States first class certified mail, return receipt requested, or (iv) on the day of transmission if sent via e-mail transmission to the e-mail address given below during regular business hours on a Business Day and, if not, then on the following Business Day, provided, in all circumstances, that the receiving party confirms receipt. Any notice, request, demand or communication required or permitted to be delivered hereunder shall be deemed delivered when received. Rejection or other refusal to accept, or inability to deliver because of change of address of which proper notice was not given under this Agreement to the other party, shall be deemed to be receipt of the notice, request, demand or communication. Either party may change its address for notice from time to time by delivery of at least ten (10) calendar days prior written notice of such change to the other party hereto in the manner prescribed herein. Notice parties and addressee information is as follows:

**EXHIBIT 1**
**Page 29 of 90**

If to Seller:

> KLD Energy Technologies, Inc.
> 8910 Research Blvd.
> Building B-1
> Austin, TX 78758
> Attn:  Terry Chase
> Email: Terry.Chase@kldenergy.com

With a duplicate copy (which shall not constitute notice to Seller) to:

> Husch Blackwell
> 111 Congress Avenue, Suite 1400
> Austin, Texas 78701
> Attn: Lynn Butler
> Email: lynn.butler@huschblackwell.com

If to Buyer:

> Dr. Jungpao Kang
> 3rd Floor, No. 26, Lane 22, Yong An Street
> Wenshang District, Taipei, Taiwan 116
> Email: kangnccu@gmail.com

With a duplicate copy (which shall not constitute notice to Buyer) to:

> Vinson & Elkins LLP
> 2001 Ross Avenue, Suite 3700
> Dallas, Texas 75201
> Attn: Bill Wallander
> Email: bwallander@velaw.com

11.5    <u>Choice of Law</u>.  This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the Bankruptcy Code and the substantive laws of the State of Texas, in each case without regard or reference to the conflict of law principles thereof or of any other jurisdiction.

11.6    <u>Entire Agreement; Amendments and Waivers</u>.    This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties. Except as set forth herein or in any certificate delivered pursuant hereto, no party (or any employee or agent thereof) makes any representation or warranty, express or implied, to any other party with respect to this Agreement or the transactions contemplated hereby. No supplement, modification or waiver of this Agreement (including, without limitation, any schedule hereto) shall be binding unless the same is executed in writing by all parties. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

**EXHIBIT 1**
**Page 30 of 90**

11.7    Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopy shall be as effective as delivery of a manually executed counterpart of this Agreement. In proving enforceability of this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

11.8    Invalidity.    If any one or more of the provisions contained in this Agreement (other than any of the provisions contained in Article II or Article III hereof) or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the parties shall use their reasonable efforts, including, but not limited to, the amendment of this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the parties hereto on the date hereof.

11.9    Headings.    The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

11.10    Exclusive Jurisdiction.    Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11.4 hereof.

11.11    Waiver of Right to Trial by Jury.    Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

11.12    Specific Performance.    Each of the parties hereto acknowledges that the other party hereto may be irreparably damaged in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached. Accordingly, each of the parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions thereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction, in addition to any other remedy to which the parties may be entitled, at law, in equity or pursuant to this Agreement.

11.13    Counting.    If the due date for any action to be taken under this Agreement (including, without limitation, the delivery of notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

**EXHIBIT 1**
**Page 31 of 90**

11.14   <u>No Third Party Beneficiaries</u>.   Except as otherwise expressly provided herein, there are no third party beneficiaries of this Agreement. No provision of this agreement is intended or shall be construed to confer upon or to give any person other than the parties to this Agreement, any rights, basis for reliance, or remedies under or by reason of this Agreement, or to create a cause of action for enforcement thereof.

11.15   <u>Opportunity to Consult Counsel, Voluntary Act</u>.   Each party to this Agreement acknowledges that it has read this Agreement in its entirety, and has consulted such legal or other advisors as it deems appropriate and understands and agrees to each of the provisions of this Agreement and further acknowledge that it has voluntarily entered into this Agreement.

11.16   <u>Attorneys' Fees</u>.   If any action or proceeding is necessary to enforce any of the terms, provisions or conditions of this Agreement, including any claim or demand, or to interpret this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which it may otherwise be entitled, whether or not such action or proceeding is prosecuted to judgment.

11.17   <u>Service of Process</u>.   Each party irrevocably consents to the service of process in any action or proceeding by receipt of mailed copies thereof by national courier service or registered United States mail, postage prepaid, return receipt requested, to its address as specified in or pursuant to <u>Section 11.4</u> hereof. However, the foregoing shall not limit the right of a party to effect service of process on the other party by any other legally available method.

11.18   <u>No Personal Liability</u>.   Notwithstanding anything to the contrary contained herein, at law or in equity, no partner, officer, director, member, shareholder, affiliate or attorney of a party shall have any personal liability to the other party or any other person (a) under this Agreement, or (b) as a result of the execution and delivery of this Agreement, and the performance or nonperformance of a party's obligations under this Agreement, or (c) as a result of the sale of the Purchased Assets pursuant to this Agreement, or (d) as a result of a default under this Agreement, or the breach of any warranty, covenant, or representation contained in this Agreement, or (e) otherwise. Notwithstanding anything to the contrary contained herein, the provisions of this <u>Section 11.18</u> shall survive the Closing or the termination of this Agreement forever, and in the event of a conflict between any other provision of this Agreement and this <u>Section 11.18</u>, the provisions of this <u>Section 11.18</u> shall prevail.

11.19   <u>Relationship of Parties</u>.   Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venture or any association between Seller and Buyer.

11.20   <u>Exhibits and Schedules</u>.   The Exhibits and Schedules attached to, delivered with and identified to this Agreement are a part of this Agreement the same as if fully set forth herein and all references herein to any Section of this Agreement shall be deemed to include a reference to any Schedule named therein.

11.21   <u>Interpretation</u>.

**EXHIBIT 1**
**Page 32 of 90**

(a)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(c)     The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms

(d)     Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)     A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(f)     A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)     All references to "$" and dollars shall be deemed to refer to United States currency unless otherwise specifically provided.

(h)     All references to any financial or accounting terms shall be defined in accordance with GAAP.

11.22   <u>Preparation of this Agreement</u>.  Buyer and Seller hereby acknowledge that (i) Buyer and Seller jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (ii) both Buyer and Seller have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (iii) no presumption shall be made that any provision of this Agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

*[End of Text; Two Signature Pages Follow]*

**EXHIBIT 1**
**Page 33 of 90**

**SIGNED** by KLD Energy Technologies, Inc., in its capacity as Debtor and Debtor-in-Possession at _____, on the _____ day of _____, 2016, in the physical presence of me, Notary Public, and the following competent witnesses.

**Witnesses:**                                          **KLD Energy Technologies, Inc.**
                                                         (in its capacity as Debtor and Debtor-in-Possession)


_____         By: _____

_____         Its: _____
Typed/Printed Name of Witness


_____

_____
Typed/Printed Name of Witness


_____
Print Name _____
Notary Public for _____
Notary or Bar ID No. _____
Commission Expires _____

**EXHIBIT 1**
**Page 34 of 90**

**SIGNED** by MyWay Group Co., Ltd., in its capacity as Buyer at 3rd Floor, No. 26, Lane 22, Yong An Street, Wenshang District, Taipei, Taiwan 116, on the ___ day of November, 2016.

_____
(in its capacity as Buyer)

By:     Dr. Jungpao Kang

Its:     Chief Executive Officer and Chairman

EXHIBIT 1
Page 35 of 90

**List of Schedules**

[*To Come*]

EXHIBIT 1
Page 36 of 90

**Exhibit A**

**Bidding Procedures**

[*As approved by the Bankruptcy Court*]

EXHIBIT 1
Page 37 of 90

**DISCLOSURE SCHEDULES**

**DATED AS OF NOVEMBER 28, 2016**

**TO**

**PURCHASE AND SALE AGREEMENT**

**BY AND BETWEEN**

**KLD ENERGY TECHNOLOGIES, INC.**

**And**

**MYWAY GROUP CO., LTD.**

Capitalized terms used but not defined herein shall the meanings given to such terms in the Purchase and Sale Agreement, by and between KLD Energy Technologies, Inc. and MyWay Group Co., Ltd.

## Schedule 2.1(a)

## Assets and Properties

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | **Fixed Assets** | | | |
| 08/11/10 | Casteel Automatic Fire Protection, Inc. | Modify Sprinkler System in 320 | Checking | | |
| 08/13/10 | Francisco Marquez | Balance - R-19 Blanket (Insulation) St. Elmo 320 | Checking | | |
| 10/13/10 | Oxygen Ozone Inc. | Oxygen Ozone Inc - Water Purification System | MH | | |
| 10/14/10 | Custom Stairs and Trim | Display Case & Pedestals at Settings | MH | | |
| 11/01/10 | R & S Erection of Monterey Bay | Transfer R&S Erection - Morgan Hill Move | MH | | |
| 11/04/10 | Arthur Gomez | Led Lighting for lab stations | MH | | |
| 11/16/10 | JT Electric | Electrical Improvements | MH | | |
| 12/15/10 | JT Electric | Electrical Work on Morgan Hill | MH | | |
| 12/16/10 | Calvin's Electric, Ltd. | 320 Electrical Drops for Cubicles | Checking | | |
| 12/17/10 | Kaeser Compressors, Inc. | Installed Smart Pipe | MH | | |
| 12/17/10 | Kaeser Compressors, Inc. | Install Smart Pipe | MH | | |
| 12/31/10 | Rockford Business Interiors | Install (12) Stations | Checking | | |
| 12/31/10 | Texas Custom Signs | Transfer cost of movable signs for building | Checking | | |
| 08/27/10 | The Ford Store Morgan Hill | Ford Van for Morgan Hill Location | MH | | |
| 11/01/10 | Crown | Crown Walkie Stacker - Capital Lease | MH | | |
| 11/30/10 | Ford Store | Refund on Sales Tax | MH | | |
| 01/09/12 | KLD Electronics | Forklift | Checking | | |
| 07/31/14 | Dept of Mfg.s License | | Checking | | |
| 08/26/08 | Quadtech | Scooter Test Equipment | MH | | |
| 03/11/09 | John David Woellner | 2nd Scooter - test prototype/Lab (AUS) | Checking | | |
| 04/16/09 | Techni-Tool, Inc | Metcal Soldering Station | MH | | |
| 04/30/09 | Green Ray Technologies | Trailer for Scooter Transport | MH | | |
| 06/01/09 | Abbess Instruments & Systems | Vacuum Chamber for Lab | MH | | |
| 06/02/09 | Test Equity Inc | Power Supply Unit - Lab | MH | | |
| 09/30/09 | The Luggage Factory | Carrying Case for Motor | MH | | |
| 11/03/09 | Electro Rent Corp - Capital Lease | Power Analyzer Asset# 1337613D | MH | | |

**EXHIBIT 1**
**Page 39 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 11/16/09 | Yokogawa | Testing Equipment - Torque Machine | MH | | |
| 12/09/09 | Talented Technologies | Test Equip - CA - Battery Power Supply | Checking | | |
| 03/09/10 | Magtrol - V | Quality Assessment Fixture for D1166 Stator Block | MH | | |
| 05/03/10 | Kandel Electronics Inc | Quad-Tech 1730 Precision LCR Meter | MH | | |
| 07/06/10 | Wasp Barcode Technoligies | Inventory System | MH | | |
| 07/13/10 | Sears Roebuck | 5 Drawer Chest; ll Drawer  Cabinet | Austin | | |
| 07/22/10 | G. A. Wirth Company, Inc | G.A. Wirth - Double Work Stations X 5 | MH | | |
| 07/22/10 | Bench Depot | Bench Depot - (18) Nevamar Static Control Radius Top | MH | | |
| 07/26/10 | Amazon.com | Amazon.com - 41 Inch 9 Drawer Chest X2 | MH | | |
| 07/28/10 | G. A. Wirth Company, Inc | G.A. Wirth - Lab Bench X 4 | MH | | |
| 12/31/10 | G. A. Wirth Company, Inc | G.A. Wirth - Lab Bench X 4 | MH | | |
| 07/28/10 | Magtrol - V | Torque Trans W/ Cables X 2 | MH | | |
| 08/02/10 | G. A. Wirth Company, Inc | G.A. Wirth - Lab Benches | MH | | |
| 08/11/10 | | Reclass Prepaid Dynamometer to Lab Equip - Paid in Full | MH | | |
| 08/11/10 | Discount Ramps | Discount Ramps - Bike Lifts for Lab | MH | | |
| 08/13/10 | SuperFlow Technologies Group | Eddy Current Motorcycle Dynamometer System | MH | | |
| 08/13/10 | Newark | Prgrammable DC Electronic Load 60V | MH | | |
| 08/19/10 | Global Equipment Company, Inc | Global Equipment - Inventory Cage for New FAcility | MH | | |
| 08/20/10 | Magtrol - V | Torque Display X 2 | MH | | |
| 08/20/10 | Magtrol - V | Torque Display | MH | | |
| 08/30/10 | Kaeser Compressors, Inc. | Kaeser - Compressor 2 pymnts on bk stmnt | MH | | |
| 08/23/10 | McMaster-Carr | Electronic Torque  Analyzer | MH | | |
| 08/24/10 | G. A. Wirth Company, Inc | G.A. Wirth - Assemble 8 Single & 5 Dbl Work Stations | MH | | |
| 08/23/10 | McMaster-Carr | Electronic Torque Analyzer | MH | | |
| 08/31/10 | McMaster-Carr | Electronic Torque Analyzer | MH | | |
| 08/26/10 | McMaster-Carr | SQ Drive for Elect Torque Analyzer | MH | | |
| 09/02/10 | McMaster-Carr | Returned SQ Drive for Elect. Torque Analyzer | MH | | |
| 09/03/10 | Newark | Prog DC Electronic Load 60V | MH | | |
| 09/07/10 | SuperFlow Technologies Group | 30 HP AC Motoring Option for Cycledyn | MH | | |
| 09/09/10 | Allied Electronics, Inc | Oscilloscope | MH | | |

**EXHIBIT 1**
**Page 40 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 09/09/10 | Newark | Agilent Technologies 34972A Calibrated | MH | | |
| 09/09/10 | Bizchair | Bizchair - Lab Chairs | MH | | |
| 09/16/10 | Fry's Electronics | Fry's - IT Equipment | MH | | |
| 09/25/10 | Green Ray Technologies | Costco - toolboxes, benches | MH | | |
| 09/25/10 | Green Ray Technologies | Home Depot - Tools | MH | | |
| 10/29/10 | Express Metal, Inc | Peg Boards | MH | | |
| 10/31/10 | Commerce Bank | Sears - Workbenches for 320 | Checking | | |
| 10/31/10 | Commerce Bank | Flammable Storage Cabinet 90 Gal | MH | | |
| 10/31/10 | Commerce Bank | Tools & Equipmemt | MH | | |
| 11/05/10 | BRL Test, Inc. | Quad Tech 1730 LCR Tester | MH | | |
| 11/10/10 | AirDraulic Systems, Inc. | Mount Air Compressor | Checking | | |
| 11/18/10 | Applied Indust Tech | Power Unit with Bearing Tool | MH | | |
| 11/29/10 | Express Metal, Inc | Large & Small Pallet Rack Boxes w/bike lift extensions | MH | | |
| 11/30/10 | Commerce Bank | MSC (jet mill drill and stand) | MH | | |
| 12/15/10 | Flir Systems Inc. | Therma Cam P65 | Checking | | |
| 12/23/10 | Test Equity | Tektronix Current Probe | MH | | |
| 12/29/10 | PCB Piezotronics | 4 Channel Sensor Signal Cond. | MH | | |
| 12/31/10 | Commerce Bank | CNC Lathe Machine | MH | | |
| 01/13/11 | Newark | Agilent Data Acuisition Unit - PO# 2011-0019 | MH | | |
| 01/31/11 | Newco Inc. | Gaussmeter Model 5180 Certified | MH | | |
| 02/28/11 | | Motorcycle Scale | Checking | | |
| 03/31/11 | KLD | BEMF Tester - Internal Build R&D lab | MH | | |
| 03/31/11 | KLD | BEMF Tester - Internal Build R&D lab | MH | | |
| 03/31/11 | KLD | BEMF Tester - Internal Build R&D lab | MH | | |
| 04/18/11 | McMaster-Carr | Compression Force Gauge, 2000 LB Capacity | MH | | |
| 07/31/11 | Commerce Bank | PlasmaCam - Plasma cutter for 320 lab | MH | | |
| 07/31/11 | Commerce Bank | Plasma Cutter for 320 Lab | MH | | |
| 07/31/11 | NPI:NPI - ETF | Tequipment.net - Test Equipment for NPI | Checking | | |
| 08/25/11 | R & D:R & D - Schindler | National Instruments - Module-higher current | MH | | |
| 08/25/11 | Commerce Bank | B&R Welding - TIG Welder | MH | | |
| 08/25/11 | Commerce Bank | B&R Welding - TIG Welder | MH | | |
| 08/25/11 | Commerce Bank | Welding workstation/table | MH | | |
| 09/26/11 | Commerce Bank | Nordson - Stator shoe glue dispenser | MH | | |
| 12/26/11 | Commerce Bank | MSC - Lathe and Collet Sets | MH | | |
| 01/09/12 | KLD Electronics | Tektronix Oscilloscope | MH | | |
| 06/01/12 | Okonsky Diversified | Diminsion SST 1200es Printer & SCA-1200 | MH | | |
| 03/25/13 | Northern Tool & Equip-Racks | | Checking | | |

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 05/15/13 | Aerovironment, Inc (AVI) | CapEx equipment for MH Battery testing (half down payment) Remaining $38602.50 due in 6 equal monthly payments | MH | | |
| 04/15/14 | Discount Ramps.Com | 30ft Aluminum ramp for Headway Circle dock to facilitate larger vehicle movement in and out of the facility | MH | | |
| 04/25/14 | Amazon.com | Battery cell tester for battery production line | MH | | |
| 07/30/15 | Crown Capital Equipment | Crown Lift / includign Tax | MH | | |
| 07/01/13 | Roots Industries India Ltd | Tooling for Stator Plate production | Checking | | |
| 12/31/13 | Shiny Precision | Tooling for Battery parts | Checking | | |
| 01/01/13 | Shiny Precision | Tooling for Motors | Checking | | |
| 04/01/14 | Shiny Precision | Tooling for Motors | Checking | | |
| 08/25/14 | Inv Bike Build. 13' Rear Rim | | Checking | | |
| 09/01/14 | Swing Arm tooling  Shiny Preciision MFg | | Checking | | |
| 11/30/14 | Swing Arm tooling  Shiny Preciision MFg | | Checking | | |
| 08/31/15 | Shiny Precision | Tooling for swing arms, Caliber cover, brake mounting | Checking | | |
| 06/10/08 | DELL Financial Srvcs #xx3 244 | Jerri's laptop | Austin? | | |
| 09/02/08 | DELL Financial Srvcs #xx3 244 | 4 22 inch monitors | Austin | | |
| 09/02/08 | DELL Financial Srvcs #xx3 244 | Dell Hybrid desktop | Austin | | |
| 09/30/08 | Vintage IT Services | CISCO ASA 5505 applicn w. 8prts/VPN/Firwll | Austin | | |
| 09/30/08 | Vintage IT Services | APC Smartups - 120V USB | Checking | | |
| 03/17/09 | DELL | Dell Two laptops | Austin | | |
| 05/06/09 | DELL Financial Srvcs #xx3 244 | Dell 22in Monitor x 3 | Austin | | |
| 07/01/09 | Vintage IT Services | Buffalo DriveStation TurboUSB 3x$225 + tax | Austin | | |
| 08/04/09 | DELL Financial Srvcs #xx3 244 | Vostro 1520 - Dell Laptop - M Ratel | Austin | | |
| 08/20/09 | DataVision | C Okonsky - Replacement Laptop | Austin | | |
| 08/24/09 | Dell Bus Online | Precision Mobile Workstation M6400 Laptop - J Lapaglia | Checking | | |
| 08/24/09 | DELL Financial Srvcs #xx3 244 | Dell Lat E5400 Laptop | Checking | | |
| 08/24/09 | DELL Financial Srvcs #xx3 244 | Dell 22 In Monitor | Checking | | |
| 08/27/09 | DELL | Dell 22 Inch Monitor & Dell Precision Convertible MiniTower Processor E7400 | Checking | | |

EXHIBIT 1
Page 42 of 90

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 09/07/09 | DELL Financial Srvcs #xx3 244 | Dell LatE6500 Laptop F64GVK1 | Checking | | |
| 09/15/09 | DELL Financial Srvcs #xx3 244 | Dell LatE6500 Laptop 29VVVK1 | Checking | | |
| 10/14/09 | DELL Financial Srvcs #xx3 244 | Vostro 1320 Laptop | Checking | | |
| 11/23/09 | SHI Corp | HP Design Jet - large format color printer | Checking | | |
| 11/24/09 | SHI Corp | HP Jet Direct Ethernet Print Server (Combine FA with HP Printer) | Checking | | |
| 01/22/10 | Dell Bus Online | Dell Latitude E5500 - Julian Partridge | Checking | | |
| 01/22/10 | Dell Bus Online | Dell Latitude E5500 - Robert Mora | Checking | | |
| 02/12/10 | Dell Bus Online | Latitude E5500 Laptop - Mark Lozano | Checking | | |
| 02/18/10 | Dell Bus Online | Dell Base, Notebook - Eng | Checking | | |
| 02/22/10 | Dell Bus Online | Latitude E6500 Laptop - David Gibson | Checking | | |
| 03/04/10 | Dell Bus Online | Dell Precision M4400 Laptop - Engineer Laptop | Checking | | |
| 04/23/10 | Dell Bus Online | Dell Mobile Precision M4500 for Hector | Checking | | |
| 05/31/10 | Dell Bus Online | Dell Refund on Computer | Checking | | |
| 05/01/10 | Vintage IT Services | Reclass Prepaid to Comp & Server Exp (IT Infrastructure Upgrade) | Checking | | |
| 06/22/10 | Dell Bus Online | Dell M4500 Series Computer | Checking | | |
| 12/31/10 | Dell Bus Online | Reverse Duplicate Entry | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Ratel | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Ratel | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Ratel | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Ratel | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Ratel | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Ratel | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Ratel | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Lozano | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Lozano | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Ratel | Checking | | |
| 06/30/10 | Dell Bus Online | Dell - M. Ratel | Checking | | |
| 07/02/10 | Apple | iPad w/wifi +3G64GB + Accessories | Checking | | |
| 12/31/10 | Apple | Reverse Duplicate Entry | Checking | | |
| 07/29/10 | Dell Bus Online | Dell Mobile Precision M4500 X 1 | Checking | | |
| 12/31/10 | Dell Bus Online | Reverse Duplicate Entry | Checking | | |
| 07/29/10 | Dell Bus Online | Dell Latitude E6510 FAst Track c2 X 1 | Checking | | |
| 07/29/10 | Dell Bus Online | Dell Mobile Precision E-Star M6500 X 1 | Checking | | |
| 07/29/10 | Dell Bus Online | Dell Mobile Precision E -Star M6500 X 1 | Checking | | |

**EXHIBIT 1**
**Page 43 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 07/31/10 | | Dell Latitude Computer E6410 - Anderson, Karleen | Checking | | |
| 07/31/10 | | Dell Mobile Precision M4500 Computer - T. Gallaway | Checking | | |
| 07/31/10 | | Dell Precision E Star M6500 Computer - K. Rice | Checking | | |
| 07/31/10 | | Dell Latitude E6410 Fast Track C2W/Accessoried - M Steinocher | Checking | | |
| 08/31/10 | | Dell Mobile Precision M4500 Computer - Li, Weitao | Checking | | |
| 08/31/10 | | Dell Mobile Precision M4500 Computer - Gervais, J | Checking | | |
| 08/31/10 | | Dell Latitude Computer E6510 - Beckon, M | Checking | | |
| 08/31/10 | | Dell Mobile Precision M4500 Computer - F. Rodriguez | Checking | | |
| 09/20/10 | Used Cisco | Used Cisco - Router to Network Equip R Mora | Checking | | |
| 09/22/10 | Dell Marketing L.P. | Latitude E6510 Fast Track C2 | Checking | | |
| 09/25/10 | Green Ray Technologies | Best Buy - Mac Mini, iPad, Monitor | Checking | | |
| 10/04/10 | Staples | Mora | MH | | |
| 12/31/10 | Staples | Reverse Duplicate Entry | MH | | |
| 10/25/10 | Dell Marketing L.P. | 55" Vizio LCD HD TV | Checking | | |
| 10/31/10 | Commerce Bank | Sonystyle Direct - Christian's new laptop | Checking | | |
| 11/01/10 | Vintage IT Services | Transfer Vintage IT - Lost Creek move project - total cost | Checking | | |
| 11/17/10 | Dell Marketing L.P. | Base Server PER310 | Checking | | |
| 11/17/10 | Dell Marketing L.P. | Base Server PER310 | Checking | | |
| 11/18/10 | Ray Caamano | Fry's - Apple Cmputer for Hector | Checking | | |
| 11/30/10 | Commerce Bank | Best Buy (Mac computers) | MH | | |
| 11/30/10 | Commerce Bank | Best Buy )Mac computer) | MH | | |
| 11/30/10 | Commerce Bank | Erie Computer (Mac Server) | MH | | |
| 11/30/10 | Commerce Bank | Best Buy (Mac Computers) | MH | | |
| 07/01/10 | | Dell E6510 w/ accessories | MH | | |
| 08/01/10 | | Dell E6510 w/ accessories | MH | | |
| 08/01/10 | | Dell E6510 w/ accessories | MH | | |
| 08/01/10 | | Dell E6510 w/ accessories | MH | | |
| 09/01/10 | | Dell E6510 w/ accessories | MH | | |
| 09/01/10 | | Dell E6510 w/ accessories | MH | | |
| 09/01/10 | | Dell E6510 w/ accessories | MH | | |
| 10/01/10 | | Dell E4310 w/accessories | MH | | |
| 12/01/10 | | Dell E6510 w/ accessories | MH | | |
| 12/31/10 | Commerce Bank | Apple Laptop | MH | | |

**EXHIBIT 1**
**Page 44 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 12/31/10 | Commerce Bank | Apple - LED Monitor | MH | | |
| 12/31/10 | Commerce Bank | Best Buy (Mac Laptop) | MH | | |
| 01/07/11 | Vintage IT Services | Cat 5e Cable drops & rack with accessories & install | MH | | |
| 01/31/11 | | Dell E6510 w/ accessories | MH | | |
| 01/31/11 | Vintage IT Services | New Server & Install St. Elmo 320 - IBM System/APC Smart UPS/MS Windows Server 2008/Symantec Backup | MH | | |
| 03/07/11 | Vintage IT Services | CAT5e Cable drops and Rack W/ accessories installation | MH | | |
| 10/31/11 | Asset Transfer from Okonsky | Dell Computers x 3 with monitors | MH | | |
| 11/25/2011 | Apple - Commerce CC | Apple Store - Computer for Merlin Implementation | MH | | |
| 11/28/2011 | Vintage IT | QNAP Turbo NAS TS-439 Pro II Network Storage Server with 4x2TB SATA HDD | MH | | |
| 12/26/2011 | Commerce Bank | Apple Store - Macbook Pro 15.4 for Nick Murphy | MH | | |
| 03/25/2013 | Best Buy | Best Buy-New Mac Book Pro with Microsoft needed for Merlin | MH | | |
| 02/27/2014 | Apple Store | MBP 15.4/2.3GHZ/16GB/512GC Flash | Checking | | |
| 02/27/2014 | Apple Store | MBP 15.4/2.3GHZ/16GB/512GC Flash | Checking | | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Austin | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Checking | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Checking | Laptop | |
| 05/01/2014 | Dell | Dell Venue Pro II | Checking | | |
| 05/01/2014 | Dell | Dell Venue Pro II | Checking | | |
| 05/01/2014 | Dell | Dell Venue Pro II | Checking | | |
| 05/01/2014 | Dell | Dell Venue Pro II | Checking | | |

**EXHIBIT 1**
**Page 45 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 05/01/2014 | Dell | Dell M3800 | Austin | Laptop | |
| 05/01/2014 | Dell | Dell M3800 | MH | Laptop | |
| 05/01/2014 | Dell | Dell M3800 | Checking | | |
| 05/01/2014 | Dell | Dell M3800 | Checking | | |
| 05/01/2014 | Dell | Dell M3800 | Checking | | |
| 05/01/2014 | Dell | Dell M3800 | Checking | | |
| 07/25/2014 | Best Buy: Mac book Pro: Girgaldi | | Checking | | |
| 08/04/2014 | GCS Technoligies : Routers | | Checking | | |
| 11/25/2014 | Best Buy: Jon Goyle/Marketing PC | | Checking | | |
| 12/01/2014 | Dell | Dell M3800 | Checking | | |
| 12/25/2014 | Best Buy: Jon Goyle/Marketing PC: MacBook airPro - David Collier | | Checking | | |
| 01/26/2015 | Best Buy: : MacBook Pro - Okonsky | | Austin | | |
| 02/25/2015 | Best Buy: : MacBook Pro - Whitney Fenzel | | Austin | | |
| 03/25/2015 | Best Buy: : MacBook Pro - Okonsky | | Austin | Laptop | |
| 05/01/2015 | Dell: Precision WS | Dell: Precision WS | Austin | | |
| 06/09/2015 | Dell: Precision WS | Dell Precision M3800 (Service Tag JLHHR32) & Dell Latitude E5250 (Service Tag 8JSXK32) | Checking | | |
| 07/03/2015 | Dell: Precision WS, via DFS & Journal Entry 14736 | Dell Precision M3800 (Service Tag JLHHR32) & Dell Latitude E5250 (Service Tag 9XHBT32) | Checking | | |
| 04/26/10 | Aspect Controls | Audio & Video Equipment - St. Elmo Conference Room | Austin | | |
| 06/18/10 | Apple | 2 Ipads for Christian and Tom C. | Checking | | |
| 09/30/10 | Staples | Office Equipment | Austin | | |
| 10/31/10 | Commerce Bank | Clarus Glassboards LLC - glass dry erase board for suite 220 | Austin | | |
| 10/31/10 | Commerce Bank | Lowes - refrigerators (2) and Microwaves (2) | Austin | | |
| 11/03/10 | Ray Caamano | RC-ER110310A - Costco LED TV Screens | Checking | | |
| 12/31/10 | Commerce Bank | Katom Resta (Hand Dryers) | Checking | | |
| 12/31/10 | Commerce Bank | Katom Resta (returned) | Checking | | |
| 01/31/11 | | Katom Resta (returned) | Checking | | |
| 01/31/11 | Walmart | TV for Suite 320 | Checking | | |
| 06/30/13 | Test Equity LLC | Environmental Test chamber | MH | | |
| 06/30/13 | Test Equity LLC | Magna Power Supply | MH | | |
| 07/01/13 | Magtrol - V | Dynamometer for MH | MH | | |
| 03/31/15 | Nordson Sealant Equipment, Inc. | | MH | | |
| 11/10/08 | IKEA | Off-furntr: desks, shelves, chairs, etc | Austin | | |
| 11/22/08 | IKEA | Off-furntr: desks, shelves, chairs, etc | Austin | | |
| 04/06/10 | Cox Office Furniture | (26) Chairs | Austin | | |
| 04/06/10 | IKEA | Workstations | Austin | | |
| 04/28/10 | Krissie Briggs | IKEA - Furniture St. Elmo Location | Austin | | |

**EXHIBIT 1**
**Page 46 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 05/01/10 | Ben White | Conference Room Table - St. Elmo | Austin | | |
| 05/05/10 | IKEA | Workstations | Austin | | |
| 06/15/10 | IKEA | 3 workstations, includes desk & filing cabinets | Austin | | |
| 09/01/10 | IKEA | IKEA - Furniture | MH | | |
| 09/01/10 | IKEA | IKEA - Furniture | MH | | |
| 12/31/10 | IKEA | Reverse duplicate | MH | | |
| 09/07/10 | The Home Depot | Home Depot - Appliances | MH | | |
| 09/07/10 | G. A. Wirth Company, Inc | G.A. Wirth - More Info Needed | MH | | |
| 09/10/10 | IKEA | IKEA - Office Furniture R Mora | MH | | |
| 09/13/10 | Dale Office Furniture | Dale Office (Cornerstone) - (12) Chairs | MH | | |
| 09/18/10 | DHC | DHC - Modify Work Benches & Tables | MH | | |
| 09/20/10 | Morgan Hill Move | Arthrur Gomez - Reclass Light Pods x 17 to Fixed Assets | MH | | |
| 09/24/10 | Creative Solutions | Creative Solutions - (2) United Lockers | MH | | |
| 09/25/10 | Green Ray Technologies | IKEA - Workstations | MH | | |
| 09/28/10 | Modern Collections | Modern Collections - Office Chairs | MH | | |
| 12/31/10 | Modern Collections | Reverse duplicate | MH | | |
| 09/29/10 | Office Max | Office Max - Office Chairs | MH | | |
| 09/30/10 | Green Ray Technologies | Greenray / IKEA - Workstations - New Office Set Up | MH | | |
| 10/04/10 | IKEA | Mora | MH | | |
| 10/08/10 | Creative Solutions | Maple Veneer Conference Table | MH | | |
| 10/25/10 | Green Ray Technologies | IKEA (Greenray) - Kitchen Cabinets Morgan Hill | MH | | |
| 10/25/10 | Four Hands Home | Furniture | MH | | |
| 10/31/10 | Commerce Bank | Nova Display - Brochure Display for new HG | MH | | |
| 10/31/10 | Commerce Bank | Dale Office Furniture | Austin | | |
| 11/09/10 | Creative Solutions | Maple Veneer Credenza | MH | | |
| 12/30/10 | TOPS | Transfer TOPS Furniture for new office - St. Elmo | Checking | | |
| 12/31/10 | Commerce Bank | Krystal Writing Boards (3) | Checking | | |
| 01/31/11 | Clarus Glassboards | Frost 4'x8' Glassboards | MH | | |
| 01/26/11 | JT Electric | Install Write Boards/handdriers/clocks | MH | | |
| 02/25/14 | GIH Global Industrial Equipment | Work Bench | MH | | |
| 03/25/14 | GIH Global Industrial Equipment | battery cage | MH | | |
| 03/25/14 | GIH Global Industrial Equipment | batterY cage | MH | | |
| 03/25/14 | Stevemizera | security cages that lock | MH | | |

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 03/25/14 | Unline Ship supplies | battery shelves | MH | | |
| 03/19/14 | Uline | Racks/Shelves for Batter line/Cage | MH | | |
| 03/25/14 | GIH Global Industrial Equipment | Work Bench | MH | | |
| 01/15/15 | NMEDA Trade Show Booth | | Austin | | |
| 04/15/15 | Tops North Office FF: new employee:, via CC by List | | Checking | | |
| 03/31/09 | MLC-CAD Systems | Upgrade Solid Works to Solid Works Office Professional | Checking | | |
| 04/27/09 | Amazon.com | Adobe Creative Suite 4 Design Premium | Checking | | |
| 09/01/09 | Amazon.com | Microsoft Office Small Business x 3 | Checking | | |
| 09/01/09 | Amazon.com | Adobe Acrobat Standard x 3 | Checking | | |
| 01/31/10 | MLC-CAD Systems | SolidWorks Standard x 1 | Checking | | |
| 02/23/10 | Vintage IT Services | Office Enterprise 2007 x 3 | Checking | | |
| 02/23/10 | Vintage IT Services | Project 2007 SNGL OLP NL x 2 | Checking | | |
| 04/01/10 | MLC-CAD Systems | SolidWorks Professional x 3 Seats | Checking | | |
| 04/01/10 | MLC-CAD Systems | SolidWorks Upgrade (from Standard to Pro) | Checking | | |
| 04/14/10 | MLC-CAD Systems | Solidworks Network License Install | Checking | | |
| 06/10/10 | MLC-CAD Systems | SolidWorks Premium - Standalone (1) | Checking | | |
| 06/10/10 | MLC-CAD Systems | SolidWorks Premium - Network (1) | Checking | | |
| 06/10/10 | MLC-CAD Systems | SolidWorks Simulation Professional - Network (1) | Checking | | |
| 06/10/10 | MLC-CAD Systems | SolidWorks Workgroup PDM Contributor - Network | Checking | | |
| 06/30/10 | EMA Design Automation | OrCAD Capture, CIP Enterprise | Checking | | |
| 08/19/10 | EMA Design Automation | OrCAD Capture, CIP Enterprise - Engineer Software License | Checking | | |
| 08/27/10 | MLC-CAD Systems | Solidworks Prof Standalone, Subscription Service | Checking | | |
| 12/31/10 | MLC-CAD Systems - #4706615 | | Checking | | |
| 09/21/10 | MLC-CAD Systems | Solidworks Prof - Standalone | Checking | | |
| 12/31/10 | MLC-CAD Systems - #4728915 | | Checking | | |
| 11/25/10 | National Instruments Corp | Labview Professional Development System Windows | Checking | | |
| 11/30/10 | Commerce Bank | Nextwarehouse | Checking | | |
| 12/07/10 | Vintage IT Services | Adobe Design Std. 5 Windows | Checking | | |
| 01/31/11 | MI Minitab | Statistical Software | Checking | | |
| 03/31/11 | Vintage IT Services | Cisco ASA 5505 Adaptive Security Appliance | Checking | | |
| 04/30/11 | Intuit | Intuit - Quickbooks Enterprise Software | Checking | | |
| 07/31/11 | Commerce Bank | Bobcad Cam, Inc. - Software for lab use for the end mill and lathe | Checking | | |

EXHIBIT 1
Page 48 of 90

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 08/31/11 | MLC-CAD Systems | Solidworks Premium x 1  Add to Existing Pool SNL 9010008110536348 D5DJ5NJB | Checking | | |
| 08/31/11 | MLC-CAD Systems | Solidworks ePDM CAD Editor x 11 licenses | Checking | | |
| 09/30/11 | MLC-CAD Systems/OKD | Solidworks Software  x 3 Licenses - Asset transfer from Okonsky Diversified through related party accounts | Checking | | |
| 07/01/13 | Udai Kumar | Software Development for Samsung BMS (16 hours @ $105/hour) 4/1-4/11 | MH | | |
| 07/10/14 | Superflow Tech. Eddy Current Module (2nd half paid in Oct. 14) | | MH | | |
| 02/23/15 | Superflow Tech. Eddy Current Module (2nd half paid in Oct. 14) | | MH | | |
| 12/01/12 | Udai Kumar | | MH | | |
| 12/15/12 | Udai Kumar | | MH | | |
| 01/02/13 | Udai Kumar | | MH | | |
| 02/01/13 | Udai Kumar | Software Development for Samsung BMS (15 hours @ $105/hour) | MH | | |
| 02/15/13 | Udai Kumar | Software Development for Samsung BMS (7 hours @ $105/hour) | MH | | |
| 02/28/13 | Udai Kumar | Software Development for Samsung BMS (31 hours @ $105/hour) | MH | | |
| 04/15/13 | Udai Kumar | Software Development for Samsung BMS (25.5 hours @ $105/hour) 3/6-3/16 | MH | | |
| 04/15/13 | Udai Kumar | Software Development for Samsung BMS (10hours @ $105/hour) 3/25-4/4 | MH | | |
| 04/15/13 | Udai Kumar | Software Development for Samsung BMS (16 hours @ $105/hour) 4/1-4/11 | MH | | |
| 12/25/14 | Nordson Sealant Equipment, Inc. | | MH | | |
| 03/31/15 | Nordson Sealant Equipment, Inc. | | MH | | |
| 12/31/14 | SuperFlow Technologie | | MH | | |
| 07/31/14 | SuperFlow Technologie | | MH | | |
| 07/19/11 | QJ Motor Company | Production tooling and set-up | MH | | |
| 07/19/11 | QJ Motor Company | Production tooling and set-up | MH | | |
| 01/01/13 | QJ Motor Company | Production tooling and set-up | MH | | |
| 08/03/11 | ETI Tech | ETI Tech - 50% Downpayment on Production Tooling | MH | | |

**EXHIBIT 1**
**Page 49 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| 11/17/11 | ETI Tech | ETI Tech - Final Payment on Production Tooling - Quote 20110026A | MH | | |
| 12/31/13 | ETI Tech | ETI Tech - Final Payment on Production Tooling - Quote 20110026A | MH | | |
| 02/21/13 | 360 Prototyping | PO 2013-0010a-Prototype casting PN 63-70-00100-001_X03 | MH | | |
| 03/21/13 | 360 Prototyping | PO 2013-0010a-Prototype casting PN 63-70-00100-001_X03 | MH | | |
| 12/31/13 | 360 Prototyping | PO 2013-0010a-Prototype casting PN 63-70-00100-001_X03 | MH | | |
| 04/01/13 | Shiny Precision Machining | Deposit on Tooling for Flexibus Tray | MH | | |
| 11/01/13 | Shiny Precision Machining Limited | Mid Payment - Tooling for FlexiBus Tray | MH | | |
| 07/16/13 | Shiny Precision Machining | Deposit - Tooling for plastic pieces in 3KWH battery | MH | | |
| 09/23/13 | Shiny Precision Machining | Mid Payment - Tooling for plastic pieces in 3KWH battery | MH | | |
| 11/01/13 | Shiny Precision Machining Limited | Balance Payment - Tooling for FlexiBus Tray | MH | | |
| 12/31/13 | Shiny Precision Machining | Mid Payment - Tooling for plastic pieces in 3KWH battery | MH | | |
| | | **De Minimus Assets** | | | |
| | | Kitchen appliances:  Austin | Austin | | |
| | | Office furniture:  Austin | Austin | | |
| | | Unibind UniBinder 8.M | Austin | | |
| | | Display Stands | Austin | | |
| | | Paper Board Cutter | Austin | | |
| | | Steam Cleaner | Austin | | |
| | | Shop Vac | Austin | | |
| | | Yellow Vacuum Cleaner | Austin | | |
| | | Wall Clocks | Austin | | |
| | | Power connect | Austin | | |
| | | Web Smart Switch | Austin | | |
| | | Gigabit Switch | Austin | | |
| | | Dell Computers | Austin | | |
| | | Digital DVR | Austin | | |
| | | Network Attached Storage | Austin | | |
| | | Dell tablets | Austin | | |
| | | Scooter parts | MH and Austin | | |

**EXHIBIT 1**
**Page 50 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 20-70-00012-001 (ASSY, FET SPACER  ) | MH | | |
| | | 23-30-00025-002 (ASSY, G4 S2 CONTROLLER TRAY, W/ PEM NUTS) | MH | | |
| | | 23-70-00017-001 (ASSY, RED FLEXIBUS  ) | MH | | |
| | | 23-70-00023-002 (ASSY, NEGATIVE EXIT BUS BAR  ) | MH | | |
| | | 23-70-00025-001 (ASSY, PRIMARY BUS BAR  ) | MH | | |
| | | 23-70-00027-001 (ASSY, TERMINAL W/FUSE BUS BAR  ) | MH | | |
| | | 23-90-00044-001 (ASSY, INTERNAL HARNESS, CURRENT SENSE & FUSE  ) | MH | | |
| | | 23-90-00045-001 (ASSY, HARNESS, ESS CONTROL, SAMI-6R   ) | MH | | |
| | | 23-90-00052-001 (ASSY, EXTERNAL HARNESS ON BOARD, 1 BATTERY  ) | MH | | |
| | | 40-20-00007-001 (FOOT PEDAL) | MH | | |
| | | 40-20-00008-001 (FENDER, BRACKET) | MH | | |
| | | 40-40-00001-001 (KLD MARK 1101-8 MOTOR CONTROLLER, G4 S2) | MH | | |
| | | 40-40-00002-001 (KLD MARK 1104-8 MOTOR CONTROLLER, G4 S4) | MH | | |
| | | 40-50-00002-003 (BATTERY CHARGER, DQ, 48V, INTERLOCK, REMOTE LED) | MH | | |
| | | 40-50-00002-004 (BATTERY CHARGER, DQ, 48V, IC650 W/COMM) | MH | | |
| | | 41-20-00005-002 (STATOR, COATED, 0.23MM G.O.S.S., SANDED  ) | MH | | |
| | | 43-00-00011-003 (COIL, MAGNET, 67T, 16.5 AWG, MW30C, CLOCKWISE  ) | MH | | |
| | | 44-30-00024-001 (M10 CONICAL WHEEL LUG NUT) | MH | | |
| | | 44-30-00027-001 (AXLE TORQUE LOCK NUT) | MH | | |
| | | 44-50-00019-001 (EDGE SEAL, 1/16" EDGE, 13/64" BULB WIDTH RUBBER 1400MM) | MH | | |
| | | 44-70-00003-001 (VENT, M12 X 1.5, POLYAMIDE) | MH | | |
| | | 45-10-00004-002 (PCB, INTERCONNECT, STATOR BLOCK, D1166, ENLARGED) | MH | | |
| | | 45-16-00009-002 (FUSE STRIP, SLOWBLOW, 58V, 200A) | MH | | |
| | | 45-18-00004-001 (CONTACTOR, GX12FA) | MH | | |
| | | 45-20-00008-001 (HALL EFFECT CURRENT SENSOR) | MH | | |

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 45-30-00021-002 (MICRO-LINK ENCODER CABLE 5 POLE FEMALE, SHIELDED) | MH | | |
| | | 45-30-00045-002 (RECEPTICAL, MALE, 5 POLE, ENCODER, PLASTIC PLATED BRASS  ) | MH | | |
| | | 45-30-00050-001 (CIRCULAR CONNECTOR 2P PANEL MOUNT) | MH | | |
| | | 45-30-00051-001 (CIRCULAR CONNECTOR 2P SOCKET CABLE END) | MH | | |
| | | 45-30-00102-001 (CONNECTOR, CIRCULAR, 2P PANEL MOUNT) | MH | | |
| | | 45-30-00117-002 (CONNECTOR, HOUSING, SBS50, 2P, BLUE  ) | MH | | |
| | | 45-30-00131-001 - A01 (Multi-Con-X Plastic Connector Straight Cable Plug 03 Pin) | MH | | |
| | | 45-30-00153-001 (CONNECTOR, PLUG, 14 PIN, MALE, BLUE) | MH | | |
| | | 45-51-00001-001 (CORE PACK, 13S6, SAMSUNG) | MH | | |
| | | 50-00-00009-001 (BADGE) | MH | | |
| | | 50-00-00010-001 (VEHICLE DECAL, POWERED BY KLD ONEDRIVE) | MH | | |
| | | 60-50-00032-001 (SWINGARM, CAST, D1166) | MH | | |
| | | 60-50-00033-002 (CALIPER BRAKE MOUNT, SWINGARM, CAST, MACHINED FOR BADGE, D1166) | MH | | |
| | | 60-50-00033-003 (CALIPER BRAKE MOUNT, SWINGARM, CAST, ECLIMO, D1166) | MH | | |
| | | 60-50-00034-001 (PHASE CABLE COVER, SWINGARM, CAST, D1166) | MH | | |
| | | 60-50-00036-001 (BUS COVER, SWINGARM, CAST, D1166) | MH | | |
| | | 60-70-00033-002 (BOTTOM) | MH | | |
| | | 60-70-00034-001 (DIVIDER, FIRST) | MH | | |
| | | 60-70-00034-002 (DIVIDER, SECOND  ) | MH | | |
| | | 60-70-00035-001 (BMS TRAY  ) | MH | | |
| | | 60-70-00038-001 (BUS BAR, POSITIVE TO CONTACTOR  ) | MH | | |
| | | 60-70-00039-001 (BUS BAR, CONTACTOR TO FUSE  ) | MH | | |
| | | 60-70-00042-002 (COVER) | MH | | |
| | | 60-70-00045-001 (THERMAL DISTRIBUTION BAR) | MH | | |
| | | 60-70-00046-001 (SECONDARY THERMAL DISTRIBUTION BAR  ) | MH | | |

**EXHIBIT 1**
**Page 52 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 60-70-00047-001 (MODULE SLIDE SKIN) | MH | | |
| | | 60-80-00009-001 (HEAT SINK , CONTROLLER, 1104-8) | MH | | |
| | | 60-80-00010-001 (HEATSINK AL, G4, S2, SIDEWAYS FINS, CONTROLLER) | MH | | |
| | | 61-11-00001-001 (BRAKE ROTOR DRIVE SLEEVE, D1166  (Matrex)) | MH | | |
| | | 61-11-00001-003 (BRAKE ROTOR DRIVE SLEEVE, D1166  (QJ)) | MH | | |
| | | 61-20-00020-001 (ROTOR, CV JOINT ADAPTER) | MH | | |
| | | 61-60-00014-001 (REMKE PLUG, FLEX HOUSING, UNIVERSAL) | MH | | |
| | | 63-10-00009-002 (INSULATOR, THIN SEAL, STATOR BLOCK, D1166) | MH | | |
| | | 63-10-00027-001 (GASKET, SEAL, INSULATOR, STATOR BLOCK, D1166) | MH | | |
| | | 63-10-00037-001 (INSULATOR, WIRE GUIDE, STATOR BLOCK, CLEARANCE, D1166) | MH | | |
| | | 63-20-00013-001 (MAGNET HOLDER, .420" MAGNETS, D1166) | MH | | |
| | | 63-32-00031-001 (SENSOR HOUSING, FLEX HOUSING, D1166) | MH | | |
| | | 63-32-00032-001 (COVER, FLEX HOUSING, D1166) | MH | | |
| | | 63-40-00028-001 (CABLE CONNECTION TRAY, DETENT, D1166 (UP TO 5SB)) | MH | | |
| | | 63-40-00028-002 (CABLE CONNECTION TRAY, DETENT, 4SB, D1166) | MH | | |
| | | 63-40-00030-001 (CABLE CONNECTION TRAY, DETENT, 1106  ) | MH | | |
| | | 63-70-00084-002 (ADAPTER, FUSE SUPPORT W/ CONTACT INSERTS  ) | MH | | |
| | | 63-70-00097-002 (CRADLE, PRIMARY BUS BAR, BLACK  ) | MH | | |
| | | 63-70-00097-003 (CRADLE, PRIMARY BUS BAR, RED  ) | MH | | |
| | | 63-70-00098-002 (CRADLE CLIP, BUS BAR, BLACK  ) | MH | | |
| | | 63-70-00098-003 (CRADLE CLIP, BUS BAR, RED  ) | MH | | |
| | | 63-70-00099-001 (TERMINAL SUPPORT, BLACK W/ INSERTS  ) | MH | | |
| | | 63-70-00099-002 (TERMINAL SUPPORT, RED ) | MH | | |

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 63-70-00100-001 (TERMINAL SEAL, BLACK  ) | MH | | |
| | | 63-70-00100-002 (TERMINAL SEAL, RED  ) | MH | | |
| | | 63-70-00102-001 (GAP PAD, SMALL  ) | MH | | |
| | | 63-70-00102-002 (GAP PAD, LARGE  ) | MH | | |
| | | 63-70-00108-001 (HARNESS BRIDGE, BATTERY, MODULE ZERO  ) | MH | | |
| | | Flatscreen TVs | MH and Austin | | |
| | | Dynojet 250i dynamometer | MH | | |
| | | Various outdated controllers | MH | | |
| | | Unused tools | MH | | |
| | | **Inventory\*** | | | |
| | | 20-20-00034-001 (ASSY, FLANGED RING ROTOR, CAST W/ BACK IRON, D1166) | MH | | - |
| | | 20-30-00015-001 (ASSY, STATOR BLOCK BLANK OFF PLATE, D1166) | MH | | - |
| | | 20-70-00012-001 (ASSY, FET SPACER  ) | MH | | **62** |
| | | 23-15-00020-001 (ASSY, ENCODER, FLEX, PCBA, D1166) | MH | | - |
| | | 23-30-00025-002 (ASSY, G4 S2 CONTROLLER TRAY, W/ PEM NUTS) | MH | | 1,000 |
| | | 23-70-00017-001 (ASSY, RED FLEXIBUS  ) | MH | | 500 |
| | | 23-70-00023-002 (ASSY, NEGATIVE EXIT BUS BAR  ) | MH | | 96 |
| | | 23-70-00025-001 (ASSY, PRIMARY BUS BAR  ) | MH | | 84 |
| | | 23-70-00027-001 (ASSY, TERMINAL W/FUSE BUS BAR  ) | MH | | 33 |
| | | 23-90-00044-001 (ASSY, INTERNAL HARNESS, CURRENT SENSE & FUSE  ) | MH | | 291 |
| | | 23-90-00045-001 (ASSY, HARNESS, ESS CONTROL, SAMI-6R   ) | MH | | 276 |
| | | 23-90-00052-001 (ASSY, EXTERNAL HARNESS ON BOARD, 1 BATTERY  ) | MH | | 64 |
| | | 40-05-00002-001 (CHASSIS, ECLIMO) | MH | | - |
| | | 40-20-00002-001 (VALVE STEM, TUBELESS, .24 IN, CHROME) | MH | | - |
| | | 40-20-00003-001 (TIRE, STRYKE 130/60-13) | MH | | - |
| | | 40-20-00005-001 (REAR BRAKE DISC) | MH | | - |
| | | 40-20-00006-001 (CALIPER (ASSY)) | MH | | - |
| | | 40-20-00007-001 (FOOT PEDAL) | MH | | - |

**EXHIBIT 1**
**Page 54 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 40-20-00008-001 (FENDER, BRACKET) | MH | | 194 |
| | | 40-20-00010-001 (TIRE TUBE) | MH | | - |
| | | 40-40-00001-001 (KLD MARK 1101-8 MOTOR CONTROLLER, G4 S2) | MH | | 1,145 |
| | | 40-40-00002-001 (KLD MARK 1104-8 MOTOR CONTROLLER, G4 S4) | MH | | 296 |
| | | 40-41-00002-001 (CABLE, AC CORD 3M 16 AWG IP66 IEC 320 NEMA 5-15  ) | MH | | - |
| | | 40-50-00002-002 (Delta Q Charger DC-DC) | MH | | - |
| | | 40-50-00002-003 (BATTERY CHARGER, DQ, 48V, INTERLOCK, REMOTE LED) | MH | | 10 |
| | | 40-50-00002-004 (BATTERY CHARGER, DQ, 48V, IC650 W/COMM) | MH | | 2 |
| | | 41-10-00017-001 (MAGNET, 50M, 29.62 X 10.67 X 4.57MM, NI PLATE) | MH | | - |
| | | 41-20-00005-002 (STATOR, COATED, 0.23MM G.O.S.S., SANDED  ) | MH | | 9,360 |
| | | 42-00-00003-001 (EPOXY, THERMAL CONDUCTIVE) | MH | | - |
| | | 42-00-00004-005 (EPOXY POTTING COMPOUND, SCOTCH-WELD, DP-270) | MH | | - |
| | | 42-00-00011-001 (EPOXY RESIN PART A) | MH | | - |
| | | 42-00-00011-002 (EPOXY RESIN PART B) | MH | | - |
| | | 43-00-00011-003 (COIL, MAGNET, 67T, 16.5 AWG, MW30C, CLOCKWISE  ) | MH | | 20,056 |
| | | 43-95-00001-001 (REMOTE LED 3M SHIELDED BARE WIRES) | MH | | - |
| | | 44-30-00024-001 (M10 CONICAL WHEEL LUG NUT) | MH | | 1,579 |
| | | 44-30-00027-001 (AXLE TORQUE LOCK NUT) | MH | | 1,813 |
| | | 44-40-00019-001 (BEARING, 17MM ID, 47MM OD, 14MM W, 6303-2RSH/C3) | MH | | - |
| | | 44-40-00019-002 (BEARING, 17MM ID, 47MM OD, 14MM W, 6303-2RSH) | MH | | - |
| | | 44-40-00024-001 (BUSHING, 12 X 24 X 32) | MH | | - |
| | | 44-50-00019-001 (EDGE SEAL, 1/16" EDGE, 13/64" BULB WIDTH RUBBER 1400MM) | MH | | 33,600 |
| | | 44-70-00003-001 (VENT, M12 X 1.5, POLYAMIDE) | MH | | 77 |
| | | 45-10-00004-002 (PCB, INTERCONNECT, STATOR BLOCK, D1166, ENLARGED) | MH | | 557 |
| | | 45-16-00008-001 (FUSE, 80V, 250A) | MH | | - |
| | | 45-16-00009-002 (FUSE STRIP, SLOWBLOW, 58V, 200A) | MH | | 108 |

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 45-16-00011-001 (FUSE HOLDER, BLADE INLINE) | MH | | - |
| | | 45-18-00004-001 (CONTACTOR, GX12FA) | MH | | 104 |
| | | 45-18-00009-001 (Relay) | MH | | - |
| | | 45-20-00008-001 (HALL EFFECT CURRENT SENSOR) | MH | | 738 |
| | | 45-30-00004-001 (Automotive Connectors PLG 35 POS F/H BLK) | MH | | - |
| | | 45-30-00021-002 (MICRO-LINK ENCODER CABLE 5 POLE FEMALE, SHIELDED) | MH | | 134 |
| | | 45-30-00045-002 (RECEPTICAL, MALE, 5 POLE, ENCODER, PLASTIC PLATED BRASS  ) | MH | | 443 |
| | | 45-30-00050-001 (CIRCULAR CONNECTOR 2P PANEL MOUNT) | MH | | 471 |
| | | 45-30-00051-001 (CIRCULAR CONNECTOR 2P SOCKET CABLE END) | MH | | 342 |
| | | 45-30-00068-002 (CONNECTOR, RADSOK, 3.6MM,R4) | MH | | - |
| | | 45-30-00086-001 - A01 (CONNECTOR, PLUG, 31 POSITION #20 PINS, MEGA-CON-X) | MH | | - |
| | | 45-30-00102-001 (CONNECTOR, CIRCULAR, 2P PANEL MOUNT) | MH | | - |
| | | 45-30-00117-002 (CONNECTOR, HOUSING, SBS50, 2P, BLUE  ) | MH | | - |
| | | 45-30-00131-001 - A01 (Multi-Con-X Plastic Connector Straight Cable Plug 03 Pin) | MH | | - |
| | | 45-30-00145-001 (CONNECTOR, DEUTSCH 8 PIN DT SERIES ACCESSORY KIT) | MH | | - |
| | | 45-30-00153-001 (CONNECTOR, PLUG, 14 PIN, MALE, BLUE) | MH | | - |
| | | 45-30-00162-001 (CONN, PCB, INTERCONNECT, LONG CASTING, SOCKET, D1166) | MH | | - |
| | | 45-30-00162-002 (CONN, PCB, INTERCONNECT, SHORT CASTING, SOCKET, D1166) | MH | | - |
| | | 45-51-00001-001 (CORE PACK, 13S6, SAMSUNG) | MH | | 1,707 |
| | | 46-00-00029-001 (VIN LABEL) | MH | | 231 |
| | | 47-20-00004-001 (BOX, STATOR BLOCK 8 PACK) | MH | | - |
| | | 48-20-00002-001 (SHAFT SEAL, NITRILE, 52MM OD, 26MM ID, 8MM W) | MH | | - |
| | | 50-00-00009-001 (BADGE) | MH | | 308 |

**EXHIBIT 1**
**Page 56 of 90**

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 50-00-00010-001 (VEHICLE DECAL, POWERED BY KLD ONEDRIVE) | MH | | 129 |
| | | 50-00-00011-001 (BADGE, CALIPER MOUNT, INVESTOR NAME, MACHINED) | MH | | - |
| | | 60-10-00025-002-OLD (CONN, PCB, INTERCONNECT LONG CASTING, SOCKET, D1166 ) | MH | | - |
| | | 60-10-00026-002OLD (CONN, PCB, INTERCONNECT, SHORT CASTING, SOCKET, D1166 ) | MH | | - |
| | | 60-11-00002-001 (ROTOR FLANGE RING, CAST ROTOR, D1166) | MH | | - |
| | | 60-20-00027-001 (REAR 13" RIM ) | MH | | - |
| | | 60-50-00032-001 (SWINGARM, CAST, D1166) | MH | | 171 |
| | | 60-50-00033-002 (CALIPER BRAKE MOUNT, SWINGARM, CAST, MACHINED FOR BADGE, D1166) | MH | | 132 |
| | | 60-50-00033-003 (CALIPER BRAKE MOUNT, SWINGARM, CAST, ECLIMO, D1166) | MH | | 4 |
| | | 60-50-00034-001 (PHASE CABLE COVER, SWINGARM, CAST, D1166) | MH | | 177 |
| | | 60-50-00036-001 (BUS COVER, SWINGARM, CAST, D1166) | MH | | 175 |
| | | 60-70-00033-002 (BOTTOM) | MH | | 18 |
| | | 60-70-00034-001 (DIVIDER, FIRST) | MH | | 104 |
| | | 60-70-00034-002 (DIVIDER, SECOND ) | MH | | 64 |
| | | 60-70-00035-001 (BMS TRAY ) | MH | | 96 |
| | | 60-70-00038-001 (BUS BAR, POSITIVE TO CONTACTOR  ) | MH | | 102 |
| | | 60-70-00039-001 (BUS BAR, CONTACTOR TO FUSE  ) | MH | | 101 |
| | | 60-70-00042-002 (COVER) | MH | | 22 |
| | | 60-70-00045-001 (THERMAL DISTRIBUTION BAR) | MH | | 105 |
| | | 60-70-00046-001 (SECONDARY THERMAL DISTRIBUTION BAR  ) | MH | | 103 |
| | | 60-70-00047-001 (MODULE SLIDE SKIN) | MH | | 215 |
| | | 60-71-00008-001 (ICM DC-DC MOUNTING PLATE) | MH | | - |

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 60-71-00009-001 (ON-BOARD CHARGER MOUNTING PLATE) | MH | | - |
| | | 60-80-00009-001 (HEAT SINK , CONTROLLER, 1104-8) | MH | | 276 |
| | | 60-80-00010-001 (HEATSINK AL, G4, S2, SIDEWAYS FINS, CONTROLLER) | MH | | 1,112 |
| | | 61-11-00001-001 (BRAKE ROTOR DRIVE SLEEVE, D1166  (Matrex) | MH | | 145 |
| | | 61-11-00001-003 (BRAKE ROTOR DRIVE SLEEVE, D1166  (QJ)) | MH | | 157 |
| | | 61-20-00016-003 (AXLE, DRIVE MOD, D1166) | MH | | - |
| | | 61-20-00020-001 (ROTOR, CV JOINT ADAPTER) | MH | | 101 |
| | | 61-40-00008-001 (AXLE NUT SEAT) | MH | | - |
| | | 61-60-00014-001 (REMKE PLUG, FLEX HOUSING, UNIVERSAL) | MH | | 693 |
| | | 63-10-00009-002 (INSULATOR, THIN SEAL, STATOR BLOCK, D1166) | MH | | 2,150 |
| | | 63-10-00027-001 (GASKET, SEAL, INSULATOR, STATOR BLOCK, D1166) | MH | | - |
| | | 63-10-00037-001 (INSULATOR, WIRE GUIDE, STATOR BLOCK, CLEARANCE, D1166) | MH | | 2,322 |
| | | 63-20-00013-001 (MAGNET HOLDER, .420" MAGNETS, D1166) | MH | | 338 |
| | | 63-32-00031-001 (SENSOR HOUSING, FLEX HOUSING, D1166) | MH | | 683 |
| | | 63-32-00032-001 (COVER, FLEX HOUSING, D1166) | MH | | 683 |
| | | 63-40-00019-001 (GASKET, COMPRESSION, BUS BAR, STATOR PLATE, SEALED, D1166  ) | MH | | - |
| | | 63-40-00023-001 (INSULATOR, BUS BAR, FIVE CONN, OFFSET INJECTION) | MH | | - |
| | | 63-40-00028-001 (CABLE CONNECTION TRAY, DETENT, D1166 (UP TO 5SB)) | MH | | 579 |
| | | 63-40-00028-002 (CABLE CONNECTION TRAY, DETENT, 4SB, D1166) | MH | | 570 |
| | | 63-40-00030-001 (CABLE CONNECTION TRAY, DETENT, 1106  ) | MH | | - |
| | | 63-70-00084-002 (ADAPTER, FUSE SUPPORT W/ CONTACT INSERTS  ) | MH | | 256 |
| | | 63-70-00097-002 (CRADLE, PRIMARY BUS BAR, BLACK  ) | MH | | 242 |
| | | 63-70-00097-003 (CRADLE, PRIMARY BUS BAR, RED  ) | MH | | 263 |

EXHIBIT 1
Page 58 of 90

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 63-70-00098-002 (CRADLE CLIP, BUS BAR, BLACK  ) | MH | | 562 |
| | | 63-70-00098-003 (CRADLE CLIP, BUS BAR, RED  ) | MH | | 540 |
| | | 63-70-00099-001 (TERMINAL SUPPORT, BLACK W/ INSERTS  ) | MH | | 255 |
| | | 63-70-00099-002 (TERMINAL SUPPORT, RED ) | MH | | 251 |
| | | 63-70-00100-001 (TERMINAL SEAL, BLACK  ) | MH | | 263 |
| | | 63-70-00100-002 (TERMINAL SEAL, RED  ) | MH | | 262 |
| | | 63-70-00102-001 (GAP PAD, SMALL  ) | MH | | 924 |
| | | 63-70-00102-002 (GAP PAD, LARGE  ) | MH | | 649 |
| | | 63-70-00108-001 (HARNESS BRIDGE, BATTERY, MODULE ZERO) | MH | | 360 |
| | Total Inventory | | | | 92,035 |
| | Assembly | | | | |
| | | 00-11-00009-CW1 (MOTOR, SINGLE DRIVE, 1104, CW) | MH | | - |
| | | 00-11-00010-002 (MOTOR, SINGLE DRIVE 5 STATOR, D1166) | MH | | - |
| | | 00-11-00010-004 (MOTOR, SINGLE DRIVE 4 STATOR, D1166) | MH | | - |
| | | 00-11-00020-002 (MOTOR, SINGLE DRIVE W/BEARING, 1105F) | MH | | - |
| | | 03-02-00002-001 (ONEDRIVE 1105F-14-3-148LI-14, ES120) | MH | | 4 |
| | | 20-20-00031-001 (ASSY, AXLE, D1166) | MH | | - |
| | | 20-20-00032-001 (ASSY, WHEEL & TIRE, 3 SPOKE) | MH | | 186 |
| | | 20-20-00036-001 ((ROTOR) ROTATING ASSY, CAST IN BACK IRON, .420" 50M MAGNETS, D1166) | MH | | - |
| | | 20-20-00037-001 (ASSY, ROTOR, CAST IN BACK IRON, 420" 50M MAGNETS, D1166) | MH | | 105 |
| | | 20-30-00021-001 (SUB-ASSY, STATOR PLATE, FLANGED ROTOR, SEALED, D1166) | MH | | 116 |
| | | 20-30-00029-005 (ASSY, STATOR PLATE, 5 SB, POS SENSOR, D1166) | MH | | - |
| | | 20-30-00029-006 (ASSY, STATOR PLATE, 4 SB, POS SENSOR, D1166) | MH | | - |
| | | 20-30-00032-001 (ASSY, COOLING PLATE W/ COVER, D1166) | MH | 52 | |
| | | 20-40-00016-001 (ASSY, BUS BAR, OFFSET CONN, LONG PIN, D1166) | MH | 72 | |

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 20-50-00017-002 (ASSY, CALIPER MOUNT, W/ BEARING, MACHINED FOR BADGE) | MH | | - |
| | | 20-50-00018-001 (ASSY, SWINGARM, CAST, W/ BUSHINGS, D1166) | MH | | - |
| | | 20-70-00009-001 (ASSY, SAMSUNG BRICK) | MH | | 203 |
| | | 23-10-00019-001 (ASSY, STATOR CUP W/ INSERTS, D1100) | MH | | 792 |
| | | 23-10-00024-CS1 (ASSY, STATOR BLOCK, 1100, 67T, 16.5AWG, RND, 9MIL, D1166, CS (V1)) | MH | | 88 |
| | | 23-10-00024-CS2 (ASSY, STATOR BLOCK W/ THERMISTOR, 1100, 67T, 16.5AWG, RND, 9MIL,... | MH | | 20 |
| | | 23-10-00024-CW1 (ASSY, STATOR BLOCK, 1100, 67T, 16.5AWG, RND, 9ML, D1166, CW(V1)) | MH | | - |
| | | 23-10-00024-CW2 (ASSY, STATOR BLOCK W/THERMISTOR, 1100, 67T, 16.5AWG, RND, 9ML, D... | MH | | - |
| | | 23-10-00034-001 (ASSY, STATOR BLOCK, 1100, 67T, 16.5AWG, .23MM(V1+)) | MH | | - |
| | | 23-10-00034-002 (ASSY, STATOR BLOCK W/ THERMISTOR, 1100, 67T, 16.5AWG, .23MM(V1+)... | MH | | - |
| | | 23-10-00034-003 (ASSY, STATOR BLOCK, 1100, 67T, 16.5AWG, .23MM(V1+)) | MH | | 71 |
| | | 23-10-00034-004 (ASSY, STATOR BLOCK W/ THERMISTOR, 1100, 67T, 16.5AWG, .23MM(V1+)... | MH | | 60 |
| | | 23-15-00025-001 (ASSY, POSITION SENSOR, FLEX, D1166  ) | MH | | - |
| | | 23-30-00019-001 (ASSY, CONTROLLER, W/ HEAT SINK & TRAY, G4 S4) | MH | | - |
| | | 23-30-00020-002 (ASSY, G4 S4 CONTROLLER TRAY, W/PEM NUTS) | MH | | 74 |
| | | 23-30-00021-001 (ASSY, CONTROLLER, W/ HEAT SINK & TRAY, G4 S2) | MH | | 225 |
| | | 23-30-00032-001 (ASSY, MASTER CONTROLLER, 1104-8, W/ HEAT SINK) | MH | | - |
| | | 23-40-00001-001 (ASSY, BATTERY CHARGER, DQ, 48V, INTERLOCK, REMOTE LED) | MH | | - |
| | | 23-55-00005-001 (ASSY, MODULE, BMS) | MH | | 46 |
| | | 23-70-00016-001 (ASSY, GREEN FLEXIBUS) | MH | | 500 |

EXHIBIT 1
Page 60 of 90

| Purchase Date | Supplier/Vendor (if applicable) | Description | Location | Use | On Hand |
|---|---|---|---|---|---|
| | | 23-70-00016-002 (ASSY, GREEN FLEXIBUS, 5 SB) | MH | | - |
| | | 23-70-00017-002 (ASSY, RED FLEXIBUS, 5 SB..) | MH | | - |
| | | 23-70-00018-001 (ASSY, BLUE FLEXIBUS) | MH | | 500 |
| | | 23-70-00018-002 (ASSY, BLUE FLEXIBUS, 5 SB..) | MH | | - |
| | | 23-90-00016-001 (ASSY, PTC THERMISTOR CABLE) | MH | | - |
| | | 23-90-00021-001 (ASSY, HARNESS, THERMISTOR, AND ENCODER) | MH | | - |
| | | 23-90-00021-003 (ASSY, HARNESS, THERMISTOR, AND ENCODER, 1500MM) | MH | | - |
| | | 23-90-00060-001 (ASSY, POWER CABLE, POSITIVE, 3KWH 48V) | MH | | - |
| | | 23-90-00061-001 (ASSY, POWER CABLE, NEGATIVE, 3KWH 48V) | MH | | - |
| | | 23-90-00074-002 (ASSY, KLD SYSTEM HARNESS (SINGLE MOTOR, 1 CONTROLLER, 1 BATTERY)) | MH | | - |
| | | 23-90-00076-002 (ASSY, CUSTOMER INTERFACE HARNESS, 1104-8, W/ FORWARD & REVERSE, ... | MH | | - |
| | | 23-90-00082-001 (ASSY, BATTERY MASTER POSITIVE CABLE, 3000MM) | MH | | - |
| | | 23-90-00083-001 (ASSY, BATTERY MASTER NEGATIVE CABLE, 3000MM) | MH | | - |
| | | 27-40-00031-001 (ASSY, BATTERY 3KWH 48V LI ION  ) | MH | | 37 |
| | | 40-41-00005-002 (HARNESS, VMOTO/ECLIMO CHASSIS) | MH | | - |
| | | 60-10-00025-002 (CONN, PCB, INTERCONNECT, LONG CASTING, SOCKET, D1166) | MH | | 1,300 |
| | | 60-10-00026-002 (CONN, PCB, INTERCONNECT, SHORT CASTING, SOCKET, D1166) | MH | | 2,500 |
| | Total Assembly | | | | 6,951 |
| | | | | | 98,986 |

**EXHIBIT 1**
**Page 61 of 90**

## KLD Energy Technologies, Inc. Patent List

| Reference # | Type | Title | Serial # | Filed Date | Patent # | Issue Date | Country | Status | Next Due Date |
|---|---|---|---|---|---|---|---|---|---|
| 527825-023 | Licensed | ELECTRIC MACHINES AND METHODS OF MAKING SAME | 14/376,496 | 08/04/2014 | | | UNITED STATES | PUBLISHED | 11/04/2016 STATUS CHECK |
| 527825-024 | Licensed | ELECTRIC MACHINES INCLUDING STATOR MODULES | 13102196.3 | 09/07/2010 | | | HONG KONG | PUBLISHED | 09/07/2018 ANNUITY DUE |
| 527825-029 | Licensed | ARBITRARY PHASE RELATIONSHIP FOR ELECTRICAL CONNECTIONS IN N-PHASE ELECTRIC MACHINES | 13102195.4 | 09/07/2010 | | | HONG KONG | PUBLISHED | 09/07/2018 ANNUITY DUE |
| 527825-046 | Licensed | HIGH FREQUENCY MOTOR OR GENERATOR | 200910138466.7 | 05/18/2009 | ZL 2009101384 66.7 | | CHINA | ISSUED | 12/01/2016 ANNUITY DUE 1/29/17 |
| 527825-047 | Licensed | HIGH FREQUENCY MOTOR OR GENERATOR | 10-2004-7011905 | 01/29/2003 | 10-1002352 | | SOUTH KOREA | ISSUED | 12/13/2016 ANNUITY DUE |
| 527825-051 | Owned | SCOOTER | A00200903514 | 11/06/2009 | ID 0 027 541 - D | 02/08/2012 | INDONESIA | ISSUED | |
| 527825-053 | Licensed | HIGH FREQUENCY MOTOR OR GENERATOR | 10104357.7 | 05/18/2009 | HK1136699 | 09/07/2012 | HONG KONG | ISSUED | 12/01/2016 ANNUITY DUE 1/29/17 |
| 527825-054 | Owned | SCOOTER | 09-01199-0101 | 11/06/2009 | MY 09-01199-0101 | 07/19/2010 | MALAYSIA | ISSUED | 05/06/2019 ANNUITY DUE |
| 527825-060 | Licensed | HIGH FREQUENCY MOTOR OR GENERATOR | 03735082.4 | 01/29/2003 | | | EUROPEAN PATENT CONVENT | PUBLISHED | 12/01/2016 ANNUITY DUE 1/29/17 |
| 527825-061 | Licensed | HIGH FREQUENCY MOTOR OR GENERATOR | 2003-565012 | 01/29/2003 | 4708707 | | JAPAN | ISSUED | 03/25/2017 ANNUITY DUE |
| 527825-064 | Licensed (not used) | BUS BAR MODULE FOR AN ELECTRIC MACHINE | 13102194.5 | 09/07/2013 | HK1175037 | 10/16/2015 | HONG KONG | ISSUED | 10/16/2018 WORKING |
| 527825-066 | Owned | VEHICLE COMMUNICATIONS, POWER MANAGEMENT, AND SEATING SYSTEMS--KENGURU | 14/211,898 | 03/14/2014 | | | UNITED STATES | PUBLISHED | 10/23/2016 RESPONSE TO OA |
| 527825-068 | Licensed | HIGH FREQUENCY ELECTRIC MOTOR OR GENERATOR INCLUDING MAGNETIC CORES FORMED FROM THIN FILM SOFT MAGNETIC MATERIAL | 10/060,645 | 01/30/2002 | 6,879,080 | 04/12/2005 | UNITED STATES | ISSUED | |
| 527825-069 | Licensed | HIGH FREQUENCY ELECTRIC MOTOR OR GENERATOR | 10/956,900 | 09/30/2004 | 7,030,534 | 04/18/2006 | UNITED STATES | ISSUED | 10/18/2017 3RD MAINT |

AUS-6319580-1

**EXHIBIT 1**
**Page 62 of 90**

| Reference # | Type | Title | Serial # | Filed Date | Patent # | Issue Date | Country | Status | Next Due Date |
|---|---|---|---|---|---|---|---|---|---|
| | | INCLUDING MAGNETIC CORES FORMED FROM THIN FILM SOFT MAGNETIC MATERIAL | | | | | | | FEE DUE |
| 527825-070 | Licensed | HIGH FREQUENCY ELECTRIC MOTOR OR GENERATOR | 11/228,747 | 09/16/2005 | 7,358,639 | 04/15/2008 | UNITED STATES | ISSUED | 10/15/2019 3RD MAINT FEE DUE |
| 527825-071 | Licensed | HIGH FREQUENCY ELECTRIC MOTOR OR GENERATOR INCLUDING MAGNETIC CORES FORMED FROM THIN FILM SOFT MAGNETIC MATERIAL | 10/060,732 | 01/30/2002 | 6,603,237 | 08/05/2003 | UNITED STATES | ISSUED | |
| 527825-073 | Owned | WHEEL DRIVE HUB | 29/336,634 | 05/06/2009 | D616,350 | 05/25/2010 | UNITED STATES | ISSUED | |
| 527825-076 | Owned | SCOOTER | 29/336,632 | 05/06/2009 | D616,334 | 05/25/2010 | UNITED STATES | ISSUED | |

## KLD Energy Nano-Grid Systems, Inc – Patent List

| Reference # | Type | Title | Serial # | Filed Date | Patent # | Issue Date | Country | Status | Next Due Date |
|---|---|---|---|---|---|---|---|---|---|
| 527825-83 | Subsidiary—not Owned by KLD | INTRA-STROKE CYCLE TIMING FOR PUMP JACK FLUID PUMPING--NANOGRID | 15/191,042 | 06/23/2016 | | | UNITED STATES | PENDING | 09/23/2016 INVENTORS OATH |
| 527825-84 | Subsidiary – not | DETECTION AND MITIGATION OF DETRIMENTAL OPERATING CONDITIONS DURING PUMPJACK PUMPING--NANOGRID | 15/191,072 | 06/23/2016 | | | UNITED STATES | PENDING | 10/29/2016 INVENTORS OATH |
| 527825-85 | Subsidiary | ELECTRIC MOTOR CONTROL FOR PUMPJACK PUMPING NANO-GRID | 15/191,136 | 06/23/2016 | | | UNITED STATES | PENDING | 10/29/2016 INVENTORS OATH |

**\*The motor parts for 6 assembled 11" V3 motors are listed in the table above.**

## KLD Energy Technologies, Inc.  – Trademark List

| Reference # | Mark | Application # | File Date | Registration # | Registration Date | Country | Status |
|---|---|---|---|---|---|---|---|
| 527825-36 | KENGURU | IR1167609 | 06/17/2013 | | | AUSTRALIA | PENDING |
| 527825-49 | KENGURU | IR1167609 | 06/17/2013 | | | CHINA | PENDING |
| 527825-57 | KENGURU | IR1167609 | 06/17/2013 | | | EUROPEAN UNION | PENDING |

| | | | | | | (EUTM & RCD) | |
|---|---|---|---|---|---|---|---|
| 527825-41 | KENGURU | IR1167609 | 06/17/2013 | | | ISRAEL | PENDING |
| 527825-50 | KENGURU | IR1167609 | 06/17/2013 | | | JAPAN | PENDING |
| 527825-31 | KENGURU | IR1167609 | 06/17/2013 | | | LIECHTENSTEIN | PENDING |
| 527825-43 | KENGURU | IR1167609 | 06/17/2013 | | | MEXICO | PENDING |
| 527825-42 | KENGURU | IR1167609 | 06/17/2013 | | | MONACO | PENDING |
| 527825-35 | KENGURU | IR1167609 | 06/17/2013 | | | NEW ZEALAND | PENDING |
| 527825-44 | KENGURU | IR1167609 | 06/17/2013 | | | RUSSIA | PENDING |
| 527825-34 | KENGURU | IR1167609 | 06/17/2013 | | | SOUTH KOREA | PENDING |
| 527825-78 | KENGURU | 85/319,144 | 05/12/2011 | 4,074,089 | 12/20/2011 | UNITED STATES | REGISTERED |
| 527825-45 | KENGURU | IR1167609 | | IR1167609 | 06/17/2013 | WIPO | REGISTERED |
| 527825-65 | KLD | 13483767 | 11/05/2013 | | | CHINA | PENDING |
| 527825-52 | KLD | 12272712 | 10/31/2013 | 012272712 | 07/13/2014 | EUROPEAN UNION (EUTM & RCD) | REGISTERED |
| 527825-62 | KLD | 2013015157 | 10/31/2013 | 2013015157 | 03/05/2015 | MALAYSIA | REGISTERED |
| 527825-77 | ONEDRIVE | 86/180,209 | 01/30/2014 | | | UNITED STATES | ABANDONED due to settlement with UnoDrive |

## KLD Energy Technologies, Inc. Website List

| |
|---|
| www.kenguru.com |
| www.kldenergy.com |
| www.eliteelectricvehicles.com |

## Ownership Interests in Other Entities

All Ownership Interests held by KLD Energy Technologies, Inc. in the following entities:

KLD Electronics Texas, Inc.
KLD Energy Technologies Malaysia SDN BHD
China KLD Energy Technologies Limited
KLD Energy Nano-Grid Systems, Inc.

AUS-6319580-1

EXHIBIT 1
Page 64 of 90

## Schedule 2.1(b)

### Accounts Receivable

| | Current | 1 – 30 | 31 – 60 | 61 – 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| Anderson Receivable ........ | 0.00 | 0.00 | 0.00 | 0.00 | 14,600.00 | 14,600.00 |
| Eclimo Sdn. Bhd. – Customer | | | | | | |
| Eclimo PO 1047 – 500 ............................ | 0.00 | 0.00 | 0.00 | 0.00 | 1,482.63 | 1,482.63 |
| Total Eclimo Sdn. Bhd. – Customer .................... | 0.00 | 0.00 | 0.00 | 0.00 | 1,482.63 | 1,482.63 |
| Rogue Rovers.................... | 0.00 | 0.00 | 0.00 | 0.00 | 14,200.00 | 14,200.00 |
| TOTAL ............................ | 0.00 | 0.00 | 0.00 | 0.00 | 30,282.63 | 30,282.63 |

**EXHIBIT 1**
**Page 65 of 90**

## Schedule 2.1(c)

## Assigned Contracts

| Counterparty | Contract | Address of Counterparty | | | | Description | Cure Amount |
|---|---|---|---|---|---|---|---|
| Dell Financial Services  L.L.C. | Master Lease Agreement (No. 6705710), dated April 2, 2014, by and between Dell Financial Services L.L.C. and KLD Energy Technologies, Inc.<br><br>Master Lease Agreement Schedule No. 01-6705710-500, effective as of May 1, 2014.<br><br>Master Lease Agreement Schedule No. 001-6705710-501, effective as of November 1, 2014. | One Dell Way | Round Rock | TX | 78682-0000 | Austin:  IT | $44,330.01 |
| Green Ray Technologies LLC | Amended and Restated License Agreement, dated January 4, 2010, by and among Green Ray Technologies  LLC, Ramon A. Caamano and KLD Energy Technologies, Inc, as amended by: (i) the Amendment dated October 1, 2010, (ii) the Second Amendment dated August 11, 2011 (iii) the Second Amendment dated November 30, 2011, (iv) the Third Amendment dated May 31, 2012, (v) the Fourth Amendment dated June 30, 2012, (vi) the Fifth Amendment dated July 31, 2012, (vii) the Sixth Amendment dated October 31, 2012 and (viii) the Seventh Amendment dated February 26, 2016. | 6450A Mt. Madonna Road | Gilroy | CA | 95020-0000 | License Agreement | $100,000.00 |
| Kenguru, Inc., Kenguru Acquisition Corp. and other related parties | Agreement and Plan of Merger, by and among KLD Energy Technologies, Inc., Kenguru, Inc., Kenguru Acquisition Corp., Istvan Kissaroslaki and Stacy Zoern, as the principal stockholders, and Istvan Kissaroslaki, as the stockholder representative, dated May 15, 2015. | C/O Stacy Zoern 2104 Monarch Drive | Austin | TX | 78748 | Merger Agreement | $0.00 |

**EXHIBIT 1**<br>**Page 66 of 90**

16-10345-hcm  Doc#330-1  Filed 12/01/16  Entered 12/01/16 17:53:48  Proposed Order  Pg 97 of 123

| Counterparty | Contract | Address of Counterparty | | | | Description | Cure Amount |
|---|---|---|---|---|---|---|---|
| Fratelli Investments LLC | Lease Agreement for Suites 100A, 100 and 120 at 15750 Vineyard Boulevard, Morgan Hill, California, by and between Fratelli Investments LLC, as Landlord, and KLD Energy Technologies, Inc., as Tenant, dated June 25, 2010, as amended by: (i) the First Amendment, dated December 31, 2013, and (ii) the Second Amendment, dated May 26, 2015. | C/O Vanni Properties Inc. 8080 Santa Teresa Blvd. | Gilroy | CA | 95020-0000 | Morgan Hill : Rent | $0.00 |
| Communications Plus, Inc. | Sublease Agreement for 8910 Research Boulevard, Suite B-1, Austin, TX, by and between Communications Plus, Inc., as Sublessor, and KLD Energy Technologies, Inc., as Sublessee, dated March 21, 2016, as amended on September 30, 2016. | PO Box 2402 | Sherman | TX | 75091-2402 | Austin: HQ Rent | $0.00 |
| Kuehne & Nagel Inc. | N/A | 1001 Busse Road | Elk Grove Village | IL | 60007 | Storage | $1,356.00 |
| South Valley Internet (Garlic) | N/A | PO Box 1246 | San Martin | CA | 95046-1246 | Morgan Hill: internet Service | $0.00 |
| Squarespace | N/A | 225 Varick Street 12th floor | New York | NY | 10014 | Webhosting | $0.00 |
| Delta Alarm, Inc. (MH#120) | Security System Sales and Installation Agreement, dated September 23, 2010, by and between Delta Alarm Systems, Inc. and KLD Energy Technologies, Inc. | 323 Piercy Road | San Jose | CA | 95138-0000 | Morgan Hill: Security monitoring | $0.00 |
| GoDaddy | | Corporate Headquarters 14455 N. Hayden Rd., Ste. 226 | Scottsdale | AZ | 85260 | Webhosting | $0.00 |

AUS-6319580-1

**EXHIBIT 1**
**Page 67 of 90**

**Schedule 2.1(d)**

**Assumed Leases**

| Type | Name | Location | Mo. Expense | Annual Cost |
|------|------|----------|-------------|-------------|
| Unexpired Lease | Lease Agreement for Suites 100A, 100 and 120 at 15750 Vineyard Boulevard, Morgan Hill, California, by and between Fratelli Investments LLC, as Landlord, and KLD Energy Technologies, Inc., as Tenant, dated June 25, 2010, as amended by: (i) the First Amendment, dated December 31, 2013, and (ii) the Second Amendment, dated May 26, 2015. | 15750 Vineyard Boulevard, Morgan Hill, CA 95037 (Suites 100A, 100, 120) | $21,741 | $260,892 |
| Unexpired Lease, New Facility Sub-Lease | Sublease Agreement for 8910 Research Boulevard, Suite B-1, Austin, TX, by and between Communications Plus, Inc., as Sublessor, and KLD Energy Technologies, Inc., as Sublessee, dated March 21, 2016, as amended on September 30, 2016. | 8910 Research Blvd., Austin, TX 78758 | $2,000 | $24,000 |
| Unexpired IT Lease | Master Lease Agreement (No. 6705710), dated April 2, 2014, by and between Dell Financial Services L.L.C. and KLD Energy Technologies, Inc.<br><br>Master Lease Agreement Schedule No. 01-6705710-500, effective as of May 1, 2014.<br><br>Master Lease Agreement Schedule No. 001-6705710-501, effective as of November 1, 2014. | One Dell Way, Round Rock, TX 78682 | $2,674 | $32,088 |

**Schedule 2.2(n)**

**Other Excluded Assets**

None.

**Schedule 4.6**

**Contracts Affecting the Purchased Assets**

**<u>KLD – List of all Contracts</u>**

| TYPE | Name | Address 1 | Address 2 | Address 3 | City | State | Zip | Description | (days) Term Remaining | Gov Contract No | Co Debtor | St. Date | End Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contract: Milestones | Red Italia / Sandro Grespan | Via Pace 7 | Levata | di Curatone 46010 | Mantova | Italy | | Consulting Agreements- with Milestones | 1628 | No | No | 9/1/2015 | 9/1/2020 | |
| Contract: Milestones | Ricardo - Phase A: Concept | Chicago Technical Center | 7850 S. Grant Street | | Burr Ridge | IL | 60527 | Consulting Agreements- with Milestones | -17 | No | No | 10/9/2015 | 3/1/2016 | no end date |
| Contract: Milestones | Ricardo - Phase B: EV | Chicago Technical Center | 7850 S. Grant Street | | Burr Ridge | IL | 60527 | Consulting Agreements- with Milestones | -17 | No | No | 10/8/2015 | 3/1/2016 | no end date |
| Contract: Milestones | P3 | 1957 Crooks Rd, Suite B | | | Troy | MI | 48084 | Consulting Agreements- with Milestones | -17 | No | No | 3/20/2015 | 3/1/2016 | no end date |
| Contract: Milestones | PwC | P.O. Box 952282 | | | Dallas | TX | 75395-2282 | Consulting Agreements- with Milestones | -17 | No | No | 8/20/2013 | 3/1/2016 | no end date |
| Contract: Milestones | L'Auto | Via pier Luig | Da Palestrina No. 2 | | Milan | Italy | | Consulting Agreements- with Milestones | 1630 | No | No | 9/3/2015 | 9/3/2020 | |
| Contract: Milestones -IB | Tejara | Al Fattan Currency House | Tower 1, Level 2 | PO Box482014 | DIFC | Dubai | | Equity Raising : Investment Bankers/Milestones | 196 | No | No | 10/12/2015 | 9/30/2016 | up to 10 months AFTER Ricardo report |
| Contract: Milestones -IB | UGR / Enverra | 2101 L Street NW | Suite 800 | | Washington | DC | 20037 | Equity Raising : Investment Bankers/Milestones | -169 | No | No | 10/1/2014 | 10/1/2015 | 30 days notice |

**EXHIBIT 1**
**Page 70 of 90**

| TYPE | Name | Address 1 | Address 2 | Address 3 | City | State | Zip | Description | (days) Term Remaining | Gov Contract No | Co Debtor | St. Date | End Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contract: Milestones -IB | Venture Connections / G. Devlin (3 Docs) | Houston Road | | | Kilmacolm | Ireland | PA13 4NY | Equity Raising : Investment Bankers/Milestones | 439 | No | No | 10/16/2015 | 5/31/2017 | |
| Contract: Milestones -IB | RiverWIDE(2 agreements) | River Wide House | 6 Masons Yard | | London | UK | SW1Y 6BU | Equity Raising : Investment Bankers/Milestones | 13 | No | No | 9/11/2015 | 3/31/2016 | 30 days |
| Contract: Milestones -IB | Gunnercooke | 53 King Street | | | Manchester | UK | M2 4LQ | Equity Raising : Investment Bankers/Milestones | -11 | No | No | 11/1/2015 | 3/7/2016 | 7 days notice |
| Contract: Milestones -IB | City & Westminster | 50 Jermyn St. | | | London | UK | SW1Y 6LX | Equity Raising : Investment Bankers/Milestones | 74 | No | No | 11/30/2015 | 5/31/2016 | 30 day notice |
| Exec Contract | GreenRay Technologies (plus 6 amendments) | 6450A Mt. Madonna Road | | | Gilroy | CA | 95020 | Consulting - open - no Milestones / IP | -17 | No | No | | 3/1/2016 | |
| Exec Contract | Island Park Labs | 2600 Garden Rd | Suite 226 | | Monterey | CA | 93940 | Consulting - open - no Milestones / IP | -17 | No | No | | 3/1/2016 | |
| Exec Contract | GCS - IT support | 8701 N Mo-Pac Expy #155 | | | Austin | TX | 78759 | Consulting - open - no Milestones. IT Support | 13 | No | No | 4/3/2014 | 3/31/2016 | 30 days |
| Exec Contract | Financial Valuation Services | 3305 Northland Drive Suite 410 | | | Austin | TX | 78731 | Consulting - open - no Milestones | -17 | No | No | 6/30/2015 | 3/1/2016 | none listed |
| Exec Contract | F&R-KLD | PO Box 3295 | | | Boston | MA | 02241-3295 | Consulting - open - no Milestones / Legal | -17 | No | No | | 3/1/2016 | |
| Exec Contract | Sandlin Law Firm | 1250 S. Cap of TX Hwy | Building 3, Suite 400 | | Austin | TX | 78746 | Consulting - open - no Milestones / Legal | -17 | No | No | | 3/1/2016 | |

| TYPE | Name | Address 1 | Address 2 | Address 3 | City | State | Zip | Description | (days) Term Remaining | Gov Contract No | Co Debtor | St. Date | End Date | Notes |
|------|------|-----------|-----------|-----------|------|-------|-----|-------------|----------------------|-----------------|-----------|----------|----------|-------|
| Exec Contract | Cenntro Group Limited | 304 Jackson mills road | | | Freehold | NJ | 7728 | Customer Agreement | 257 | No | No | 12/1/2013 | 11/3/2016 | Extended monthly |
| Exec Contract | Michael Donohoe | 1509 Silver Oak Trail | | | Cedar Park | TX | 78613 | Consulting - open - no Milestones | -185 | No | No | 5/16/2015 | 9/15/2015 | monthly auto-renewal |
| Exec Contract | Office Team | P. O. Box 743295 | | | Los Angeles | CA | 90074-3295 | Consulting - open - no Milestones / Temp service | -17 | No | No | 5/21/2013 | 3/1/2016 | as needed basis |
| Exec Contract | Ranstad | P.O. Box 2084 | | | Carol Stream | IL | 60132-2084 | Consulting - open - no Milestones / Temp service | -17 | No | No | 1/15/2014 | 3/1/2016 | as needed basis |
| Exec Contract | Survival Systems | 2149 Portola Road | | | Ventura | CA | 93003 | Consulting - open - no Milestones / Recruiter service | -17 | No | No | 12/4/2015 | 3/1/2016 | as needed basis |
| Exec Contract | Ultimate Staffing Services / Roth Staffing | 450 N. State College Blvd. | | | Orange | CA | 92868 | Consulting - open - no Milestones / Temp service | -17 | No | No | 6/13/2013 | 3/1/2016 | as needed basis |
| Exec Contract | IBM Comp. | P.O. Box 676673 | | | Dallas | TX | 75267-6673 | Consulting - open - no Milestones / Database access | -413 | No | No | 12/4/2015 | 1/30/2015 | Extended monthly |
| Exec Contract | Zone 24X7 | 1310 Rimrock Drive | | | San Jose | CA | 95120 | Consulting - open - no Milestones / | -17 | No | No | | 3/1/2016 | |
| Exec Contract | Blue Cross Blue Shield | PO Box 660049 | | | Dallas | TX | 75266-0049 | Consulting - open - no Milestones / Benefits | -17 | No | No | | 3/1/2016 | |
| Exec Contract | Unum | PO Box 409548 | | | Atlanta | GA | 30384-9548 | Consulting - open - no Milestones / Benefits | -17 | No | No | | 3/1/2016 | |

AUS-6319580-1

EXHIBIT 1
Page 72 of 90

| TYPE | Name | Address 1 | Address 2 | Address 3 | City | State | Zip | Description | (days) Term Remaining | Gov Contract No | Co Debtor | St. Date | End Date | Notes |
|------|------|-----------|-----------|-----------|------|-------|-----|-------------|-----------------------|-----------------|-----------|----------|----------|-------|
| Exec Contract | AlwaysCare, Inc. | Dept. 1891 | PO Box 2153 | | Birmingham | AL | 35287 1891 | Consulting - open - no Milestones / Benefits | -17 | No | No | 12/1/2014 | 3/1/2016 | Extended monthly |
| Exec Contract | Keague concepts | 109 Auburn Glen Manor S.E. | | | Calgary | AB / Canada | T3M 0L4 | Consulting - open - no Milestones | -473 | No | No | 10/13/2014 | 12/1/2014 | Extended monthly |
| Exec Contract | Momentum Consulting Inc | PO Box 161646 | | | Austin | TX | 78746 | Consulting - open - no Milestones / Training | -17 | No | No | | 3/1/2016 | |
| Exec Contract | Joerrie de Ridder | Ectric Drive BVDA | Vilfhoekstraet 24-B 2600 | | Antwerp | Belgium | | Consulting - open - no Milestones / Equipment Storage | -17 | No | No | | 3/1/2016 | |
| Employee Agreements | Avlas, Leon (Nicolas) | 536 Glenburry Way | | | San Jose | CA | 95123 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Baker, David | 2804 Allison Dr. | | | Austin | TX | 78741 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Bell, Dan | 1306 Becca Teal | | | Round Rock | TX | 78681 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Brindle, Jerry | 70 Wright Ave | | | Morgan Hill | CA | 95037 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Caamano, Ray A. | 6405A Mt. Madonna Rd. | | | Gilroy | CA | 95020 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Chen, Ziyu | 7641 A Dowdy St. | | | Gilroy | CA | 95020 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |

EXHIBIT 1
Page 73 of 90

| TYPE | Name | Address 1 | Address 2 | Address 3 | City | State | Zip | Description | (days) Term Remaining | Gov Contract No | Co Debtor | St. Date | End Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Agreements | Collier, David | 150 Abbott Drive | | | Austin | TX | 78737 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | DaCunha, Pierre | 50 E 5th St | | | Morgan Hill | CA | 95037 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Ferber, Robert | 245 Allen Road | | | Woodside | CA | 94062 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Gallagher, David | 5273 Camden Ave #198 | | | San Jose | CA | 95124 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Gibson, David | 15701 Hilcroft Cove | | | Austin | TX | 78717 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Helfand, Jason | 14001 Tyburn Trail | | | Austin | TX | 78717 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Kissaroslaki, Istvan (termed) | 16208 McAloon Way | | | Austin | TX | 78728 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Lee, Michael | 25984 Mesa Drive | | | Carmel | CA | 93923 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Li, Weitao | 2101 E. St. Elmo, Ste 100 | | | Austin | TX | 78744 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | List, Jaye C. | 147 Lavaca Loop | | | Hutto | TX | 78634 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |

**EXHIBIT 1**
**Page 74 of 90**

| TYPE | Name | Address 1 | Address 2 | Address 3 | City | State | Zip | Description | (days) Term Remaining | Gov Contract No | Co Debtor | St. Date | End Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Agreements | Miller, Christina | 6450 Mt. Madonna Rd. | | | Gilroy | CA | 95020 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Moya, Hector | 18523 Poppy Jasper | | | Morgan Hill | CA | 95037 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Okonsky, Christian | 20 Sundown Parkway | | | Austin | TX | 78746 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Orteza, Mark | 3262 Floresta Dr | | | San Jose | CA | 95148 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Wabschall, Mark | 8838 Chalk Knoll Drive | | | Austin | TX | 78735 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Wabschall, Mark - Wage Deferral | 8838 Chalk Knoll Drive | | | Austin | TX | 78735 | Wage Deferral Plan | 1 | No | No | 10/1/2015 | 3/19/2016 | |
| Employee Agreements | Wan, Alfred | 388 Santana Row, Unit 2101 | | | San Jose | CA | 95128 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Zoern, Stacy (Termed) | 2104 Monarch Dr. | | | Austin | TX | 78748 | Employee Agreements-Active | 0-Tx: At Will State | No | No | | | |
| Employee Agreements | Gagliardi, Mike (Termed) | 3004 Onslow Dr. | | | Austin | TX | 78748 | Employee Agreements-Termed / with Pay-outs | 0 : Termed | No | No | | | |
| Employee Agreements | Donohoe, Brian (Termed) | 8417 San Fernando Way | | | Dallas | TX | 75218 | Employee Agreements-Termed / with Pay-outs | 0 : Termed | No | No | | | |

EXHIBIT 1
Page 75 of 90

| TYPE | Name | Address 1 | Address 2 | Address 3 | City | State | Zip | Description | (days) Term Remaining | Gov Contract No | Co Debtor | St. Date | End Date | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Agreements | Sauers, Victor (Termed) | 2704 Culber Cliff Ln | | | Cedar Park | TX | 7861 3 | Employee Agreements- Termed / with Pay-outs | 0 Termed | : No | No | | | |
| UnEx Lease: TX | GAP VII IND-A WALNUT, LP. | PO Box 2402 | | | Sherma n | TX | 7509 1-2402 | Unexpired Leases in Austin: HQ Rent | 773 | No | No | 5/4/2 012 | 4/30/ 2018 | |
| UnEx Lease: TX | Regus/China Rent | 993 West Nanjing Road | | | Shangh ai 200040 | China | | Unexpired Leases in Austin / China office rent | -21 | No | No | 2/26/ 2015 | 2/26/ 2016 | no auto renewal |
| UnEx Lease: TX | Public Storage | 10001 North IH 35 | | | Austin | TX | 7875 3 | Unexpired Leases in Austin: Storage Unit | 135 | No | No | 2/12/ 2016 | 7/31/ 2016 | |
| UnEx Lease: TX | CIT Technology Fin Serv, Inc. | 21146 Network Place | | | Chicago | IL | 6067 3-1211 | Unexpired Leases in Austin / Copiers | 13 | No | No | 4/12/ 2012 | 3/31/ 2016 | 30 day notice |
| UnEx Lease: TX | Dell (Tablets). 1 | One Dell Way | | | Round Rock | TX | 7868 2 | Unexpired Leases in Austin / IT | 745 | No | No | 4/2/2 014 | 4/2/2 018 | |
| UnEx Lease: TX | Dell (Tablets). 2 | One Dell Way | | | Round Rock | TX | 7868 2 | Unexpired Leases in Austin / IT | 745 | No | No | 4/2/2 014 | 4/2/2 018 | |
| UnEx Lease: TX | Air Craft, Inc | 1916 Picadilly Drive | | | Round Rock | TX | 7866 4 | Unexpired Leases in Austin / HVAC Maint | -17 | No | No | 5/8/2 012 | 3/1/2 016 | renews annual. Cancelled on notice |
| UnEx Lease: TX | Dahill | 8303 N. Mopac | Bldg 1, Suite 300 | | Austin | TX | 7875 9 | Unexpired Leases in Austin: Copier Lease | 72 | No | No | 4/25/ 2012 | 5/29/ 2016 | 90 |
| UnEx Lease: TX | Shred-It USA LLC | PO BOX 101007 | | | Pasaden a | CA | 9118 9-1007 | Unexpired Leases in Austin / Paper & Doc Mgmt | 239 | No | No | 11/1 2/20 10 | 11/1 2/20 16 | Auto renewal at 3 yrs. 60 day notice |
| UnEx Lease: TX | Stratus Building Solutions, Inc. | 7719 Wood Hollow Dr. | Suite #156 | | Austin | TX | 7873 1 | Unexpired Leases in Austin / Cleaning | 43 | No | No | 8/8/2 014 | 4/30/ 2016 | renews annual/60 day notice |

| TYPE | Name | Address 1 | Address 2 | Address 3 | City | State | Zip | Description | (days) Term Remaining | Gov Contract No | Co Debtor | St. Date | End Date | Notes |
|------|------|-----------|-----------|-----------|------|-------|-----|-------------|----------------------|-----------------|-----------|----------|----------|-------|
| UnEx Lease: TX | Cintas Corporation-09736 | PO Box 650838 | | | Dallas | TX | 75265-0838 | Unexpired Leases in Austin / Supplies | -18 | No | No | 8/23/2013 | 2/29/2016 | Cancelled. Demand letter |
| UnEx Lease: TX | Dell: LOC | | | | | | | Unexpired Leases in Austin / Financing | -42447 | No | No | | | |
| UnEx Lease: CA | Vanni Properties, Inc. (Fratelli) | C/O Vanni Properties Inc. | 8080 Santa Teresa Blvd. | | Gilroy | CA | 95020 | Unexpired Leases in Morgan Hill : Rent | 1688 | No | No | 5/31/2016 | 10/31/2020 | |
| UnEx Lease: CA | NEC-phones | 250 Pehle Avenue | Suite 704 | | Saddle Brook | NJ | 07663-5806 | Unexpired Leases in Morgan Hill: Phone Lease | 229 | No | No | 11/2/2015 | 11/2/2016 | |
| UnEx Lease: CA | Frito-Janitorial | 17485 Montera Road | Suite #200 | | Morgan Hill | CA | 95037 | Unexpired Leases in Morgan Hill / Custodial Serv. | 348 | No | No | 3/1/2015 | 3/1/2017 | renews annually |
| UnEx Lease: CA | Delta Alarm, Inc. (MH#120) | 323 Piercy Road | | | San Jose | CA | 95138 | Unexpired Leases in Morgan Hill / Security monitoring | 13 | No | No | 7/21/2014 | 3/31/2016 | 30 day notice |
| UnEx Lease: CA | South Valley Internet (Garlic) | PO Box 1246 | | | San Martin | CA | 95046-1246 | Unexpired Leases in Morgan Hill/ interent Service | 13 | No | No | 9/12/2014 | 3/31/2016 | 30 day notice |
| UnEx Lease: TX | Richard Hunter | 1331 CR 245 | | | Georgetown | TX | 78633 | Unexpired Leases in Austin / Consulting | 20 | No | No | 1/8/2016 | 4/7/2016 | mutually renewable for 90 days. Signed 3/2/16 |

AUS-6319580-1

EXHIBIT 1
Page 77 of 90

## Schedule 4.8(b)

## Registered Intellectual Property

## Patent List

| Reference # | Type | Title | Serial # | Filed Date | Patent # | Issue Date | Country | Status | Next Due Date |
|---|---|---|---|---|---|---|---|---|---|
| 527825-023 | Licensed | ELECTRIC MACHINES AND METHODS OF MAKING SAME | 14/376,496 | 08/04/2014 | | | UNITED STATES | PUBLISHED | 11/04/2016 STATUS CHECK |
| 527825-024 | Licensed | ELECTRIC MACHINES INCLUDING STATOR MODULES | 13102196.3 | 09/07/2010 | | | HONG KONG | PUBLISHED | 09/07/2018 ANNUITY DUE |
| 527825-029 | Licensed | ARBITRARY PHASE RELATIONSHIP FOR ELECTRICAL CONNECTIONS IN N-PHASE ELECTRIC MACHINES | 13102195.4 | 09/07/2010 | | | HONG KONG | PUBLISHED | 09/07/2018 ANNUITY DUE |
| 527825-046 | Licensed | HIGH FREQUENCY MOTOR OR GENERATOR | 200910138466.7 | 05/18/2009 | ZL 2009101384 66.7 | | CHINA | ISSUED | 12/01/2016 ANNUITY DUE 1/29/17 |
| 527825-047 | Licensed | HIGH FREQUENCY MOTOR OR GENERATOR | 10-2004-7011905 | 01/29/2003 | 10-1002352 | | SOUTH KOREA | ISSUED | 12/13/2016 ANNUITY DUE |
| 527825-051 | Owned | SCOOTER | A00200903514 | 11/06/2009 | ID 0 027 541 - D | 02/08/2012 | INDONESIA | ISSUED | |
| 527825-053 | Licensed | HIGH FREQUENCY MOTOR OR GENERATOR | 10104357.7 | 05/18/2009 | HK1136699 | 09/07/2012 | HONG KONG | ISSUED | 12/01/2016 ANNUITY DUE 1/29/17 |
| 527825-054 | Owned | SCOOTER | 09-01199-0101 | 11/06/2009 | MY 09-01199-0101 | 07/19/2010 | MALAYSIA | ISSUED | 05/06/2019 ANNUITY DUE |
| 527825-060 | Licensed | HIGH FREQUENCY MOTOR OR GENERATOR | 03735082.4 | 01/29/2003 | | | EUROPEAN PATENT CONVENT | PUBLISHED | 12/01/2016 ANNUITY DUE 1/29/17 |
| 527825-061 | Licensed | HIGH FREQUENCY MOTOR OR GENERATOR | 2003-565012 | 01/29/2003 | 4708707 | | JAPAN | ISSUED | 03/25/2017 ANNUITY DUE |
| 527825-064 | Licensed (not used) | BUS BAR MODULE FOR AN ELECTRIC MACHINE | 13102194.5 | 09/07/2013 | HK1175037 | 10/16/2015 | HONG KONG | ISSUED | 10/16/2018 WORKING |
| 527825-066 | Owned | VEHICLE COMMUNICATIONS, POWER MANAGEMENT, AND SEATING SYSTEMS--KENGURU | 14/211,898 | 03/14/2014 | | | UNITED STATES | PUBLISHED | 10/23/2016 RESPONSE TO OA |
| 527825-068 | Licensed | HIGH FREQUENCY ELECTRIC MOTOR OR GENERATOR INCLUDING MAGNETIC CORES FORMED FROM THIN | 10/060,645 | 01/30/2002 | 6,879,080 | 04/12/2005 | UNITED STATES | ISSUED | |

AUS-6319580-1

EXHIBIT 1
Page 78 of 90

| Reference # | Type | Title | Serial # | Filed Date | Patent # | Issue Date | Country | Status | Next Due Date |
|---|---|---|---|---|---|---|---|---|---|
| | | FILM SOFT MAGNETIC MATERIAL | | | | | | | |
| 527825-069 | Licensed | HIGH FREQUENCY ELECTRIC MOTOR OR GENERATOR INCLUDING MAGNETIC CORES FORMED FROM THIN FILM SOFT MAGNETIC MATERIAL | 10/956,900 | 09/30/2004 | 7,030,534 | 04/18/2006 | UNITED STATES | ISSUED | 10/18/2017 3RD MAINT FEE DUE |
| 527825-070 | Licensed | HIGH FREQUENCY ELECTRIC MOTOR OR GENERATOR | 11/228,747 | 09/16/2005 | 7,358,639 | 04/15/2008 | UNITED STATES | ISSUED | 10/15/2019 3RD MAINT FEE DUE |
| 527825-071 | Licensed | HIGH FREQUENCY ELECTRIC MOTOR OR GENERATOR INCLUDING MAGNETIC CORES FORMED FROM THIN FILM SOFT MAGNETIC MATERIAL | 10/060,732 | 01/30/2002 | 6,603,237 | 08/05/2003 | UNITED STATES | ISSUED | |
| 527825-073 | Owned | WHEEL DRIVE HUB | 29/336,634 | 05/06/2009 | D616,350 | 05/25/2010 | UNITED STATES | ISSUED | |
| 527825-076 | Owned | SCOOTER | 29/336,632 | 05/06/2009 | D616,334 | 05/25/2010 | UNITED STATES | ISSUED | |

## KLD Energy Nano-Grid Systems, Inc – Patent List

| Reference # | Type | Title | Serial # | Filed Date | Patent # | Issue Date | Country | Status | Next Due Date |
|---|---|---|---|---|---|---|---|---|---|
| 527825-83 | Subsidiary—not Owned by KLD | INTRA-STROKE CYCLE TIMING FOR PUMP JACK FLUID PUMPING--NANOGRID | 15/191,042 | 06/23/2016 | | | UNITED STATES | PENDING | 09/23/2016 INVENTORS OATH |
| 527825-84 | Subsidiary – not | DETECTION AND MITIGATION OF DETRIMENTAL OPERATING CONDITIONS DURING PUMPJACK PUMPING--NANOGRID | 15/191,072 | 06/23/2016 | | | UNITED STATES | PENDING | 10/29/2016 INVENTORS OATH |
| 527825-85 | Subsidiary | ELECTRIC MOTOR CONTROL FOR PUMPJACK PUMPING NANO-GRID | 15/191,136 | 06/23/2016 | | | UNITED STATES | PENDING | 10/29/2016 INVENTORS OATH |

## KLD – Trademark List

| Reference # | Mark | Application # | File Date | Registration # | Registration Date | Country | Status |
|---|---|---|---|---|---|---|---|
| 527825-36 | KENGURU | IR1167609 | 06/17/2013 | | | AUSTRALIA | PENDING |
| 527825-49 | KENGURU | IR1167609 | 06/17/2013 | | | CHINA | PENDING |
| 527825-57 | KENGURU | IR1167609 | 06/17/2013 | | | EUROPEAN UNION (EUTM & RCD) | PENDING |
| 527825-41 | KENGURU | IR1167609 | 06/17/2013 | | | ISRAEL | PENDING |
| 527825-50 | KENGURU | IR1167609 | 06/17/2013 | | | JAPAN | PENDING |
| 527825-31 | KENGURU | IR1167609 | 06/17/2013 | | | LIECHTENSTEIN | PENDING |
| 527825-43 | KENGURU | IR1167609 | 06/17/2013 | | | MEXICO | PENDING |
| 527825-42 | KENGURU | IR1167609 | 06/17/2013 | | | MONACO | PENDING |
| 527825-35 | KENGURU | IR1167609 | 06/17/2013 | | | NEW ZEALAND | PENDING |
| 527825-44 | KENGURU | IR1167609 | 06/17/2013 | | | RUSSIA | PENDING |
| 527825-34 | KENGURU | IR1167609 | 06/17/2013 | | | SOUTH KOREA | PENDING |
| 527825-78 | KENGURU | 85/319,144 | 05/12/2011 | 4,074,089 | 12/20/2011 | UNITED STATES | REGISTERED |
| 527825-45 | KENGURU | IR1167609 | | IR1167609 | 06/17/2013 | WIPO | REGISTERED |
| 527825-65 | KLD | 13483767 | 11/05/2013 | | | CHINA | PENDING |
| 527825-52 | KLD | 12272712 | 10/31/2013 | 012272712 | 07/13/2014 | EUROPEAN UNION (EUTM & RCD) | REGISTERED |
| 527825-62 | KLD | 2013015157 | 10/31/2013 | 2013015157 | 03/05/2015 | MALAYSIA | REGISTERED |
| 527825-77 | ONEDRIVE | 86/180,209 | 01/30/2014 | | | UNITED STATES | ABANDONED due to settlement with UnoDrive |

## KLD – Website List

| |
|---|
| www.kenguru.com |
| www.kldenergy.com |
| www.eliteelectricvehicles.com |

EXHIBIT 1
Page 80 of 90

**Schedule 4.8(e)**

**Material Contracts Related to Acquired Intellectual Property**

Amended and Restated License Agreement, dated January 4, 2010, by and among Green Ray
Technologies  LLC, Ramon A. Caamano and KLD Energy Technologies, Inc, as amended by: (i)
the Amendment dated October 1, 2010, (ii) the Second Amendment dated August 11, 2011 (iii)
the Second Amendment dated November 30, 2011, (iv) the Third Amendment dated May 31,
2012, (v) the Fourth Amendment dated June 30, 2012, (vi) the Fifth Amendment dated July 31,
2012, (vii) the Sixth Amendment dated October 31, 2012 and (viii) the Seventh Amendment
dated February 26, 2016.

Agreement and Plan of Merger, by and among KLD Energy Technologies, Inc., Kenguru, Inc.,
Kenguru Acquisition Corp., Istvan Kissaroslaki and Stacy Zoern, as the principal stockholders,
and Istvan Kissaroslaki, as the stockholder representative, dated May 15, 2015.

**EXHIBIT 1**
**Page 81 of 90**

**Schedule 4.9(a)**

**Lease Agreements to KLD**

| Type | Name | Location | Mo. Expense | Annual Cost |
|---|---|---|---|---|
| Unexpired Lease | Lease Agreement for Suites 100A, 100 and 120 at 15750 Vineyard Boulevard, Morgan  Hill, California, by and between Fratelli Investments LLC, as Landlord, and KLD Energy Technologies, Inc., as Tenant, dated June 25, 2010, as amended by: (i) the First Amendment, dated December 31, 2013, and (ii) the Second Amendment, dated May 26, 2015. | 15750 Vineyard Boulevard, Morgan Hill, CA 95037 (Suites 100A, 100, 120) | $21,741 | $260,892 |
| Unexpired Lease, New Facility Sub-Lease | Sublease Agreement for 8910 Research Boulevard, Suite B-1, Austin, TX, by and between Communications Plus, Inc., as Sublessor, and KLD Energy Technologies, Inc., as Sublessee, dated March 21, 2016, as amended on September 30, 2016 . | 8910 Research Blvd., Austin, TX 78758 | $2,000 | $24,000 |

**EXHIBIT 1**
**Page 82 of 90**

**Schedule 4.9(b)**

**Lease Agreements by KLD**

Schedule 4.9(a) is incorporated herein by reference.

**EXHIBIT 1**
**Page 83 of 90**

**Schedule 4.11**

**Personal Property Exceptions**

None.

**EXHIBIT 1**
**Page 84 of 90**

## Schedule 4.13

### Undisclosed Liabilities

### KLD Energy Technologies, Inc.
### A/P Aging Summary Pre-Petition
### As of October 28, 2016

| | Current | 1 – 30 | 31 – 60 | 61 – 90 | > 90 | Total |
|---|---|---|---|---|---|---|
| A & J Machining .................... | 0.00 | 0.00 | 0.00 | 0.00 | 19,626.00 | 19,626.00 |
| Acclaim Screen Printing ......... | 0.00 | 0.00 | 0.00 | 0.00 | 268.46 | 268.46 |
| Advanced Test Equipment Rentals ............................... | 0.00 | 0.00 | 0.00 | 0.00 | 972.92 | 972.92 |
| Air Craft, Inc ........................ | 0.00 | 0.00 | 0.00 | 0.00 | 2,937.32 | 2,937.32 |
| Allied Electronics, Inc ............ | 0.00 | 0.00 | 0.00 | 0.00 | 1,332.30 | 1,332.30 |
| Amphenol (ATZ) ................... | 0.00 | 0.00 | 0.00 | 0.00 | 23,229.39 | 23,229.39 |
| AT&T - xx7001 (Fbr/Offc Phone) ............................... | 0.00 | 0.00 | 0.00 | 0.00 | 1,745.21 | 1,745.21 |
| Aus-Tex Printing ................... | 0.00 | 0.00 | 0.00 | 0.00 | 1,606.88 | 1,606.88 |
| Austin Professional Couriers ............................. | 0.00 | 0.00 | 0.00 | 0.00 | 28.75 | 28.75 |
| Austin Reliability Labs ........... | 0.00 | 0.00 | 0.00 | 0.00 | -2,850.00 | -2,850.00 |
| Benefit Systems, Inc. ............. | 0.00 | 0.00 | 0.00 | 0.00 | 530.00 | 530.00 |
| Blue River Global .................. | 0.00 | 0.00 | 0.00 | 0.00 | 2,850.00 | 2,850.00 |
| Brett Morris .......................... | 0.00 | 0.00 | 0.00 | 0.00 | 1,071.45 | 1,071.45 |
| Brian Donohoe ...................... | 0.00 | 0.00 | 0.00 | 0.00 | 10,792.12 | 10,792.12 |
| Ceva ..................................... | 0.00 | 0.00 | 0.00 | 0.00 | 293.06 | 293.06 |
| CIT Technology Fin Serv, Inc. ..................................... | 0.00 | 0.00 | 0.00 | 0.00 | 13,838.92 | 13,838.92 |
| City of Austin ....................... | 0.00 | 0.00 | 0.00 | 0.00 | 7,959.58 | 7,959.58 |
| City of Morgan Hill FARP .................................. | 0.00 | 0.00 | 0.00 | 0.00 | 56.00 | 56.00 |
| Corporate Creations ............... | 0.00 | 0.00 | 0.00 | 0.00 | 444.50 | 444.50 |
| Corporate Unicorn Limited ............................... | 0.00 | 0.00 | 0.00 | 0.00 | 15,404.81 | 15,404.81 |
| Dahill .................................... | 0.00 | 0.00 | 0.00 | 0.00 | 489.19 | 489.19 |
| Daniel Smith .......................... | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 |
| Daniel Valle ........................... | 0.00 | 0.00 | 0.00 | 0.00 | 47.58 | 47.58 |
| Dell Financial Svcs (CAPLS) ........................... | 0.00 | 0.00 | 0.00 | 0.00 | 19,245.14 | 19,245.14 |
| DELL Financial Svcs (LOC) – 244 ...................... | 0.00 | 0.00 | 0.00 | 0.00 | 7,496.00 | 7,496.00 |
| Dell Marketing L.P. ............... | 0.00 | 0.00 | 0.00 | 0.00 | 2,529.50 | 2,529.50 |
| Delta Alarm, Inc. (MH#120) ......................... | 0.00 | 0.00 | 0.00 | 0.00 | 145.97 | 155.97 |
| Drake Industries Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 2,028.08 | 2,028.08 |
| Drisdale Sandlin PI-LC ........... | 0.00 | 0.00 | 0.00 | 0.00 | 168,668.75 | 168,668.75 |
| Electric Drive bVba ............... | 0.00 | 0.00 | 0.00 | 0.00 | 10,906.10 | 10,906.10 |
| Elias Haddad ......................... | 0.00 | 0.00 | 0.00 | 0.00 | 6,298.43 | 6,298.43 |
| Enverra Partners LLC ............. | 0.00 | 0.00 | 0.00 | 0.00 | 10,930.05 | 10,930.05 |
| Epic Resins ........................... | 0.00 | 0.00 | 0.00 | 0.00 | 543.84 | 543.84 |
| FedEx .................................. | 0.00 | 0.00 | 0.00 | 0.00 | 3,861.53 | 3,861.53 |
| FedEx Freight ........................ | 0.00 | 0.00 | 0.00 | 0.00 | 2,731.06 | 2,731.06 |
| FedEx Trade Networks ........... | 0.00 | 0.00 | 0.00 | 0.00 | 1,846.38 | 1,846.38 |
| Financial Valuations Services LC ........................ | 0.00 | 0.00 | 0.00 | 0.00 | 5,032.50 | 5,032.50 |
| Firato Service Co., Inc ........... | 0.00 | 0.00 | 0.00 | 0.00 | 3,390.00 | 3,390.00 |
| Fish & Richardson P,C. ........... | 0.00 | 0.00 | 0.00 | 0.00 | 204,488.71 | 204,488.71 |
| Fourlane, Inc, (AQB) .............. | 0.00 | 0.00 | 0.00 | 0.00 | 468.75 | 468.75 |
| G&L Devlin Ltd. ................... | 0.00 | 0.00 | 0.00 | 0.00 | 41,099.10 | 41,099.10 |

**EXHIBIT 1**
**Page 85 of 90**

## Schedule 4.2 - continued

| | Current | 1 – 30 | 31 – 60 | 61 – 90 | > 90 | Total |
|---|---|---|---|---|---|---|
| GCS Technotogies, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 6,221.72 | 6,221.72 |
| Grainger | 0.00 | 0.00 | 0.00 | 0.00 | 937.96 | 937.96 |
| Gunnercooke llp | 0.00 | 0.00 | 0.00 | 0.00 | 3,750.00 | 3,750.00 |
| HDZ – China | 0.00 | 0.00 | 0.00 | 0.00 | 12.00 | 12.00 |
| Healing Tao USA | 0.00 | 0.00 | 0.00 | 0.00 | 596.00 | 596.00 |
| Hill Country Engineering, PLLC | 0.00 | 0.00 | 0.00 | 0.00 | 1,237.50 | 1,237.50 |
| HiMARC | 0.00 | 0.00 | 0.00 | 0.00 | 3,600.00 | 3,600.00 |
| IBM Corporation | 0.00 | 0.00 | 0.00 | 0.00 | 1,121.22 | 1,121.22 |
| icc Compliance Center | 0.00 | 0.00 | 0.00 | 0.00 | 137.79 | 137.79 |
| Kaspar Manufacturing | 0.00 | 0.00 | 0.00 | 0.00 | 668.19 | 668.19 |
| Keage Concepts | 0.00 | 0.00 | 0.00 | 0.00 | 1,600.00 | 1,600.00 |
| KLD Electronics | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Knight Janitorial Services, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 3,839.77 | 3,839.77 |
| Kuehne + Nagel, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 3,207.35 | 3,207.35 |
| Mach-1 Global | 0.00 | 0.00 | 0.00 | 0.00 | 14,191.95 | 14,191.95 |
| McMaster-Carr | 0.00 | 0.00 | 0.00 | 0.00 | 3,601.31 | 3,601.31 |
| Michael Gagliardi | 0.00 | 0.00 | 0.00 | 0.00 | 160.00 | 160.00 |
| Momentum Consulting Inc | 0.00 | 0.00 | 0.00 | 0.00 | 30,200.00 | 30,200.00 |
| Morgan Hill Plastics, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 1,120.50 | 1,120.50 |
| Mouser Electronics | 0.00 | 0.00 | 0.00 | 0.00 | 5,662.62 | 5,662.62 |
| MWR Legal | 0.00 | 0.00 | 0.00 | 0.00 | 2,973.86 | 2,973.86 |
| NEC Financial Services, LLC | 0.00 | 0.00 | 0.00 | 0.00 | 482.78 | 482.78 |
| Office Team, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 12,885.12 | 12,885.12 |
| P3 North America, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 190,806.80 | 190,806.80 |
| Pacific Gas & Electric Co. | 0.00 | 0.00 | 0.00 | 0.00 | 2,625.51 | 2,625.51 |
| Par-Tech, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 3,181.20 | 3,181.20 |
| PeopleFund | 0.00 | 0.00 | 0.00 | 0.00 | 39,000.00 | 39,000.00 |
| Perennial Design LLC | 0.00 | 0.00 | 0.00 | 0.00 | 743.16 | 743.16 |
| Perry Tools and Research | 0.00 | 0.00 | 0.00 | 0.00 | 1,152.00 | 1,152.00 |
| Pirkey Barber PLLC | 0.00 | 0.00 | 0.00 | 0.00 | 752.00 | 752.00 |
| Praxair Distribution Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 298.29 | 298.29 |
| Pricewaterhouse Coopers, LLP | 0.00 | 0.00 | 0.00 | 0.00 | 89,150.00 | 89,150.00 |
| Professional Testing (EMI) Inc, | 0.00 | 0.00 | 0.00 | 0.00 | 1,160.00 | 1,160.00 |
| Progressive Waste Solutions of TX, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 535.74 | 535.74 |
| Purvis Industries | 0.00 | 0.00 | 0.00 | 0.00 | 127.63 | 127.63 |
| QJ Motor Company | 0.00 | 0.00 | 0.00 | 0.00 | 25,656.50 | 25,656.50 |
| QT Aflagnetc Solutions | 0.00 | 0.00 | 0.00 | 0.00 | 687.84 | 687.84 |
| Raintree Alliance | 0.00 | 0.00 | 0.00 | 0.00 | 703.15 | 703.15 |
| Ranastad, inc | 0.00 | 0.00 | 0.00 | 0.00 | 4,915.70 | 4,915.70 |
| Recology South Valley, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 1,245.08 | 1,245.08 |
| Recus – China | 0.00 | 0.00 | 0.00 | 0.00 | 2,870.52 | 2,870.52 |
| Richard L. Hunter, Jr. | 0.00 | 0.00 | 0.00 | 0.00 | 86,250.00 | 86,250.00 |
| Rod Macdonald | 0.00 | 0.00 | 0.00 | 0.00 | 17,500.00 | 17,500.00 |
| Roth Sta'7,-,0 Companies, L.P. | 0.00 | 0.00 | 0.00 | 0.00 | 1,274.24 | 1,274.24 |
| Santa Clara County Tax Collector | 0.00 | 0.00 | 5,316.58 | 208.49 | 0.00 | 5,525.07 |
| Shiny Precision Machining Limited | 0.00 | 0.00 | 0.00 | 0.00 | 2,283.50 | 2,283.50 |
| Shred-It USA LLC | 0.00 | 0.00 | 0.00 | 0.00 | 59.30 | 59.30 |
| Stratus Building Solutions, Inc. | 0.00 | 0.00 | 0.00 | 0.00 | 8,928.34 | 8,928.34 |

EXHIBIT 1
Page 86 of 90

## Schedule 4.2 - continued

| | Current | 1 – 30 | 31 – 60 | 61 – 90 | > 90 | Total |
|---|---|---|---|---|---|---|
| SuperFlow Technologies Group .................................. | 0.00 | 0.00 | 0.00 | 0.00 | 255.00 | 255.00 |
| Survival Systems, Inc. ............. | 0.00 | 0.00 | 0.00 | 0.00 | 32,265.00 | 32,265.00 |
| T. R. Reid ............................... | 0.00 | 0.00 | 0.00 | 0.00 | 11,718.85 | 11,718.85 |
| Teamings (BridgeOne), LLC................................. | 0.00 | 0.00 | 0.00 | 0.00 | 371.55 | 371.55 |
| Time Warner Cable xxx5278 .............................. | 0.00 | 0.00 | 0.00 | 0.00 | 146.91 | 146.91 |
| Timm Tondorf ......................... | 0.00 | 0.00 | 0.00 | 0.00 | 34,000.00 | 34,000.00 |
| Travis County Tax Office ......... | 0.00 | 0.00 | 0.00 | 0.00 | 34,875.39 | 34,875.39 |
| Tricor Services Limited .......... | 0.00 | 0.00 | 0.00 | 0.00 | 3,582.99 | 3,582.99 |
| vcfo, Inc.................................. | 0.00 | 0.00 | 0.00 | 0.00 | 2,177.50 | 2,177.50 |
| Whitney Fenzel ....................... | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Zone24X7 ............................... | 0.00 | 0.00 | 0.00 | 0.00 | 46,357.02 | 46,357.02 |
| ZS Capital GmbH ................... | 0.00 | 0.00 | 0.00 | 0.00 | 5,430.10 | 5,430.10 |
| TOTAL.............................. | 0.00 | 0.00 | 5,316.58 | 208.49 | 1,345,788.78 | 1,351,313.85 |

## A/P Aging Summary Post Petition
## As of October 28, 2016

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| ADP 401K Service – DIP ......... | 321.05 | 0.00 | 0.00 | 0.00 | 0.00 | 321.05 |
| Advanced Test Equipment Rentals – DIP...................... | 1,268.75 | 0.00 | 0.00 | 0.00 | 0.00 | 1,268.75 |
| Benefit Systems, Inc. – DIP...... | 95.00 | 0.00 | 0.00 | 0.00 | 0.00 | 95.00 |
| Christian Okonsky – DIP.......... | 393.20 | 0.00 | 0.00 | 0.00 | 0.00 | 393.20 |
| CIT Technology Fin Serv, Inc. – DIP.............................. | 0.00 | 0.00 | 0.00 | 0.00 | 2,503.80 | 2,503.80 |
| City of Austin – DIP ................ | 574.23 | 0.00 | 0.00 | 0.00 | 0.00 | 574.23 |
| City of Morgan Hill #100/110 – DIP ................... | 81.17 | 0.00 | 0.00 | 0.00 | 0.00 | 81.17 |
| City of Morgan Hill #120 – DIP...................................... | 72.83 | 0.00 | 0.00 | 0.00 | 0.00 | 72.83 |
| Husch Blackwell – DIP ............ | 20,181.00 | 16,738.76 | 43,576.70 | 0.00 | 0.00 | 80,496.46 |
| Ray Caamano – DIP ................. | 998.67 | 0.00 | 0.00 | 0.00 | 0.00 | 998.67 |
| Terry Chase – DIP ................... | 8,250.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,250.00 |
| TOTAL................................ | 32,235.90 | 16,738.76 | 43,576.70 | 0.00 | 2,503.80 | 95,055.16 |

KLD did not record 7% cumulative dividends on the preferred shares issued beginning in 2008.

## KLD NGS – Liabilities

| Debts and employees | |
|---|---|
| Wages | $    46,731 |
| Commissions | $     9,299 |
| Vendors | $   152,935 |

**Schedule 4.2 - continued**

| | | |
|---|---|---|
| Loans | $ | 10,000 |
| Customer deposits | $ | 117,500 |
| | $ | 336,465 |

**EXHIBIT 1**
**Page 88 of 90**

**Schedule 4.14**

**Subsidiaries and Ownership Interests in Other Persons**

| Company | KLD ownership | Description |
|---|---|---|
| KLD Electronics Texas, Inc. | 100% | Sub |
| KLD Energy Technologies Malaysia SDN BHD | 100% | Sub |
| China KLD Energy Technologies Limited | 100% | HK Sub |
| KLD Energy Nano-Grid Systems, Inc. | 64% | Sub |

**Summary:**

KLD Electronics Texas, Inc. – An inactive subsidiary (Texas C-Corporation) and owned 100% by KLD.

KLD Energy Technologies Malaysia SDN BHD – A 100% KLD owned Malaysian subsidiary established strictly to support the Malaysian market in sales and service. Currently, the sub has been formed and is inactive, but is up to date with annual reporting requirements.

China KLD Energy Technologies Limited – A Hong Kong Company 100% KLD owned. Currently, the sub has been formed and is inactive, but is up to date with annual reporting requirements.

KLD Energy Nano-Grid Systems, Inc. – A majority-owned subsidiary (Texas C-Corporation) of KLD. The focus of KLD Energy NGS is the evolving and growing power management, energy storage market, and nano-grid markets. KLD Energy NGS will utilize existing KLD technology, leverage existing KLD sales channels, and incorporate leading energy storage technologies to capture significant market share to accelerate growth in company value.

KLD Energy Nano-Grid Systems, Inc. Capitalization Table

*On an as-if converted fully diluted basis at a $1.00 common stock price*

|  | Basic Capitalization | Fully-Diluted Capitalization | Basic Ownership | Fully-Diluted Ownership |
|---|---|---|---|---|
| **Common Shares** | | | | |
| KLD Energy Technologies, Inc. - Parent Co. .............. | 8,000,000 | 8,000,000 | 64.9% | 63.4% |
| Founding Investors ....................................................... | 3,000,000 | 3,000,000 | 24.3% | 23.8% |
| Stock Option Pool (485,036 issued) ............................. | — | 291,022 | 0.0% | 2.3% |
| Common Stock Warrants (1,120,800 issued)................ | — | — | 0.0% | 0.0% |
| **Total Common Stock**............................................. | **11,000,000** | **11,291,022** | | |
| Series A Preferred Stock.............................................. | 1,332,800 | 1,332,800 | 10.8% | 10.6% |
| **Total Preferred Stock**........................................... | **1,332,800** | **1,332,800** | | |
| **Total Capital Stock**.................................................... | **12,332,800** | **12,623,822** | **100%** | **100%** |

## Schedule 4.15(a)

### Benefit Plans

KLD's Health Benefits are administered through Kind Health and Arthur J. Gallagher & Co. and are provided by Blue Cross Blue Shield, Always Care, and Unum.

KLD's 401K plan is managed through ADP.

## Schedule 2.1(c)

## Assigned Contracts

| Counterparty | Contract | Address of Counterparty | | | | Description | Cure Amount |
|---|---|---|---|---|---|---|---|
| Dell Financial Services  L.L.C. | Master Lease Agreement (No. 6705710), dated April 2, 2014, by and between Dell Financial Services L.L.C. and KLD Energy Technologies, Inc.<br><br>Master Lease Agreement Schedule No. 01-6705710-500, effective as of May 1, 2014.<br><br>Master Lease Agreement Schedule No. 001-6705710-501, effective as of November 1, 2014. | One Dell Way | Round Rock | TX | 78682-0000 | Austin:  IT | $44,330.01 |
| Green Ray Technologies LLC | Amended and Restated License Agreement, dated January 4, 2010, by and among Green Ray Technologies  LLC, Ramon A. Caamano and KLD Energy Technologies, Inc, as amended by: (i) the Amendment dated October 1, 2010, (ii) the Second Amendment dated August 11, 2011 (iii) the Second Amendment dated November 30, 2011, (iv) the Third Amendment dated May 31, 2012, (v) the Fourth Amendment dated June 30, 2012, (vi) the Fifth Amendment dated July 31, 2012, (vii) the Sixth Amendment dated October 31, 2012 and (viii) the Seventh Amendment dated February 26, 2016. | 6450A Mt. Madonna Road | Gilroy | CA | 95020-0000 | License Agreement | $100,000.00 |
| Kenguru, Inc., Kenguru Acquisition Corp. and other related parties | Agreement and Plan of Merger, by and among KLD Energy Technologies, Inc., Kenguru, Inc., Kenguru Acquisition Corp., Istvan Kissaroslaki and Stacy Zoern, as the principal stockholders, and Istvan Kissaroslaki, as the stockholder representative, dated May 15, 2015. | C/O Stacy Zoern 2104 Monarch Drive | Austin | TX | 78748 | Merger Agreement | $0.00 |

| Counterparty | Contract | Address of Counterparty | | | | Description | Cure Amount |
|---|---|---|---|---|---|---|---|
| Fratelli Investments LLC | Lease Agreement for Suites 100A, 100 and 120 at 15750 Vineyard Boulevard, Morgan Hill, California, by and between Fratelli Investments LLC, as Landlord, and KLD Energy Technologies, Inc., as Tenant, dated June 25, 2010, as amended by: (i) the First Amendment, dated December 31, 2013, and (ii) the Second Amendment, dated May 26, 2015. | C/O Vanni Properties Inc. 8080 Santa Teresa Blvd. | Gilroy | CA | 95020-0000 | Morgan Hill : Rent | $0.00 |
| Communications Plus, Inc. | Sublease Agreement for 8910 Research Boulevard, Suite B-1, Austin, TX, by and between Communications Plus, Inc., as Sublessor, and KLD Energy Technologies, Inc., as Sublessee, dated March 21, 2016, as amended on September 30, 2016. | PO Box 2402 | Sherman | TX | 75091-2402 | Austin: HQ Rent | $0.00 |
| Kuehne & Nagel Inc. | N/A | 1001 Busse Road | Elk Grove Village | IL | 60007 | Storage | $1,356.00 |
| South Valley Internet (Garlic) | N/A | PO Box 1246 | San Martin | CA | 95046-1246 | Morgan Hill: internet Service | $0.00 |
| Squarespace | N/A | 225 Varick Street 12th floor | New York | NY | 10014 | Webhosting | $0.00 |
| Delta Alarm, Inc. (MH#120) | Security System Sales and Installation Agreement, dated September 23, 2010, by and between Delta Alarm Systems, Inc. and KLD Energy Technologies, Inc. | 323 Piercy Road | San Jose | CA | 95138-0000 | Morgan Hill: Security monitoring | $0.00 |
| GoDaddy | | Corporate Headquarters 14455 N. Hayden Rd., Ste. 226 | Scottsdale | AZ | 85260 | Webhosting | $0.00 |

**Schedule 2.1(d)**

**Assumed Leases**

| Type | Name | Location | Mo. Expense | Annual Cost |
|---|---|---|---|---|
| Unexpired Lease | Lease Agreement for Suites 100A, 100 and 120 at 15750 Vineyard Boulevard, Morgan Hill, California, by and between Fratelli Investments LLC, as Landlord, and KLD Energy Technologies, Inc., as Tenant, dated June 25, 2010, as amended by: (i) the First Amendment, dated December 31, 2013, and (ii) the Second Amendment, dated May 26, 2015. | 15750 Vineyard Boulevard, Morgan Hill, CA 95037 (Suites 100A, 100, 120) | $21,741 | $260,892 |
| Unexpired Lease, New Facility Sub-Lease | Sublease Agreement for 8910 Research Boulevard, Suite B-1, Austin, TX, by and between Communications Plus, Inc., as Sublessor, and KLD Energy Technologies, Inc., as Sublessee, dated March 21, 2016, as amended on September 30, 2016. | 8910 Research Blvd., Austin, TX 78758 | $2,000 | $24,000 |
| Unexpired IT Lease | Master Lease Agreement (No. 6705710), dated April 2, 2014, by and between Dell Financial Services L.L.C. and KLD Energy Technologies, Inc.  Master Lease Agreement Schedule No. 01-6705710-500, effective as of May 1, 2014.  Master Lease Agreement Schedule No. 001-6705710-501, effective as of November 1, 2014. | One Dell Way, Round Rock, TX 78682 | $2,674 | $32,088 |

**EXHIBIT 2**
**Page 3 of 3**